**Execution Copy**

**ENERGY MANAGEMENT AGREEMENT**

**between**

**EDF TRADING NORTH AMERICA, LLC**
**(as Energy Manager)**

**and**

**BOSQUE POWER COMPANY, LLC**
**(as Bosque)**

**Dated February 1, 2010**

## TABLE OF CONTENTS

**Page**

ARTICLE 1     DEFINITIONS ..............................................................................................1

      1.1     Rules of Interpretation...............................................................1

      1.2     Defined Terms...........................................................................1

ARTICLE 2     APPOINTMENT OF ENERGY MANAGER AND TERM ........................10

      2.1     Appointment...........................................................................10

      2.2     Term; Effective Date; Services Implementation Date. ......................10

      2.3     Commodity Transactions and Related Agreements ...........................10

      2.4     Relationship of Parties. ............................................................11

      2.5     Party Representatives ...............................................................12

      2.6     Adequate Personnel ................................................................12

ARTICLE 3     BOSQUE'S RIGHTS AND RESPONSIBILITIES; FINANCIAL PERFORMANCE .........................12

      3.1     Bosque Rights and Responsibilities .............................................12

      3.2     Third Party Sales .....................................................................13

      3.3     Financial Performance .............................................................13

ARTICLE 4     OBLIGATIONS OF ENERGY MANAGER ...........................................14

      4.1     Services Generally...................................................................14

      4.2     Limitation on Obligations.........................................................14

      4.3     NERC Compliance ...................................................................14

      4.4     Limitation on Authority of Energy Manager. .................................15

      4.5     Energy Manager Affiliates.........................................................15

ARTICLE 5     SERVICES ...................................................................................15

      5.1     Transition Services ..................................................................15

      5.2     Power Management Services ......................................................16

      5.3     Fuel Management Services.........................................................17

      5.4     Risk Management Services ........................................................18

      5.5     Cessation of Generation ...........................................................18

      5.6     Gross Margin..........................................................................19

      5.7     Reporting Requirements ...........................................................19

ARTICLE 6     FEES; SETTLEMENT .....................................................................19

      6.1     Monthly Management Fee ........................................................19

      6.2     Financial Settlement and Payment of Energy Management Payment...............19

**TABLE OF CONTENTS**
(continued)

**Page**

|  |  |  |  |
|---|---|---|---|
|  | 6.3 | Payment Netting | 20 |
| ARTICLE 7 |  | TRANSACTION PROCEDURES | 20 |
|  | 7.1 | Transaction Procedures | 20 |
|  | 7.2 | Long-Term Commodity Transactions | 21 |
|  | 7.3 | Short-Term Commodity Transactions | 21 |
|  | 7.4 | Day-Ahead Commodity Transactions | 21 |
|  | 7.5 | Other Transactions | 21 |
|  | 7.6 | Related Agreements. | 21 |
|  | 7.7 | Risk Management Services | 22 |
|  | 7.8 | Delegation | 22 |
| ARTICLE 8 |  | REPORTS, RECORDS, AUDITS AND EQR FILINGS | 22 |
|  | 8.1 | Reports | 22 |
|  | 8.2 | Books and Records | 24 |
|  | 8.3 | Audits | 24 |
|  | 8.4 | Meetings; Availability | 24 |
| ARTICLE 9 |  | FORCE MAJEURE | 24 |
|  | 9.1 | Procedure for Calling Force Majeure | 24 |
|  | 9.2 | Performance Suspended | 25 |
|  | 9.3 | End of Force Majeure Event | 25 |
| ARTICLE 10 |  | DEFAULT AND TERMINATION | 26 |
|  | 10.1 | Energy Manager Events of Default | 26 |
|  | 10.2 | Bosque Events of Default | 26 |
|  | 10.3 | Rights of Non-Defaulting Party | 27 |
|  | 10.4 | Bosque Termination Right | 27 |
|  | 10.5 | Termination Procedure | 27 |
|  | 10.6 | Successor Energy Manager. | 28 |
|  | 10.7 | Cooperation Following Termination | 28 |
| ARTICLE 11 |  | INDEMNIFICATION | 28 |
|  | 11.1 | By Energy Manager | 28 |
|  | 11.2 | By Bosque. | 29 |
|  | 11.3 | Concurrent Negligence | 29 |

-ii-

**TABLE OF CONTENTS**
(continued)

**Page**

| | | | |
|---|---|---|---|
| | 11.4 | Cooperation Regarding Claims | 29 |
| | 11.5 | Defense of Third-Party Claims | 29 |
| ARTICLE 12 | | LIMITATION OF LIABILITY | 30 |
| | 12.1 | General Limitations of Liability | 30 |
| | 12.2 | Limitation of Bosque's Liability | 31 |
| | 12.3 | Limitation of Energy Manager's Liability | 31 |
| ARTICLE 13 | | CONFIDENTIALITY | 32 |
| | 13.1 | Non-Disclosure | 32 |
| | 13.2 | Permitted Disclosure. | 32 |
| ARTICLE 14 | | REPRESENTATIONS AND WARRANTIES | 33 |
| | 14.1 | Energy Manager Representations and Warranties | 33 |
| | 14.2 | Bosque Representations and Warranties | 33 |
| ARTICLE 15 | | DISPUTE RESOLUTION | 34 |
| | 15.1 | Dispute Resolution | 34 |
| | 15.2 | Continued Performance | 35 |
| ARTICLE 16 | | MISCELLANEOUS | 35 |
| | 16.1 | Severability | 35 |
| | 16.2 | Entire Agreement | 35 |
| | 16.3 | Amendment | 35 |
| | 16.4 | Assignment | 35 |
| | 16.5 | Notices | 36 |
| | 16.6 | Additional Documents and Actions | 36 |
| | 16.7 | Waiver | 36 |
| | 16.8 | Captions | 36 |
| | 16.9 | Survival | 36 |
| | 16.10 | No Third Party Beneficiary | 37 |
| | 16.11 | Counterparts | 37 |
| | 16.12 | Governing Law | 37 |

**TABLE OF CONTENTS**
(continued)

**Page**

**EXHIBITS**

Exhibit A        1992 ISDA Master Agreement, Form of Schedule to the 1992 ISDA Master Agreement,
                together with related the ISDA Power, Gas and Credit Support Annexes.
Exhibit B        Operating and Dispatch Procedures
Exhibit C        Form of Report
Exhibit D        Form of Letter of Credit
Exhibit E        Variable O&M Costs

**ENERGY MANAGEMENT AGREEMENT**

This Energy Management Agreement (this "Agreement") is dated as of February 1, 2010 (the "Effective Date"), and is between EDF TRADING NORTH AMERICA, LLC a Texas limited liability company ("Energy Manager") and BOSQUE POWER COMPANY, LLC, a Delaware limited liability company ("Bosque"). Bosque and Energy Manager may be referred to each individually as a "Party" and collectively as the "Parties."

**PRELIMINARY STATEMENT**

Bosque owns the gas-fired electric generating facility located at 557 Bosque County Road 3610, Laguna Park, Bosque County, Texas (as the same may be expanded and otherwise modified from time to time, the "Facility"); and

Energy Manager is in the business of providing energy management services, including managing physical, financial and commercial transactions and logistics for power generators, load serving entities and large commercial and industrial energy consumers and scheduling energy and ancillary services from power generation facilities through the bilateral markets and the markets run by regional independent system operators of the electricity transmission grid; and

Bosque desires Energy Manager to provide certain energy management services, and Energy Manager desires to provide Bosque certain energy management services, in each case, in accordance with the terms of this Agreement.

The Parties therefore agree as follows:

**ARTICLE 1**
**DEFINITIONS**

1.1     Rules of Interpretation.  All references in this Agreement to any agreement or other document of any description shall be construed as of the particular time that such agreement or other document may then have been executed, amended, varied, supplemented or modified. References in the singular shall include references in the plural and vice versa.  References to a particular Article, Section, paragraph, subparagraph, or Exhibit shall, unless specified otherwise, be a reference to that Article, Section, paragraph, subparagraph or Exhibit in or to this Agreement.  The words "include" and "including" are to be construed to include the phrase "not limited to".  Any reference in this Agreement to any Person includes its permitted successors and assigns or to any Person succeeding to its functions. All Exhibits are fully incorporated and part of this Agreement.  To the extent of any conflict between the provisions of the body of this Agreement and the provisions of any Implementation Agreement, the provisions of the body of this Agreement shall apply; provided, however, that (i) silence in the provisions of the body of this Agreement as to a matter covered in the Implementation Agreement shall not constitute a conflict, and (ii) silence in the provisions of the body of this Agreement as to a matter covered in the Implementation Agreement shall mean that the provisions of the Implementation Agreement shall control the matter in question.

1.2     Defined Terms.  As used in this Agreement, the following capitalized terms have the meanings set forth below:

"Affected Party" has the meaning set forth in Section 9.1.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly, (i) controls or owns the first Person, (ii) is controlled or owned by the first Person or (iii) is under common control or ownership with the first Person, where "own" (including, with correlative meanings, the terms "owned by" and "under common ownership with") means ownership of fifty percent (50%) or more of the equity interests or rights to distributions on account of equity of the Person, and "control" (including, with correlative meanings, the terms "controlled by" and "under common control with") means the power to direct or cause the direction of the management or policies of the Person, whether through the ownership of voting securities, by contract or otherwise. Notwithstanding the foregoing, with respect to Energy Manager, Affiliate shall not be construed to include EDF Development, Inc or any of its subsidiary companies or enXco, Inc. or any of its subsidiary companies.

"Agreement" has the meaning set forth in the first paragraph of this Agreement.

"Ancillary Services" means:  (a) the following Ancillary Services as defined in Sections 2 and 6 of the ERCOT Protocols: (i) Balancing Energy; (ii) Regulation Service; (iii) Responsive Reserve Service; (iv) Non-Spinning Reserve Service; (v) Replacement Reserves Service; and (vi) Black Start Service, and (b) any similar services or products available from generation resources as specified in the ERCOT Protocols.

"Applicable Law" means any federal, state or local laws (including common law and criminal law), codes, statutes, directives, ordinances, by-laws, regulations, rules, judgments, consent orders and agreements with Governmental Authorities, proclamations or delegated or subordinated legislation of any Governmental Authority that are applicable to this Agreement, the Parties hereto or the Facility.

"Back-to-Back Contract" means a transaction or series of transactions between Energy Manager and a Third Party that correspond(s) to a Commodity Transaction or Other Transaction between Energy Manager and Bosque pursuant to the terms of this Agreement.

"Back-to-Back Third Party Sale" has the meaning set forth in Section 3.2.

"Bilateral Third Party Sale" has the meaning set forth in Section 3.2.

"Billing Period" means a Month; provided that (a) the initial Billing Period shall run from the Services Implementation Date through the end of the Month in which the Services Implementation Date occurs, and (b) in the event that this Agreement terminates or is terminated on a day other than the last day of a Month, the last Billing Period shall run from the first day of the Month in which such termination occurs through the date of such termination.

"Bosque" has the meaning set forth in the first paragraph of this Agreement and shall include Bosque's successors and permitted assigns.

"Bosque Change of Control" means a transfer in a single transaction or series of related transactions that results in BosPower Partners LLC owning, directly or indirectly, less than or equal to 50% of the issued and outstanding equity interests of Bosque.

"Bosque Event of Default" has the meaning set forth in Section 10.2.

"Bosque Indemnified Party(ies)" means Bosque and its Affiliates, and their respective members, shareholders, partners, principals, officers, directors, employees, agents and representatives.

"<u>Bosque Permitted Transferee</u>" has the meaning set forth in Section <u>16.4(b)</u>.

"<u>Bosque Settlement Date</u>" has the meaning set forth in Section 6.2(c).

"<u>Business Day</u>" means any day on which Federal Reserve member banks in New York City are open for business, excluding Saturdays and Sundays.

"<u>Capacity</u>" means the capacity of the Facility to produce Power, expressed in MW.

"<u>Claims</u>" has the meaning set forth in Section 11.1(a).

"<u>Commodity Hedge Agreement</u>" means any agreement (including each confirmation entered into pursuant to any Master Agreement) providing for swaps, caps, collars, puts, calls, floors, futures, options, spots, forwards, power purchase, tolling or sale agreements (whether physically or financially settled), fuel purchase or sale agreements, emissions credit purchase or sales agreements, power transmission agreements, fuel transportation agreements, fuel storage agreements, netting agreements, commercial or trading agreements, each with respect to, or involving the purchase, transmission, distribution, sale, lease or hedge of, any energy, generation capacity or fuel, or any other energy related commodity or service, price or price indices for any such commodities or services or any other similar derivative agreements, and any other similar agreements.

"<u>Commodity Transactions</u>" means, collectively, Day-Ahead Commodity Transactions, Short-Term Commodity Transactions, and Long-Term Commodity Transactions.

"<u>Confidential Information</u>" has the meaning set forth in Section 13.1.

"<u>Costs</u>" means brokerage fees, commissions and any other Third Party transaction costs and expenses reasonably incurred by Energy Manager in entering into new arrangements that replace terminated transactions.

"<u>Daily Checkout</u>" has the meaning set forth in <u>Exhibit B</u>.

"<u>Day-Ahead Commodity Transaction</u>" means any agreement between Energy Manager and Bosque pursuant to the Implementation Agreement for the purchase or sale of Fuel or Power with a term of one day or less and with a forward start date of one day from the date of such agreement.

"<u>Day-Ahead Execution Strategies</u>" means strategies for execution of any Day-Ahead Commodity Transaction or associated Risk Management Policies and Strategies and related agreements, including the obligation to offer energy into a day-ahead market.

"<u>Defaulting Party</u>" means Bosque, in respect of any Bosque Event of Default, and Energy Manager, in respect of any Energy Manager Event of Default.

"<u>Delay Liquidated Damages</u>" means any amount payable to or for Bosque as a result of delayed delivery or performance under any agreement to which Bosque is a party with respect to the Facility (including any delays associated with the completion of the conversion of the Facility) or any goods or services supplied in connection with the Facility.

"<u>Design Limits</u>" means the limitations of the Facility when Dispatched on-line to produce Power as determined by the applicable permits and the engineering specifications of the principal equipment, including the combustion turbines, steam turbines, and generators, as adjusted for ambient conditions. The Design Limits shall include the following:  time from startup to synchronization; time to partial load, including quick load capability; time to full load; shut-down times; decremental capability; minimum down times between the time the Facility is Dispatched off-line and the next start-up; minimum run times when Dispatched on-line; ramp rates; power factor limitations; permit restrictions; and manufacturers' recommended operating procedures and warranties.  The Design Limits are further clarified in the Operating and Dispatch Procedures in <u>Exhibit B</u>.

"<u>Dispatch</u>" means a request that the Facility produce Power issued in accordance with the criteria set forth in <u>Exhibit B</u>.

"<u>Dispatch Model</u>" means the model developed jointly by Energy Manager and Bosque that reflects the Capacity, operating efficiencies, limitations, constraints and costs of the Facility.  The Dispatch Model will be used for purposes of optimizing the Power Revenues (including the revenues from remarketing Fuel).  The Dispatch Model may be amended by Bosque from time to time with three Business Days' prior notice to Energy Manager.

"<u>EDF QSE</u>" means Eagle Industrial (SQ4).

"<u>Effective Date</u>" has the meaning set forth in the preamble to this Agreement.

"<u>Energy Management Payment</u>" means an amount for each Billing Period that is equal to (A) Gross Margin for such Billing Period, <u>plus</u> (B) any revenues received by Energy Manager for or on behalf of the Facility for such Billing Period that are excluded from Power Revenues that are included the calculation of the Gross Margin of Bosque, <u>less</u> (C) the sum of the Monthly Management Fee for such Billing Period.

"<u>Energy Management Plan(s)</u>" has the meaning set forth in Section 3.1(a).

"<u>Energy Manager</u>" has the meaning set forth in the first paragraph of this Agreement and shall include Energy Manager's successors and permitted assigns.

"<u>Energy Manager Event of Default</u>" has the meaning set forth in Section 10.1.

"<u>Energy Manager Indemnified Party(ies)</u>" means Energy Manager and its Affiliates, and their respective members, shareholders, partners, principals, officers, directors, employees, executive committee members, agents and representatives.

"<u>Energy Manager Settlement Date</u>" has the meaning set forth in Section 6.2(c).

"<u>Equity Cure Proceeds</u>" means the net cash proceeds received by Bosque pursuant to capital contributions to its common equity, net of all reasonable and customary underwriting commissions and legal, investment banking, brokerage and accounting and other professional fees, sales commissions and disbursements actually incurred in connection with such sale, issuance or contribution.

"<u>ERCOT</u>" means the Electric Reliability Council of Texas or successor organization.

"ERCOT ISO" means the Person supervising the collective transmission facilities of ERCOT that (a) is charged with the nondiscriminatory coordination of market transactions, system-wide transmission planning and network reliability within ERCOT, and (b) is known as the ERCOT independent system operator.

"ERCOT Protocols" means the ERCOT Protocols approved by the PUCT and the ERCOT Operating Guide and the ERCOT Market Guide, each as amended and in effect from time to time.

"Event of Default" means any Bosque Event of Default or Energy Manager Event of Default, as applicable.

"Execution Strategies" means, collectively, the Long-Term Execution Strategies, the Short-Term Execution Strategies and the Day-Ahead Execution Strategies.

"Facility" has the meaning set forth in the Preliminary Statement.

"Facility Book" means all Commodity Transactions and Other Transactions, and Back-to-Back Agreements and Related Agreements associated therewith, undertaken in connection with the Services under this Agreement, indicating, for each transaction, a date, number identifier, price, and volume.

"Force Majeure" means with respect to the Affected Party any natural phenomena or other event or combination of events that the Affected Party could not reasonably foresee, control or prevent, and the occurrence of which the Affected Party has not caused or contributed to, which event(s) materially impede the Affected Party from performing its obligations under this Agreement; provided, however, that Force Majeure shall not include (i) a failure of performance of any Third Party except to the extent that such failure was caused by an event that would otherwise satisfy the definition of a Force Majeure event as defined above, (ii) lack of a market or unfavorable market conditions for Fuel or Power, (iii) economic hardship, (iv) failure of a Party to timely apply for, obtain or maintain Permits, or (v) the ability to sell Fuel or Power at a higher or more favorable price.

"Fuel" means natural gas as measured in Mcf.

"Fuel Costs" means the actual costs of Fuel incurred by Energy Manager, including (i) commodity or fixed charges,  (ii) capacity payments, storage costs, balancing costs, and penalty charges arising under any Related Agreements, (iii) variable fuel transportation costs (including losses and taxes), and (iv) any Third Party transaction costs applicable to the procurement or transportation of Fuel to the Facility, all net of any revenues from remarketed Fuel or transportation and other financial settlements.

"Fuel Management Services" has the meaning set forth in Section 5.3.

"Fuel Supply Agreement" means any agreement between Energy Manager and a Third Party for the supply of Fuel to the Facility.

"Governmental Authority" means any federal, state, local or municipal government, governmental department, commission, board, bureau, agency or instrumentality, or any judicial, regulatory or administrative body, having jurisdiction as to the matter in question.

"Gross Margin" means, during a particular Billing period, the amount equal to all Power Revenues during such Billing Period, minus the sum of the following expenses: (a) Variable O&M Costs,

(b) all Fuel Costs, including any Fuel Costs associated with Back-to-Back Third Party Sales, (c) purchases of previously sold Power and Ancillary Services, and (d) any resource specific charges assessed by the ERCOT ISO.

"Gross Margin Reconciliation Statement" has the meaning set forth in Section 6.2(a).

"Implementation Agreement" means the 1992 ISDA Master Agreement including the Schedule thereto, and a physical product Gas Annex and Power Annex and a Credit Support Annex, each between Bosque and Energy Manager, and each in the form attached as Exhibit A.

"Indemnified Party" has the meaning set forth in Section 11.4.

"Indemnifying Party" has the meaning set forth in Section 11.4.

"Independent Market Monitor" or "IMM" means the Texas Public Utility Commission's designated independent market monitor of ERCOT.

"Interest Rate" means, for the prime rate on corporate loans at large U.S. money center commercial banks as set forth in the Wall Street Journal "Money Rates" table under the heading "Prime Rate", or any successor thereto, on the first date of publication for the applicable calendar month; provided, however, that the Interest Rate shall never exceed the maximum rate permitted by Applicable Law.

"Interest Rate Hedge Agreement" means any interest rate swap, cap, collar or similar arrangement entered into by Bosque to protect Bosque against fluctuations in interest rates.

"Lender" means any Person providing Project Financing.

"Letter of Credit" has the meaning set forth in Section 3.3.

"Long-Term Commodity Transaction" means any agreement between Energy Manager and Bosque pursuant to the Implementation Agreement, including any tolling arrangement, for the purchase or sale of Fuel or Power with (i) a term greater than sixty-two (62) days, or (ii) a forward start date greater than sixty-two (62) days from the execution of the agreement.

"Long-Term Execution Strategies" means strategies for execution of any Long-Term Commodity Transaction or associated Risk Management Policies and Strategies and Related Agreements.

"Master Agreement" means any master agreement documented or based on the forms published by the International Swap and Derivatives Association, Inc., the Edison Electric Institute or the North American Energy Standards Board.

"Month" means a calendar month.

"Monthly Management Fee" has the meaning set forth in Section 6.1.

"MW" means megawatt.

"MWh" means megawatt-hour, or one million watt-hours of Power per hour.

"NERC" means the North American Electric Reliability Corporation and its successors in regulatory function.

"Non-Defaulting Party" means Bosque, in respect of any Energy Manager Event of Default, and Energy Manager, in respect of any Bosque Event of Default.

"O&M Agreement" means the Operation and Maintenance Agreement between LS Power Acquisition CO I, LLC and Operator, dated February 12, 2007, as subsequently assigned to Bosque.

"Operating and Dispatch Procedures" are set forth in Exhibit B and may be changed by Bosque upon 24-hours prior notice to Energy Manager.

"Operator" means Wood Group Power (West), Inc.

"Other Transaction" means any transaction or arrangement between Energy Manager and Bosque executed pursuant to this Agreement, other than a Commodity Transaction, which may include agreements and transactions related to Risk Management Services.

"Other Risk Management Strategies" means strategies for execution of any Other Transaction or associated Risk Management Strategy, and related agreements.

"Party" and "Parties" have the meanings set forth in the preamble to this Agreement.

"Permits" means all consents, licenses, approvals, registrations, permits or other authorizations granted by any Governmental Authority required in respect of, or in relation to, Bosque or the Services.

"Person" means any individual, partnership, corporation, association, business, trust, limited liability company, Governmental Authority or other legal entity.

"Power" means electric capacity as measured in MW, energy as measured in MWh, and/or any other electric related products or services available for sale from the Facility, including Ancillary Services.

"Power Management Services" has the meaning set forth in Section 5.2.

"Power Purchaser" means any purchaser of Power under a Power Sales Agreement.

"Power Revenues" means the actual revenues realized by Energy Manager from any (a) Commodity Transaction for the sale of Power, including Ancillary Services; and (b) Other Transaction, excluding (i) Delay Liquidated Damages; (ii) Equity Cure Proceeds; (iii) proceeds from business interruption insurance and proceeds of forced outage insurance; (iv) all non-cash items of income (including, but not limited to, unrealized gains on any Commodity Hedge Agreements or Interest Rate Hedge Agreements); (v) proceeds from Commodity Hedge Agreements between Bosque and any of its Affiliates; (vi) all power transmission costs, fees, penalties and charges arising under Related Agreements; (vii) any Third Party transaction costs applicable to the sale or transmission of Power generated by the Facility; and (viii) any revenues from repurchased Power and remarketed Power or transmission, and other financial settlements.; (ix) revenues from the sale of reactive power or installed capacity or any other form of regulatory capacity or resource adequacy payments.

"<u>Power Sales Agreement</u>" means any agreement between Energy Manager and a Third Party for the sale of Power, including any arrangement that is entered into pursuant to this Agreement, which may include transactions entered into by Energy Manager where the Facility is never actually Dispatched.

"<u>Power Transmission Agreement</u>" means any agreement between Bosque and any Transmission Provider related to the deliver of Power from the Facility.

"<u>Project</u>" means, collectively, the development, financing, construction, ownership and operation and maintenance of the Facility and all ancillary equipment and related rights.

"<u>Project Financing</u>" means the lending money or extending credit (including under any financing lease) to Bosque for (i) term or permanent financing of the Project; (ii) working capital or other business of the Project (including maintenance, repair, replacement of improvement of the Project); or (iii) any development, bridge financing, credit support, credit enhancement or interest rate protection in connection with the Project.

"<u>Project Fuel Transportation Agreements</u>" means any Fuel transportation agreement that has been or may be entered into by Bosque from time to time where Energy Manager or its Affiliate serves as agent for Bosque.

"<u>Prudent Industry Practice</u>" means, in respect of the performance of the Services under this Agreement, the practices, methods, techniques, standards and acts that, at the time of the performance of such Services under this Agreement, are then commonly used by Persons performing similar obligations and that, in the exercise of reasonable judgment in light of the facts known at the time of performance, would have reasonably been expected to accomplish the desired results.  Prudent Industry Practice is not intended to be limited to the optimum practices, methods, techniques, standards and acts to the exclusion of all others, but rather reflect the practices, methods, techniques, standards and acts then generally accepted, having due regard for, among other things, contractual obligations, Applicable Laws, Permits, and the ERCOT Protocols.

"<u>PUCT</u>" means the Public Utility Commission of Texas.

"<u>QSE</u>" means a Qualified Scheduling Entity as defined in the ERCOT Protocols.

"<u>Related Agreements</u>" means Power Transmission Agreements, Project Fuel Transportation Agreements, and Fuel Supply Agreements.  A Related Agreement may be between Bosque and a Third Party, or between Energy Manager and a Third Party.

"<u>Representative</u>" has the meaning set forth in Section 2.5.

"<u>Services</u>" means, collectively, the Transition Services, Power Management Services, Fuel Management Services, Risk Management Services and any other services that Energy Manager and Bosque have agreed to under this Agreement.

"<u>Risk Management Services</u>" means entering into physical, financial and derivative product purchases and sales either in bilateral, over-the-counter or exchange-traded markets for the purpose of hedging or mitigating price or delivery risks associated with Fuel or Power consisting of a commodity purchase and sale, swap, cross commodity swap, commodity cap, commodity floor, commodity collar,

basis swap, basis option, commodity option or any other similar price risk management product, including any combinations of the foregoing products; provided, however, that in no event shall any such risk management transactions be interpreted to include Commodity Transactions.

"Risk Management Strategy" means any strategy designed to hedge or mitigate risk, including the magnitude and types of acceptable risks, through risk management transactions.

"Services Implementation Date" means February 1, 2010.

"Settlement Date" means either the Energy Manager Settlement Date or the Bosque Settlement Date, as applicable.

"Short-Term Commodity Transaction" means any agreement between Energy Manager and Bosque pursuant to the Implementation Agreement, including any tolling arrangement, for the purchase or sale of Fuel or Power with (i) a term of sixty-two (62) days or less but greater than one day, and (ii) with a forward start date within sixty-two (62) days of the transaction date.

"Short-Term Execution Strategies" means strategies for execution of any Short-Term Commodity Transaction or associated Risk Management Strategy, and Related Agreements.

"Successor Energy Manager" has the meaning set forth in Section 10.6.

"Termination Date" means the date for termination of this Agreement which shall be the earlier of (a) December 31, 2011 and (b) the date upon which this Agreement is terminated pursuant to the termination provisions otherwise set forth herein.

"Termination (Default) Notice" means a written notice of termination delivered by the Non-Defaulting Party pursuant to Section 10.3.

"Texas Regional Entity" means the independent division of ERCOT which monitors and reports compliance in accordance with ERCOT Protocols.

"Third Party" means any Person other than Bosque or Energy Manager.

"Third Party Sale" has the meaning set forth in Section 3.2.

"Transfer" means a wire transfer payment in immediately available funds.

"Transition Services" has the meaning set forth in Section 5.1.

"Transmission Provider" means any Person that provides transmission or distribution services for the delivery of electric energy from the Facility pursuant to any Power Transmission Agreement.

"Transporter" means any Person obligated to transport Fuel to the Facility pursuant to any Project Fuel Transportation Agreement.

"Variable O&M Costs" are as set forth in Exhibit E and may be revised by Bosque with 24-hour prior notice to Energy Manager.

**ARTICLE 2**
**APPOINTMENT OF ENERGY MANAGER AND TERM**

2.1     Appointment.  Subject to the terms of this Agreement, (i) as of the Effective Date, Bosque appoints Energy Manager, and Energy Manager accepts such appointment, to be the provider of Transition Services to Bosque; and, (ii) as of the Services Implementation Date, Bosque appoints Energy Manager, and Energy Manager accepts such appointment to provide Services to Bosque until this Agreement is terminated.

2.2     Term; Effective Date; Services Implementation Date.

        (a)     This Agreement shall commence on the Effective Date and shall terminate on the Termination Date, except as expressly set forth in Section 2.2(b).

        (b)     In the event that the Services Implementation Date does not occur on or before March 31, 2009, this Agreement shall automatically terminate, unless otherwise mutually agreed upon in writing by Bosque and Energy Manager, in which case neither Party shall have any further rights or obligations arising under this  Agreement.

        (c)     Energy Manager shall (i) begin to provide the Transition Services to Bosque as of the Effective Date; (ii) begin to provide the Power Management, Fuel Management and Risk Management Services to Bosque as of the Services Implementation Date; and (iii) continue to provide Transition Services to Bosque on and after the Services Implementation Date.

        (d)     The provisions of Article 6 shall not apply prior to the Services Implementation Date.  Prior to the Services Implementation Date, Energy Manager shall be entitled to payment only for its reasonable out-of-pocket expenses incurred in connection with its provision of the Transition Services to Bosque; provided, however, that such reimbursable expenses shall not include expenses incurred by Energy Manager related to installing systems or putting in place resources to provide the Power, Fuel or Risk Management Services in excess of $20,000.

2.3     Commodity Transactions and Related Agreements.

        (a)     Subject to Section 3.2, in conducting Commodity Transactions or Other Transactions, Energy Manager shall be the contracting party with all respective Third Party suppliers and Power Purchasers, and under all Fuel Supply Agreements, Power Sales Agreements, agreements for Risk Management Services and Other Transactions, unless the Parties otherwise agree.  All transactions between Energy Manager and Bosque with respect to Commodity Transactions, Other Transactions or Risk Management Services shall be entered into pursuant to the relevant Implementation Agreements and, upon consummation of such transaction pursuant to those procedures or agreement, the terms and provisions contained in such relevant Implementation Agreement shall govern the performance of the parties thereunder.

        (b)     With respect to Related Agreements, the following shall apply:

                (i)     Bosque shall remain a party to all Project Fuel Transportation Agreements to which it is a party on the Effective Date.  The Parties intend that Bosque

10

will be a party to all other Project Fuel Transportation Agreements unless the applicable Fuel Supply Agreement requires delivery to Bosque's contracted pipelines or the Facility, or Bosque and Energy Manager determine otherwise. Bosque shall designate Energy Manager or its Affiliate as its agent with respect to all Project Fuel Transportation Agreements to which Bosque is a party.

(ii)    The Parties intend that Power Sales Agreements between Bosque and Energy Manager require power to be delivered by Bosque to Bosque's interconnection points. As part of the Services, Energy Manager will inform Bosque of opportunities to enter into Power Transmission Agreements in connection with any Power Sales Agreements. Bosque will be a party to any such Power Transmission Agreements directly with the Third Party providers of transmission.

2.4    Relationship of Parties.

(a)    Except as provided in this Section 2.4, no Party shall be an agent, partner, joint venturer, or legal representative of any other Party for any purpose whatsoever, and no Party is authorized to assume or create any obligation, liability, or responsibility, expressed or implied, on behalf of or in the name of any other Party or to bind any other Party to any Third Party in any manner whatsoever; provided, however, that Bosque may appoint Energy Manager as its agent with respect to (i) the ERCOT ISO, or (ii) an applicable Transporter for purposes of scheduling and/or transporting Fuel. The relationship of Bosque, on the one hand, with Energy Manager, on the other hand, as set forth in this Agreement is one of an independent contractor. Any provision of this Agreement that appears to give Bosque a measure of control over the details of the Services shall be deemed to mean that Energy Manager shall follow the provisions of this Agreement in order to accomplish the desires of Bosque, but Bosque shall look to Energy Manager for results only and, subject to Section 2.6, shall have no right at any time to direct or supervise Energy Manager's servants or employees in the performance of such work or as to the manner, means, and method in which the Services are performed. No Person employed by Energy Manager or its Affiliates shall be deemed to be an employee, agent or servant of Bosque. Except as expressly stated in this Agreement, no Party shall have any separate obligations or duties, including without limitation any fiduciary duties or obligations, or other implied duties. Bosque hereby agrees that it is sophisticated and capable of assessing the risks and merits of the Commodity Transactions and Other Transactions entered into pursuant to this Agreement and the relevant Implementation Agreement. In addition to the foregoing, Bosque acknowledges that Energy Manager provides energy management services similar to the Services to other third parties for Energy Manager's benefit and engages in commodities trading for its own benefit in connection with transactions in ERCOT. Except as otherwise provided below: (1) nothing contained in this Agreement shall be construed to limit Energy Manager's operations in ERCOT, or to require Energy Manager to favor the desires of Bosque over any Third Party or the interests of Energy Manager; (2) Energy Manager shall be permitted to execute such other or competing transactions as Energy Manager may identify from time to time; and (3) Energy Manager shall be permitted to engage in any business activities identified or appropriate in Energy Manager's discretion whether in ERCOT or otherwise and even in circumstances where such transactions and business activities compete directly or indirectly with the interests of Bosque under this Agreement. Notwithstanding the above, (A) Energy Manager shall not take actions which are reasonably likely to be discriminatory or detrimental to Bosque and (B) prior to executing any energy management agreement for any gas-fired electric generating facility in

the ERCOT North Zone, Energy Manager shall disclose to Bosque in writing the nature of such transaction.

(b)     Notwithstanding anything to the contrary contained in this Agreement (including the Energy Management Plans), Energy Manager will owe Bosque only the performance obligations and duties expressly set forth in this Agreement (including the Energy Management Plans).  Energy Manager is not a licensed commodities trading advisor, is not licensed to provide commodities trading advice of the type regulated by the Commodities Futures Trading Commission.  Accordingly, nothing contained in this Agreement shall be construed to obligate Energy Manager to provide any advice to Bosque or to perform any services on behalf of Bosque that would in Energy Manager's judgment subject Energy Manager to the jurisdiction of the Commodities Futures Trading Commission or any similar body.

2.5     Party Representatives.  Each Party will designate a representative ("Representative") to represent and act on behalf of such Party under this Agreement and receive communications from the other Party pursuant to this Agreement.  Each Representative will act on behalf of its respective Party as the principal interface with the other Party, and each Party will be bound by the written and oral communications, directions and decisions made by its respective Representative, provided that the Representatives may not amend this Agreement.  Each Party will provide written notice of its Representative to the other Party.  Bosque may, from time to time, remove its Representative for any or no reason whatsoever and may designate a successor Representative and up to two alternate Representatives, in each case, by providing written notice thereof to the other Party.  Energy Manager's Representative may not be replaced without Bosque's prior written consent.

2.6     Adequate Personnel.  Energy Manager shall at all times provide such experienced personnel as are reasonably required or advisable and qualified to carry out the day-to-day obligations of Energy Manager under this Agreement.  Bosque will have the right to require that employees of Energy Manager cease providing Services if Bosque reasonably believes such employee commits reckless or willful misconduct, fraud, theft or misappropriation of funds in connection with the Services.

**ARTICLE 3**
**BOSQUE'S RIGHTS AND RESPONSIBILITIES; FINANCIAL PERFORMANCE**

3.1     Bosque Rights and Responsibilities.  Bosque shall have the sole right and responsibility to:

(a)     determine and establish, in consultation with Energy Manager, the energy management strategy for Power, Fuel or Ancillary Services (generally, the "Energy Management Plans") with respect to the Facility, and to approve or disapprove of any deviations from such Energy Management Plans which may be presented by Energy Manager from time-to-time;

(b)     determine and establish, in consultation with Energy Manager, Risk Management Strategy for the Facility.  The Risk Management Strategy may provide methodologies and procedures for assessing risk on existing and proposed transactions, establishing risk management strategies, generating reports and establishing appropriate, mutually agreed, risk parameters and methodologies.  The Risk Management Strategy shall set forth the internal and external approvals that must be obtained prior to entering into Commodity Transactions and Other Transactions whose nominal value or duration exceeds

specified thresholds, or the effect of which would have certain consequences under the Risk Management Strategy. All Commodity Transactions and Other Transactions under this Agreement shall be consistent with such criteria;

(c)     determine and establish the Execution Strategies and approve or disapprove any proposed deviations from the Execution Strategies as such may be presented by Energy Manager to Bosque from time-to-time;

(d)     approve all Commodity Transactions and Other Transactions with respect to the Facility, except to the extent that authority to enter into a Short-Term Commodity Transaction or Day-Ahead Commodity Transaction has been delegated to Energy Manager under Section 7.8;

(e)     appoint Energy Manager or its Affiliate as Bosque's agent for performance of the Related Agreements, subject to the applicable requirements of such agreements relating to agency appointment;

(f)     determine the amount of Fuel to be supplied to the Facility; and

(g)     execute all agreements or other documentation reasonably necessary for Energy Manager to perform the Services.

3.2     <u>Third Party Sales</u>.  Bosque may sell Power from the Facility at any time to a Third Party (such sale, a "<u>Third Party Sale</u>").  Once Bosque identifies a Third Party Sale that Bosque wishes to execute, then, at the sole option of Bosque, either (a) Bosque and Energy Manager shall confirm the terms of the sale under the Implementation Agreement (such transaction, a "<u>Back-to-Back Third Party Sale</u>") or (b) Bosque shall transact with such Third Party directly (such transaction, a "<u>Bilateral Third Party Sale</u>").  In the case of a Back-to-Back Third Party Sale: (i) Energy Manager shall then execute such Third Party Sale with the identified Third Party utilizing a Back-to-Back Contract; (ii) Bosque must utilize Power from the Facility for such Third Party Sale in accordance with the Operating and Dispatch Procedures, and subject to the Facility's existing Commodity Transactions and Third Party Sales; (iii) any documentation regarding such Third Party Sale provided by Bosque to Energy Manager shall be considered Confidential Information subject to the provisions of Article 13; (iv) Energy Manager shall not enter into any Commodity Transaction to sell the Power committed by Bosque under such Third Party Sale; and (v) Energy Manager shall provide the relevant Services detailed in this Agreement as necessary to implement such Third Party Sale, including the Fuel Management Services, on the condition that Bosque furnishes Energy Manager with documentation authorizing Energy Manager to act on Bosque's behalf in implementing such Third Party Sale with the counterparty to such Third Party Sale.  In the case of a Bilateral Third Party Sale, Bosque shall provide the appropriate incremental credit support.

3.3     <u>Financial Performance</u>.  During the Term, Bosque shall provide and maintain with Energy Manager the security in accordance with <u>Exhibit D</u> and in an amount specified as the Credit Support Amount for Party B in the Credit Support Annex (the "<u>Letter of Credit</u>").  If (a) Energy Manager makes a drawing under the Letter of Credit due to a failure by Bosque to provide replacement security at least 10 days prior to expiration of the Letter of Credit, and (b) Bosque subsequently provides such replacement security, then Energy Manager shall pay to Bosque all such amounts drawn under the Letter of Credit within two Business Days after Bosque provides such replacement security.

**ARTICLE 4**
**OBLIGATIONS OF ENERGY MANAGER**

4.1     Services Generally.  In performing the Services, Energy Manager shall:

(a)     comply with, and ensure that all Services conform to and comply with: (i) Applicable Laws; (ii) the ERCOT Protocols; (iii) Prudent Industry Practice; and (iv) the Energy Management Plans, Risk Management Strategies and Execution Strategies of Bosque.  The Parties acknowledge that speculative trading in connection with this Agreement is prohibited and losses or gains incurred by Energy Manager as a result of Energy Manager's speculative trading activities shall be borne by Energy Manager exclusively;

(b)     meet with Bosque as often as may be reasonably requested by Bosque, but not less than monthly, unless otherwise agreed by the Parties; and

(c)     maintain credit capacity so as to maintain sufficient trading capabilities in terms of manpower, infrastructure, support and credit resources in order to perform the Services.

4.2     Limitation on Obligations.  Notwithstanding any provision to the contrary contained in this Agreement, Energy Manager shall not be obligated to perform any Services, and shall not be in breach of this Agreement for failure to perform such Services, if Energy Manager reasonably believes that its performance of such Services would (i) cause ERCOT to assess penalties on Energy Manager as a result of its performance; (ii) be prohibited by, contravene or otherwise conflict with (A) the terms of this Agreement, (B) the Energy Management Plans, (C) Applicable Laws, (D) the ERCOT Protocols or (E) Prudent Industry Practice; (iii) be construed to transfer control or dispatch authority from Bosque to Energy Manager with regard to the Facility or the Facility's operations; or (iv) subject Energy Manager to any regulation, regulatory obligation, regulatory audit or investigation as a "generation owner", "generation operator", or other similar classification having the same effect, for purposes of NERC obligations and requirements or under applicable NERC standards; provided that Energy Manager will provide prompt written notice to Bosque explaining the reasons for nonperformance.

4.3     NERC Compliance.  Nothing contained in this Agreement shall be construed to require Energy Manager to take on responsibility under the NERC policies and procedures for any obligations typically reserved to Bosque or any generation owner.  Energy Manager shall use commercially reasonable efforts to assist Bosque in any audit of Bosque or the Facility conducted or initiated by NERC, provided that Energy Manager shall not be required to participate, formally or informally, in any aspect of a NERC audit involving Bosque or the Facility, unless such audit specifically requires Energy Manager to participate in the audit of the Facility and then only in a manner confined to the specific NERC audit requirements.  Nothing contained in this Agreement shall be construed to make Energy Manager a "generation owner" or any similar entity, or to make Energy Manager subject to any classification under applicable NERC rules as a result of Energy Manager's execution of this Agreement or Energy Manager's performance of the Services or otherwise.  Rather, Bosque shall retain any and all such NERC (and where applicable ERCOT) responsibilities and obligations without regard to the Services provided under this Agreement.

4.4    <u>Limitation on Authority of Energy Manager</u>.

(a)    Except as may be expressly authorized by this Agreement or in writing or on a recorded telephonic line by Bosque from time-to-time, Energy Manager shall not:

(i)    pledge the credit of Bosque in any way in respect of any agreements entered into between Energy Manager and any Third Party without the express prior written consent of Bosque;

(ii)    violate any Applicable Law with respect to the Facility or the Services provided under this Agreement that is reasonably likely to have a material adverse effect on the Facility or the Services provided under this Agreement, or violate any material Permits;

(iii)    sell or otherwise transfer any assets of Bosque , or cause any liens or encumbrances on the Facility or any other assets of Bosque;

(iv)    make any representation or warranty relating to Bosque;

(v)    settle, compromise (including agreeing to any penalty for any violation of any Applicable Law or Permit), assign, pledge, transfer, release or consent to the compromise, assignment, pledge, transfer or release of, any claim, suit, debt, demand or judgment against or due by Bosque, or submit any such claim, dispute or controversy to arbitration or judicial process, or stipulate in respect thereof to a judgment, or consent to do the same; or

(vi)    engage in any transaction on behalf of Bosque not permitted under this Agreement.

(b)    Bosque shall have no liability with respect to any transactions executed by Energy Manager in breach of Section 4.4(a) above, and Energy Manager shall indemnify and hold harmless the Bosque Indemnified Parties from any Claims arising in connection with such transactions.

4.5    <u>Energy Manager Affiliates</u>.  Notwithstanding any provision of this Agreement to the contrary, Energy Manager shall in all cases remain obligated for the performance of the Services and its obligations under this Agreement regardless of whether such Services or obligations are performed by its Affiliates.

**ARTICLE 5**
**SERVICES**

5.1    <u>Transition Services</u>.  Subject to the terms of this Agreement and starting on the Effective Date, Energy Manager shall provide to Bosque the services necessary to ensure the transition of the energy management services from Fulcrum Power Services L.P. to Energy Manager, including the following services (the "<u>Transition Services</u>"):

(a)     establish and implement operational information technology and control area interfaces;

(b)     establish itself as the QSE for Bosque;

(c)     establish its ability to directly receive revenues and pay costs associated with Commodity Transactions and Other Transactions;

(d)     establish itself as the Fuel nominating agent for Bosque and obtain the ability to make any Fuel transport and supply arrangements relating to Bosque; and

(e)     one day prior to the Services Implementation Date: (A) schedule the Dispatch and delivery of Power from the Facility for the Services Implementation Date up to the Capacity in accordance with the Operating and Dispatch Procedures; (B) manage Power imbalances for the Facility with the intent of reducing the adverse economic impact of such Power imbalances; (C) purchase the Fuel required for the operation of the Facility and nominate the delivery of such Fuel to Facility for the Services Implementation Date; and (D) adjust such nomination to reflect any changes in production at the Facility.

5.2     <u>Power Management Services</u>.  Subject to the terms of this Agreement and starting on the Services Implementation Date, Energy Manager shall provide Power management services for the Capacity of the Facility, including the following services ("<u>Power Management Services</u>"):

(a)     negotiate and execute forward hedging transactions in accordance with the approved Energy Management Plan and Risk Management Strategy;

(b)     develop day-ahead base, incremental and decremental commitment offers consistent with ERCOT Protocols, and negotiate and execute Short-Term and Day-Ahead Commodity Transactions for the sale of Power in accordance with the Dispatch Model and existing obligations;

(c)     develop Third Party customer relationships, and engage in transaction structuring, analysis, and contract negotiating with Third Parties for Power sales;

(d)     develop the Dispatch Model in coordination with Bosque;

(e)     negotiate, execute and assist with scheduling of real-time Power and Ancillary Services transactions; coordinate with Fuel management personnel; coordinate with applicable control area manager on re-Dispatch; manage Ancillary Services transactions and reliability obligations; use reasonable efforts to respond to real-time forced outages; and assist Bosque with intra-day Dispatch enhancement including Power procurement at economics below decremental cost, in accordance with the Energy Management Plan;

(f)     assist Bosque with coordination of Dispatch decisions with the Operator to determine the optimal hour-by-hour Dispatch given short-term Power and Fuel prices, market liquidity, operating costs and risk/return tradeoffs of various energy products;

(g)     develop other Ancillary Service product bids and offers, as permitted by ERCOT;

(h)     provide Bosque with information with respect to the Services in the possession of Energy Manager and reasonably requested by Bosque in order for Bosque to prepare compliance reports required by the FERC, PUCT, ERCOT, Texas Regional Entity, NERC, or the Independent Market Monitor for ERCOT, as applicable;

(i)     provide necessary telemetry and real time communications to enable Bosque, ERCOT and Energy Manager to monitor the output of the Facility in real time and comply with the communications requirements of the ERCOT Protocols;

(j)     participate in daily, weekly and monthly conference calls or meetings with Bosque as reasonably requested by Bosque to discuss commercial, financial, operational and strategic goals and issues related to the Facility;

(k)     notify ERCOT of any scheduled and forced outages of the Facility for which Energy Manager receives notice from the Facility and, to the extent commercially practical, assist Bosque in mitigating Bosque's damages in connection therewith, provided that nothing in this Section 5.2(k) shall obligate Energy Manager to incur more than *de minimis* costs or expenses, in each case, in carrying out its obligations pursuant to this Section 5.2(k);

(l)     reconcile and settle ERCOT ISO invoices in respect of the Facility; receive and forward to Bosque any and all notices received from ERCOT, the Texas Regional Entity, and the IPM in respect of the Facility; and

(m)     provide any other scheduling and optimization services for the Facility as may be mutually agreed to by the Parties.

5.3     <u>Fuel Management Services</u>.  Subject to the terms of this Agreement and starting on the Services Implementation Date, Energy Manager shall provide Fuel management services for the Capacity of the Facility, including the following services ("<u>Fuel Management Services</u>"):

(a)     procure and supply the required Fuel quantity for each Commodity Transaction for the sale of Power;

(b)     enter into Commodity Transactions for Fuel with Bosque pursuant to the Implementation Agreement;

(c)     arrange and conduct Fuel supplier and Transporter meetings as needed;

(d)     negotiate Related Agreements and provide invoice reconciliation for Related Agreements;

(e)     nominate and schedule, in accordance with the Operating and Dispatch Procedures, the delivery of Fuel to Facility, and adjust the schedule to reflect any changes in production at the Facility;

(f)     nominate, schedule and balance (including daily and hourly) with suppliers, Transporters and storage providers of Fuel, including imbalances created in connection with

nomination of Fuel for the Facility through the use of an operational balancing agreement to be procured by Bosque and administered by Energy Manager;

(g)     assist Bosque with the development and implementation of a Fuel procurement strategy which could include minimizing Bosque's costs, including but not limited to taxes;

(h)     consistent with the Energy Management Plan, assist Bosque with the development of short-term, intermediate-term and long-term commercial strategies with respect to the purchase of Fuel for the Facility;

(i)     market and sell any excess Fuel;

(j)     coordinate delivery of Fuel with Operator;

(k)     evaluate and present to Bosque long-term Fuel transportation options;

(l)     provide Other Services related to Fuel as may be agreed to in writing by the Parties from time to time, including but not limited to, marketing excess transportation capacity; and

(m)     coordinate with Third Party service providers to assist Bosque in accurately nominating Fuel and minimizing Fuel costs.

5.4     Risk Management Services.  Subject to the terms of this Agreement and starting on the Services Implementation Date, Energy Manager shall provide Risk Management Services with respect to the Facility, including the following services:

(a)     subject to the negotiation of the following transactions by Energy Manager and Bosque, arrange for, administer and enter into heat rate call option, swaps, cross commodity swaps, commodity caps, commodity floors, commodity collars, basis swaps, basis option, or commodity options; and

(b)     perform other services as may be agreed to by the Parties from time-to-time.

(c)     Notwithstanding anything to the contrary set forth in this Section 5.4, nothing contained herein shall be construed to require Energy Manager to enter into any specific risk management transaction of the type specified in subparagraph (a).   The Parties acknowledge that any such transaction must be separately and independently negotiated and approved based on existing market conditions, unique transactional terms and conditions and credit support resources available to and from each of the Parties to the proposed transaction.

5.5     Cessation of Generation.  The Parties acknowledge that from time to time, NERC, ERCOT or other Governmental Authorities may issue directives affecting or requiring the specific operation of the Facility.  Where any such directives are issued requiring changes in the dispatch or operation of the Facility, Energy Manager shall instruct Bosque to generate or provide Power, or to cease generating or providing Power as mandated by such directives.  The instructions will be given to Bosque following receipt of any operational directives by Energy Manager.  Based on the ERCOT and NERC directives, Energy Manager shall instruct Bosque of the quantities of Power to generate or provide, or to cease

generating or providing, and the time period during which such instructions are to be followed, and Bosque shall cause the Facility to promptly follow the instructions, consistent with the operational limitations of the Facility.  Where there exists a planned outage, forced outage, event of Force Majeure or any other event affecting the operations of the Facility, Bosque shall notify Energy Manager as soon as Bosque becomes aware of the event and Bosque shall provide Energy Manager with all necessary and available information concerning the associated reduction in the Facility's output, reductions or fluctuations in the availability of Power from the Facility, and any other anticipated effects of the event affecting the performance of the Facility.

5.6     Gross Margin.  Except as may be otherwise agreed to by Bosque or otherwise limited in this Agreement, Energy Manager shall perform the Services with the goal of maximizing the Gross Margin.

5.7     Reporting Requirements.  Subject to Article 8 below and Daily Checkout, weekly, or at such other times as may be reasonably requested by Bosque, Energy Manager shall submit to Bosque summary reports of all Commodity Transactions and Other Transactions entered into between Bosque and Energy Manager in connection with the Services, including a daily report of mark-to-market exposure and credit available for transactions.

**ARTICLE 6**
**FEES; SETTLEMENT**

6.1     Monthly Management Fee.  Commencing on the Services Implementation Date, Energy Manager shall be entitled each Month, to a fee (the "Monthly Management Fee") equal to the greater of: (i) ten thousand dollars ($10,000); and (ii) 4% of the Gross Margin for such month.

6.2     Financial Settlement and Payment of Energy Management Payment.

(a)     By the tenth (10th) calendar day following the Month in which the relevant Services were rendered, Energy Manager shall render to Bosque a statement (the "Gross Margin Reconciliation Statement"), which may be based on reasonable estimates if actual data are not then available, setting forth in total for the Month in which the relevant Services were rendered (i) the Fuel Costs, (ii) the Power Revenues, (iii) the Variable O&M Costs, (iv) the Gross Margin, (v) the Monthly Management Fee; and (vi) the Energy Management Payment, together with related worksheets showing the relevant calculations and inputs thereto.

(b)     If the Gross Margin Reconciliation Statement provided pursuant to Section 6.2(a) is based on reasonable estimates rather than actual data, Energy Manager shall by the twentieth (20th) calendar day of the same Month provide Bosque with a Gross Margin Reconciliation Statement based on actual data.

(c)     If the Energy Management Payment for any Month is a positive number, Energy Manager shall by the twenty-fifth (25th) calendar day of such Month, or if such day is not a Business Day, the next Business Day (the "Energy Manager Settlement Date"), transfer to Bosque the Energy Management Payment.  If the Energy Management Payment for any Month is a negative number, then, on the twenty-fifth (25th) calendar day of such Month, or if such day is not a Business Day, the next Business Day, (the "Bosque Settlement Date"), Bosque shall Transfer to Energy Manager an amount equal to such shortfall.

(d)     If either Party fails to pay the entire amount shown to be due to the other Party on any Gross Margin Reconciliation Statement when such amount becomes due (other than amounts disputed in good faith by such Party), the owing Party shall pay the other Party a late charge on the unpaid balance that shall accrue on each calendar day from the due date at the Interest Rate.  If a Party, in good faith, disputes any part of any Gross Margin Reconciliation Statement, such Party shall provide a written explanation of the basis for the dispute and pay the portion of such Energy Management Payment conceded to be correct no later than the due date as calculated pursuant to this Section.  If any amount disputed by such Party is determined to be due to the other Party either by agreement between the Parties or as a result of resolution under Article 15, such amount shall be paid on the next Settlement Date or, if there is no next scheduled Settlement Date within ten (10) days of such determination, along with interest calculated at the Interest Rate from the original due date until the date paid.

6.3     Payment Netting.  In the event Energy Manager and Bosque are required to pay an amount on the same date pursuant to this Agreement, then such amounts with respect to each of Energy Manager and Bosque shall be aggregated and Energy Manager and Bosque shall discharge their obligations to pay through netting, in which case such Party, if any, owing the greater aggregate amount shall pay to the other Party the difference between the amounts owed. Bosque and Energy Manager reserve to themselves all rights, setoffs, counterclaims and other remedies and defenses consistent with Article 12 (to the extent not expressly waived or denied in this Agreement) which such Party has or may be entitled to arising from or out of this Agreement or any Transaction under an Implementation Agreement.

**ARTICLE 7**
**TRANSACTION PROCEDURES**

7.1     Transaction Procedures.

(a)     On the Services Implementation Date, Bosque and Energy Manager shall enter into an Implementation Agreement in the form attached as Exhibit A, pursuant to which Bosque will enter into Commodity Transactions and Other Transactions with Energy Manager.

(b)     Energy Manager shall utilize documentation forms that are in Energy Manager's judgment, similar to the Implementation Agreement for Back-to-Back Contracts to meet Energy Manager's obligations under Commodity Transaction and Other Transactions.  The confirmations with respect to the Commodity Transactions and Other Transactions governed by the Implementation Agreement shall mirror the commercial terms of the transaction confirmations with respect to the corresponding Back-to-Back Contracts (*i.e.*, price, product, quantity, delivery specifications shall be the same).

(c)     Bosque agrees that Energy Manager may purchase Power from the Facility for Energy Manager's own use and at Energy Manager's own risk and without an associated transaction under a Back-to-Back Agreement.

(d)     For any Commodity Transaction or Other Transaction, the contract price shall be equal to either (i) the applicable contract price specified in the related Back-to-Back Contract, or, (ii) where Energy Manager is supporting such Commodity Transaction with its own Power portfolio pursuant to Section 7.1(c) above and there is no related Back-to-Back Agreement, the

contract price agreed to between Bosque and Energy Manager in the relevant confirmation; provided, however, that the contract price for a Commodity Transaction with respect to Fuel shall be the prevailing market price. Upon request by Bosque, Energy Manager shall verify the market price by receiving, if available, up to three (3) market quotes from market participants in the power industry, and/or providing data from recognized market indices. The quantity, term and other special conditions for a specific Commodity Transaction or Other Transaction shall be as mutually agreed to by Bosque and Energy Manager as provided in this Article 7 or as authorized by Bosque. Energy Manager shall establish a separate Facility Book in its trading system for Bosque.

7.2     <u>Long-Term Commodity Transactions</u>. Subject to Section 4.4(a):

(a)     Energy Manager shall present any potential Long-Term Commodity Transaction to Bosque for review and approval. Bosque shall, in its sole discretion, determine whether to approve any proposed Long-Term Commodity Transaction. Energy Manager and Bosque shall mutually agree as to the terms and conditions of any Long-Term Commodity Transaction. Bosque and Energy Manager shall confirm such approved Long- Term Commodity Transaction in accordance with the Implementation Agreement.

(b)     Bosque shall retain the right to participate with Energy Manager in any negotiations of any Back-to-Back Contract which is the basis of any Long-Term Commodity Transactions with respect to the Facility.

7.3     <u>Short-Term Commodity Transactions</u>. Except where Bosque has made a delegation of authority to Energy Manager under Section 7.8, Energy Manager shall present any potential Short-Term Commodity Transaction to Bosque for review and approval, and Bosque shall, in its sole discretion, determine whether to approve any proposed Short-Term Commodity Transaction. Energy Manager and Bosque shall mutually agree as to the terms and conditions of any Short-Term Commodity Transaction. Bosque and Energy Manager shall confirm such approved Short-Term Commodity Transaction in accordance with the Implementation Agreement.

7.4     <u>Day-Ahead Commodity Transactions</u>. Except where Bosque has made a delegation to Energy Manager under Section <u>7.8</u>, Energy Manager shall present any potential Day-Ahead Commodity Transaction to Bosque for review and approval, and Bosque shall, in its sole discretion, determine whether to approve any Day-Ahead Commodity Transaction.

7.5     <u>Other Transactions</u>. Energy Manager shall present each potential Other Transaction to Bosque for review and approval. Bosque shall, in its sole discretion, determine whether to approve any proposed Other Transaction. Energy Manager and Bosque shall mutually agree as to the terms and conditions of any Other Transaction. Bosque and Energy Manager shall confirm such approved Other Transaction in accordance with the Implementation Agreement.

7.6     <u>Related Agreements</u>.

(a)     Energy Manager shall present any potential Related Agreement to Bosque for review and approval. Upon receipt of Bosque's approval, Energy Manager or its Affiliate, shall finalize and execute the Related Agreements in the form agreed to by the Parties.

(b)     Bosque shall be obligated to reimburse Energy Manager in accordance with this Agreement for all costs and charges actually paid by Energy Manager to Third Parties in connection with Related Agreements undertaken for Bosque's benefit (which include the monthly transportation and/or transmission charges actually paid by Energy Manager, if any, pursuant to relevant arrangements with a Transporter or Transmission Provider).  Such costs and charges shall include all rates, fees, cash-outs, penalties, forfeitures, taxes, and Fuel or Power retainage charges, attributable to Fuel transportation or Power transmission transactions administered and/or undertaken in accordance with this Agreement for Bosque's benefit, unless incurred through the gross negligence or willful misconduct of Energy Manager.  In addition to the other indemnification provisions set forth in this Agreement, Bosque shall indemnify and hold harmless the Energy Manager Indemnified Parties from any Claims arising in connection with Related Agreements between Bosque and Third Parties.

7.7     <u>Risk Management Services</u>.  Subject to Section <u>4.5</u> and all other limitations provided by this Agreement, at the request of Bosque, Energy Manager shall provide proposals to Bosque for various Risk Management Services to address specific financial risks identified by Bosque with respect to the activities of the Facility.  In the event Bosque should decide to pursue any Risk Management Services to manage any of the financial risks to Bosque with respect to the activities of the Facility, Bosque agrees to enter into a financial derivative transaction with Energy Manager as an Other Transaction upon mutually satisfactory terms under the Implementation Agreement.  Any such financial derivative transaction will be on an arms-length basis and nothing relating to Energy Manager's services under this Agreement shall be construed as creating a fiduciary or other advisory relationship between Energy Manager and Bosque in respect of any such financial derivative transaction.  Such Other Transaction shall be confirmed in accordance with the terms of the Implementation Agreement.

7.8     <u>Delegation</u>.  The provisions of Sections 7.3 and 7.4 notwithstanding, but subject to any restrictions in this Agreement on Energy Manager's ability to enter into Commodity Transactions, Bosque may from time-to-time in writing delegate its authority to Energy Manager to execute Day-Ahead Commodity Transactions and Short-Term Commodity Transactions without prior approval by Bosque, subject to such restrictions and reporting requirements as Bosque may direct in connection with such delegation.  Any Short-Term Commodity Transaction or Day-Ahead Commodity Transaction executed by Energy Manager in accordance with such delegation shall be automatically entered into between Energy Manager and Bosque pursuant to the Implementation Agreement.

**ARTICLE 8**
**REPORTS, RECORDS, AUDITS AND EQR FILINGS**

8.1     <u>Reports</u>.  Energy Manager shall provide Bosque with such reports, if reasonably requested by Bosque, or that are required to be provided by Energy Manager to Bosque under Applicable Law or Permit.  In addition, Energy Manager shall develop and submit the following information to Bosque:

(a)     Energy Manager shall develop daily trading and marketing reports as required to keep Bosque informed of daily positions and credit utilization in relation to relevant credit support requirements as mutually agreed upon by Bosque and Energy Manager.  Monthly and quarterly reports will also be produced in a form mutually agreed upon by Bosque and Energy Manager.  Prior to the Services Implementation Date, Bosque and Energy Manager shall develop a form of report to be attached to this Agreement as <u>Exhibit C</u>, which such form may be revised

by the Parties from time to time.  Such reports shall provide summaries in a form and in such detail as may be reasonably satisfactory to Bosque including information on any penalties or fines arising during the period, information relating to sources of gas transportation and pricing for such transportation and, to the extent Energy Manager is utilizing Bosque's pipeline capacity, information requested to provide transparency in fuel optimization off of Bosque's fixed pipeline capacity.

(b)     Energy Manager shall provide reasonable cooperation in establishment of appropriate links and data access between the systems of Bosque and Energy Manager to facilitate reporting and communication to the extent practicable.

(c)     Energy Manager shall provide on the first day of each Month:

(i)     24 Month gross margin forecast for Bosque.  These reports shall be updated each Month and provide Month-by-Month and peak/off peak detail.

(ii)     Monthly regulatory report outlining key issues and regulatory changes within ERCOT.

(d)     Bosque may from time-to-time specify changes to be made to the format or timing of any report required to be submitted to Bosque under this Agreement, and Energy Manager shall use commercially reasonable efforts to comply with any such request.  The relevant agreed-upon revised format shall be adopted by Energy Manager with effect from the date of the specified revision and shall apply to the first period to which such report or plan relates commencing after receipt of Bosque's notice specifying such changes.

(e)     If Bosque is required by any Applicable Law, any Permit or Project Financing to produce any projection, report or other document relating to the provision of the Services, Energy Manager shall make commercially reasonable efforts to provide such information at the request of Bosque; provided that Energy Manager shall be reimbursed for any costs reasonably incurred by Energy Manager in connection with this clause.

(f)     If Energy Manager is required by any Applicable Law or any Permit to produce any projection, report or any other document, it shall prepare such report timely and shall submit the same to Bosque with sufficient time to permit Bosque to comment thereon. Notwithstanding anything to the contrary in this Agreement, upon obtaining knowledge thereof, the Parties shall submit prompt written notice to the other of:

(i)     any litigation or material claims, disputes or actions, threatened or filed, concerning the Services;

(ii)     any refusal or threatened refusal to grant, renew or extend, or any action pending or threatened that might affect, the granting, renewal or extension of any Permit relating to the Services;

(iii)     any dispute with any Governmental Authority relating to the Services;

(iv)     all penalties or notices of violation issued by any Governmental Authority relating to the Services;

(v)     any material violation of any Applicable Law or Permits, in either case, relating to the Services; and

(vi)     any other event or circumstance that could materially affect the performance of the Services.

8.2     Books and Records.  Each Party shall maintain in accordance with Prudent Industry Practice complete, accurate and up-to-date supporting records which are pertinent to the performance of such Party's obligations under this Agreement and records of all expenses and costs incurred under this Agreement as such pertain to Bosque and the Facility and the Services. Each Party shall ensure that such supporting books and records are segregated and distinguishable from its own books and records. Each Party shall retain all such books and records for a minimum of two (2) years or, if longer, the relevant period required by Applicable Law.

8.3     Audits.  Bosque shall be entitled, upon reasonable notice to Energy Manager, to audit all books, records, procedures and policies kept and maintained by Energy Manager relating to the Commodity Transactions, Other Transactions and Back-to-Back Agreements and Energy Manger's obligations under this Agreement and the Implementation Agreements.  Without limitation, such review shall also include other Energy Manager transactions entered into with  Affiliates of Energy Manager, agents of Energy Manager, and Affiliates of agents of Energy Manager having similar terms and conditions as Commodity Transactions, Other Transactions and Back-to-Back Agreements in all the trading locations in ERCOT; provided, however, that if such information is subject to a Third Party confidentiality agreement, Energy Manager shall in any case provide Bosque with the volume, price, duration and scope of such transaction.  If any audit reveals any inaccuracy in any Gross Margin Reconciliation Statement, the necessary adjustments to such Gross Margin Reconciliation Statement and the payments thereof will be made on the next Settlement Date.  Energy Manager shall be entitled, upon reasonable notice to Bosque, to audit log books of Bosque as necessary to comply with ERCOT requirements.

8.4     Meetings; Availability.  Energy Manager shall meet with Bosque or other representative of Bosque in person or by conference call no less than two (2) times per Month and at such other reasonable times in any Month as Bosque may request. During such meetings, Energy Manager shall provide Bosque, as requested, with any material information concerning new or significant changes in the Fuel and Power markets applicable to the Facility. Each Party shall make itself available to the other Party through telephone, voicemail, e-mail and/or facsimile during normal business hours, and by telephone, instant messaging, mobile telephone and/or pager during non-business hours. Energy Manager shall also make itself available to Bosque through its 24-hour desk.

**ARTICLE 9**
**FORCE MAJEURE**

9.1     Procedure for Calling Force Majeure.   If one Party wishes to claim relief from performance of its obligations arising under this Agreement on account of any event or circumstance of Force Majeure (that Party, the "Affected Party"), then the Affected Party shall give written notice to the other Party of that event or circumstance as soon as reasonably practicable after becoming aware of

that event or circumstance.  Any Force Majeure event arising in connection with a Long-Term Commodity Transaction, Day-Ahead Commodity Transaction or Short-Term Commodity Transaction shall be handled in accordance with the Force Majeure provision contained in the relevant Implementation Agreements and not the provisions of this Article 9.  Each notice of a Force Majeure event served by an Affected Party to the other Party shall specify the event or circumstance of Force Majeure in respect of which the Affected Party is claiming relief and the steps being taken to mitigate and overcome the effects of such event or circumstances.  Noncompliance by the Affected Party with this procedure shall relieve the other Party from accepting the Affected Party's claim until notice is provided.  The Affected Party shall, by reason of any event or circumstance of Force Majeure in respect of which it has claimed relief under this Article 9:

    (a)    use its commercially reasonable efforts to mitigate the effects of such Force Majeure and to remedy any inability to perform its obligations under this Agreement due to such events as promptly as reasonably practicable; provided that:

    (i)    the Affected Party shall not be obliged to take any steps that would not be in accordance with Prudent Industry Practice or Applicable Laws or that would be beyond its reasonable control; and

    (ii)    the Affected Party shall not be required to settle any strikes or other labor disputes on terms that are adverse to the Affected Party and not commercially reasonable.

    (b)    furnish periodic reports to the other Party regarding the progress in overcoming the adverse effects of such event of Force Majeure and setting forth its best, good faith estimate concerning when it will be able to resume the performance of its obligations under this Agreement; and

    (c)    resume the performance of its obligations under this Agreement as soon as is reasonably practicable after the events of Force Majeure are remedied or cease to exist.

9.2    <u>Performance Suspended</u>.  During the continuance of any Force Majeure, the obligations of an Affected Party under this Agreement, other than any obligation of either Party to pay money when due under the terms of this Agreement (including, without limitation, under Article 6), shall be suspended to the extent such condition results in the Affected Party's inability to perform its obligations.

9.3    <u>End of Force Majeure Event</u>.  When the Affected Party is able, or would have been able if it had complied with its obligations under Section 9.1 and 9.2, to resume the performance of all of its obligations under this Agreement affected by the occurrence of an event or circumstance of Force Majeure, then the period of Force Majeure relating to such event or circumstance shall be deemed to have ended.

**ARTICLE 10**
**DEFAULT AND TERMINATION**

10.1    <u>Energy Manager Events of Default</u>.  The occurrence of any one or more of the following events shall constitute an Energy Manager Event of Default ("<u>Energy Manager Event of Default</u>") under this Agreement:

(a)    the failure by Energy Manager to make, when due, any payment required under this Agreement if such failure is not remedied within three (3) Business Days after written notice of such failure is received by Energy Manager; or

(b)    subject to Article 9, the failure by Energy Manager to perform any material covenant or agreement set forth in this Agreement (other than as described in Sections 10.1(a), 10.1(c), and 10.1(d)) and such failure is not cured within ten (10) Business Days after written notice is received by Energy Manager; or

(c)    Energy Manager shall either (i) fail to maintain in full force and effect any Permit necessary for the performance of the Services under this Agreement or for the purchase and sale of Fuel and/or Power, or (ii) become subject to an order by any Governmental Authority whereby such Governmental Authority revokes or suspends any Permit necessary for the performance of the Services under this Agreement or for the purchase and sale of Fuel and/or Power; or

(d)    any representation or warranty of Energy Manager in this Agreement proves to have been incorrect in any material respect as of the Effective Date or the Services Implementation Date; or

(e)    an Event of Default or Termination Event (which, solely for purposes of this Section 10.1(e), have the meanings given to such capitalized terms in the Implementation Agreement) occurs with respect to Energy Manager under any Implementation Agreement.

10.2    <u>Bosque Events of Default</u>.  The occurrence of any one or more of the following events shall constitute a Bosque Manager Event of Default ("<u>Bosque Event of Default</u>") under this Agreement:

(a)    the failure by Bosque to make, when due, any payment required under this Agreement if such failure is not remedied within three (3) Business Days after written notice of such failure is received by Bosque; or

(b)    subject to Article 9, the failure by Bosque to perform any material covenant or agreement set forth in this Agreement (other than as described in Sections 10.2(a), 10.2(c), and 10.2(d)) and such failure is not cured within ten (10) Business Days after written notice is received by Bosque; or

(c)    Bosque shall either (i) fail to maintain in full force and effect any material Permit necessary to operate the Facility, or (ii) become subject to an order by any Governmental Authority whereby such Governmental Authority revokes or suspends any Permit necessary for the operation of the Facility; or

(d)     any representation or warranty of Bosque in this Agreement proves to have been incorrect in any material respect as of the Effective Date, or any representation or warranty of Bosque in this Agreement proves to have been incorrect in any material respect as of the Services Implementation Date; or

(e)     an Event of Default or Termination Event (which, solely for purposes of this Section 10.2(e), have the meanings given to such capitalized terms in the Implementation Agreement) occurs with respect to Bosque under the Implementation Agreement.

10.3    <u>Rights of Non-Defaulting Party</u>.  When an Event of Default has occurred and is then continuing, the Non- Defaulting Party shall have the right to: (i) by not more than 20 days notice to the Defaulting Party, designate in such Termination (Default) Notice a day not earlier than the day such notice is effective as a Termination Date with respect to this Agreement in its entirety or with respect to Bosque; (ii) suspend performance under this Agreement; and/or (iii) withhold any payments due to the Defaulting Party under this Agreement.  The Termination (Default) Notice shall specify in reasonable detail the circumstances giving rise to the Termination (Default) Notice and shall specify whether transactions are to be terminated or continue to term, in accordance with Section 10.5.   Except to the extent otherwise provided in this Agreement, this Agreement shall terminate on the date specified in the Termination (Default) Notice.

10.4    <u>Bosque Termination Right</u>.  Bosque shall have the right to terminate this Agreement at any time by delivering written notice of termination to Energy Manager, specifying a Termination Date not less than sixty (60) Business Days after the date the termination notice is delivered.  In the event of a Bosque Change of Control, this Agreement shall terminate automatically unless BosPower Development LLC notifies Energy Manager in writing prior to such Bosque Change of Control that this Agreement will continue in effect.  Termination pursuant to this Section 10.4 shall not relieve either Party of any of its obligations under this Agreement up to the Termination Date, including Bosque's obligation to pay Energy Manager for the Services provided pursuant to this Agreement prior to the Termination Date.  If the Termination Date occurs on or prior to December 31, 2010, Bosque shall pay Energy Manager a termination fee in the amount of $150,000.00, which payments shall be due and payable no later than the Termination Date.  Nothing contained in this Section 10.4 shall be deemed to result in a termination of any transaction undertaken pursuant to the Implementation Agreement.

10.5    <u>Termination Procedure</u>.  Upon termination of this Agreement under this Article 10, the Non-Defaulting Party in the event of a termination under Section 10.3, or Bosque in the event of a termination under Section 10.4, shall have the right to (i) elect to have all transactions, if any, still outstanding under the Implementation Agreements at the time of termination of this Agreement continue for the remaining term of such transactions, and the terms and provisions (including credit requirements) contained in the relevant Implementation Agreements shall govern such transactions for the remaining term of such transactions; or (ii) elect to liquidate all such transactions, and the terms and provisions (including credit requirements, if any) contained in the relevant Implementation Agreements shall govern the liquidation of such transactions.   If the Non-Defaulting Party in the event of a termination under Section 10.3, or Bosque in the event of a termination under Section 10.4, as the case may be, elects to have the transactions continue in effect under subsection (i) above, then (x) Energy Manager shall be entitled to the Monthly Management Fee for the remaining term of such transactions; and (y) during the time of such transactions post-termination, Energy Manager shall not undertake or put on any new positions for the Facility.  All transactions that are liquidated under subparagraph (ii)

above and in accordance with the terms of the Implementation Agreements shall be reconciled and netted in accordance with Article 6.

10.6    Successor Energy Manager.

(a)    Energy Manager shall use commercially reasonable efforts to facilitate the transfer of duties to any Person appointed by Bosque to provide Services in connection with the operation of the Facility (the "Successor Energy Manager") so as not to disrupt the normal operation of the Facility, including but not limited to continuing to provide Services pursuant to the terms of this Agreement upon Bosque's request for up to sixty (60) days after the date on which termination of this Agreement becomes effective and shall thereafter provide all relevant information, data and records relating thereto to the Successor Energy Manager and its representatives and accede to all reasonable requests made by such Persons in connection with preparing for taking over the duties and obligations of Energy Manager.

(b)    Promptly after the Termination Date, Energy Manager shall deliver to (and shall, with effect from termination, hold in trust for and to the order of) Bosque or (if so required by Bosque by written notice) to the Successor Energy Manager all property in its possession or under its control owned by Bosque or leased or licensed to Bosque.

10.7    Cooperation Following Termination.    Energy Manager shall, upon termination of this Agreement, cooperate with Bosque and the Successor Energy Manager and comply with all reasonable requests thereof, including the execution of documents and other actions; provided, however, that Bosque shall pay any reasonable costs incurred by Energy Manager relating thereto.  Notwithstanding the foregoing, if such termination was the result of an Energy Manager Event of Default, then Energy Manager shall reimburse Bosque for the reasonable costs incurred in connection with the appointment and engagement of the Successor Energy Manager.

**ARTICLE 11**
**INDEMNIFICATION**

11.1    By Energy Manager.

(a)    Energy Manager shall indemnify, defend and hold harmless Bosque Indemnified Parties from and against any and all suits, actions, liabilities, legal proceedings, claims, demands, losses, costs and expenses of whatsoever kind or character, including reasonable attorneys' fees and expenses (collectively, "Claims") in respect of personal injury to, or death of, Third Parties and in respect of loss of, or damage to, any Third Party property to the extent that the same arises out of or results from (i) the breach of any representation or warranty made by Energy Manager under this Agreement or any Implementation Agreement, (ii) any failure of Energy Manager to perform its obligations under this Agreement, (iii) any negligent or tortuous acts or omissions by Energy Manager or its subcontractors or their respective agents or employees, or (iv) any fraudulent action, willful misconduct or breach of Applicable Law on the part of Energy Manager or its subcontractors or their respective agents or employees in the performance of their express obligations arising under this Agreement.

(b)    Subject to the provisions of Article 12 and without limiting the provisions of Section 11.1(a), Energy Manager shall also indemnify, defend and hold harmless the Bosque

Indemnified Parties from and against any and all regulatory penalties or fines, and expenses (including attorneys' fees and expenses whether at the trial or appellate level) to the extent arising from Energy Manager's violation of any Applicable Law, unless any of the foregoing are the direct result of Energy Manager following the explicit instructions of Bosque in which case Energy Manager shall have no obligation to indemnify.

11.2    By Bosque.

(a)    Bosque shall indemnify, defend and hold harmless Energy Manager Indemnified Parties from and against any and all Claims in respect of personal injury to, or death of, Third Parties and in respect of loss of, or damage to, any Third Party property to the extent the same arises out of or results from (i) the breach of any representation or warranty made by Bosque under this Agreement or any Implementation Agreement, (ii) any failure of Bosque to perform its obligations under this Agreement, (iii) any negligent or tortuous acts or omissions by Bosque, its subcontractors (other than Energy Manager or its subcontractors or their respective agents or employees) or their respective agents or employees, (iv) any fraudulent action, willful misconduct or breach of Applicable Law on the part of Bosque, its subcontractors (other than Energy Manager or its subcontractors or their respective agents or employees) or their respective agents or employees.

(b)    Subject to the provisions of Article 12 and without limiting the provisions of Section 11.1(a), Bosque shall also indemnify, defend and hold harmless the Energy Manager Indemnified Parties from and against any and all regulatory penalties or fines, and expenses (including attorneys' fees and expenses whether at the trial or appellate level) to the extent arising from Bosque's violation of any Applicable Law, and operation and ownership of the Facility.

11.3    Concurrent Negligence.    NOTWITHSTANDING SECTIONS 11.1 AND 11.2, WHEN ANY OBLIGATION FOR INDEMNIFICATION RESULTS FROM JOINT OR CONCURRENT NEGLIGENCE, GROSS NEGLIGENCE, WILLFUL MISCONDUCT, OR BAD FAITH OF BOTH BOSQUE AND ENERGY MANAGER, SUCH PARTIES' DUTY OF INDEMNIFICATION SHALL BE IN PROPORTION TO EACH SUCH PARTY'S ALLOCABLE SHARE OF JOINT OR CONCURRENT NEGLIGENCE, GROSS NEGLIGENCE, WILLFUL MISCONDUCT, OR BAD FAITH.

11.4    Cooperation Regarding Claims.    If any Party hereto shall receive notice or have knowledge of any claim that may result in a claim for indemnification by any Bosque Indemnified Party or any Energy Manager Indemnified Party, as applicable (the "Indemnified Party") against the other Party (the "Indemnifying Party") pursuant to this Agreement, such Indemnified Party shall, as promptly as possible, give the Indemnifying Party notice of such claim, including a reasonably detailed description of the facts and circumstances relating to such claim, and a complete copy of all notices, pleadings and other papers related thereto, and in reasonable detail the basis for its potential claim for indemnification with respect thereto; provided, that failure promptly to give such notice or to provide such information and documents shall not relieve the Indemnifying Party from the obligation under this Agreement to respond to or to defend the Indemnified Party failing to give such notice against such claim, unless the failure to provide such notice would give rise to additional liability on the part of the Indemnifying Party, in which case the Indemnifying Party shall not be liable for such additional liability.

11.5    Defense of Third-Party Claims.

(a)    The Indemnifying Party shall be entitled, at its option, and expense and with counsel of its selection, to assume and control the defense of any third-party claim, action, suit or proceeding that is subject to any indemnity provided in this Agreement by such Indemnifying Party, subject to the prior approval of the Indemnified Party, which shall not unreasonably be withheld; provided that the Indemnifying Party gives prompt notice of its intention to do so to the Indemnified Party and reimburses the Indemnified Party for the reasonable costs and expenses incurred by the Indemnified Party prior to the assumption by the Indemnifying Party of such defense.

(b)    Notwithstanding the provisions of this Section 11.5, unless and until the Indemnifying Party acknowledges in writing its obligation to indemnify the Indemnified Party and assumes control of the defense of a claim, suit, action or proceeding in accordance with Section 11.5(a), the Indemnified Party shall have the right, but not the obligation, to contest, defend and litigate, with counsel of its own selection, any claim, action, suit or proceeding by any Third Party alleged or asserted against the Indemnified Party in respect of, resulting from, related to or arising out of any matter for which it is entitled to be indemnified under this Agreement, and the reasonable costs and expenses thereof shall be subject to the indemnification obligations of the Indemnifying Party under this Agreement.

(c)    Indemnifying Party shall not be entitled to settle or compromise any such claim, suit, action or proceeding without the prior written consent of the Indemnified Party; provided that after agreeing in writing to indemnify the Indemnified Party, the Indemnifying Party may settle or compromise any claim without the approval of the Indemnified Party so long as such claim is solely for monetary damages that are paid in full by the Indemnifying Party and so long as the Indemnified Party is fully released from liability by the claimant.  So long as the Indemnifying Party is fulfilling its obligations pursuant to this Article 11, the Indemnified Party shall not be entitled to settle any such claim, suit, action or proceeding without the prior written consent of the Indemnifying Party, which consent shall not be unreasonably withheld, conditioned or delayed.

(d)    Following the acknowledgment of the indemnification and the assumption of the defense by the Indemnifying Party, the Indemnified Party shall have the right to employ its own counsel and such counsel may participate in such action, but the fees and expenses of such counsel shall be at the expense of the Indemnified Party, when and as occurred, unless (i) the employment of counsel by the Indemnified Party has been authorized in writing by the Indemnifying Party and the Indemnifying Party has agreed to pay such fees and expenses, (ii) the Indemnified Party shall have reasonably concluded, upon advice of counsel, that there would be a conflict of interest between the Indemnifying Party and the Indemnified Party in the conduct of the defense of such action, or (iii) the Indemnifying Party shall not in fact have employed independent counsel reasonably satisfactory to the Indemnified Party to assume the defense of such action and shall have been so notified by the Indemnified Party.

**ARTICLE 12**
**LIMITATION OF LIABILITY**

12.1     General Limitations of Liability.

(a)     THE PARTIES CONFIRM THAT THE EXPRESS REMEDIES AND MEASURES OF DAMAGES PROVIDED IN THIS AGREEMENT SATISFY THE ESSENTIAL PURPOSES OF THIS AGREEMENT.  FOR BREACH OF ANY PROVISION FOR WHICH AN EXPRESS REMEDY OR MEASURE OF DAMAGES IS PROVIDED, SUCH EXPRESS REMEDY OR MEASURE OF DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY.  THE OBLIGOR'S LIABILITY SHALL BE LIMITED AS SET FORTH IN SUCH PROVISION AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED.  IF NO REMEDY OR MEASURE OF DAMAGES IS EXPRESSLY PROVIDED HEREIN, THE OBLIGOR'S LIABILITY SHALL BE LIMITED TO DIRECT ACTUAL DAMAGES ONLY, SUCH DIRECT ACTUAL DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED.

(b)     NEITHER PARTY SHALL BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, OR OTHER BUSINESS INTERRUPTION DAMAGES, BY STATUTE, IN TORT OR CONTRACT, OR OTHERWISE.  The Parties further agree that the waivers and disclaimers of liability, indemnities, releases from liability, and limitations on liability expressed in this Agreement shall survive termination of this Agreement, and shall apply at all times, whether in contract, equity, tort or otherwise.

(c)     IT IS THE INTENT OF THE PARTIES THAT THE LIMITATIONS HEREIN IMPOSED ON REMEDIES AND THE MEASURE OF DAMAGES BE WITHOUT REGARD TO THE CAUSE OR CAUSES RELATED THERETO, INCLUDING THE NEGLIGENCE OF ANY PARTY, WHETHER SUCH NEGLIGENCE BE SOLE, JOINT OR CONCURRENT, OR ACTIVE OR PASSIVE.

12.2     Limitation of Bosque's Liability.   Energy Manager understands and agrees that, notwithstanding anything to the contrary in this Agreement, (a) no claim shall be made against any employee, shareholder, partner, member, representative, officer or director, whether past, present or future, of Bosque in connection with this Agreement; (b) there shall be absolutely no personal liability or recourse fore the payment of any amounts due under this Agreement, or the performance of any obligations under this Agreement against any employee, shareholder, partner, member, representative, officer or director, whether past, present or future, of Bosque, irrespective of any failure to comply with thee provisions of this Agreement; (c) Energy Manager shall look solely to the assets of Bosque for thee satisfaction of each and every remedy of Energy Manager in the event of any breach by Bosque; (d) Energy Manager shall have no right to any claim against Bosque for any capital contributions from any employee, shareholder, partner, member, representative, officer or director, whether past, present or future, of Bosque; and (e) the provisions of Section 12.2(a) through 12.2(d) are made expressly for the benefit of employees, shareholders, partners, members, representatives, officers and directors, whether past, present or future, of Bosque.

12.3     Limitation of Energy Manager's Liability.   Bosque understands and agrees that, notwithstanding anything to the contrary in this Agreement, (a) no claim shall be made against any employee, shareholder, partner, member, representative, officer or director, whether past, present or future, of Energy Manager in connection with this Agreement; (b) there shall be absolutely no personal liability or recourse fore the payment of any amounts due under this Agreement, or the performance of

any obligations under this Agreement against any employee, shareholder, partner, member, representative, officer or director, whether past, present or future, of Energy Manager, irrespective of any failure to comply with thee provisions of this Agreement; (c) Bosque and shall have no right to any claim against Energy Manager for any capital contributions from any employee, shareholder, partner, member, representative, officer or director, whether past, present or future, of Energy Manager; and (d) the provisions of 12.3(a) through (c) are made expressly for the benefit of employees, shareholders, partners, members, representatives, officers and directors, whether past, present ore future, of Energy Manager. Notwithstanding any provision to the contrary contained in this Agreement, the total aggregate liability of Energy Manager to Bosque for damages arising out of or in connection with this Agreement, whether based in contract, warranty, tort (including negligence (but not gross negligence) and strict liability), or other basis except fraud, willful misconduct or gross negligence, shall not exceed the aggregate amount of the total compensation theretofore paid by Bosque to Energy Manager pursuant to this Agreement.

**ARTICLE 13**
**CONFIDENTIALITY**

13.1     <u>Non-Disclosure</u>.   Except as provided in Section 13.2, each Party agrees to hold in confidence any information imparted to it by the other Party which pertains to Bosque's or Energy Manager's, as the case may be, business activity in any manner, and which is not the subject of general public knowledge, including, without limitation, this Agreement and its Exhibits, proprietary processes, technical information and know-how, information concerning Bosque's or Energy Manager's management policies, economic policies, financial and other data ("<u>Confidential Information</u>"). Confidential Information shall not include:  (i) information in the public domain, or (ii) information obtained by a Party from a Third Party not under an obligation of non-disclosure to any Party under this Agreement.  This obligation shall continue to remain in full force and effect for four (4) years after the date of termination of this Agreement.

13.2     <u>Permitted Disclosure</u>.

(a)     Either Party (the "<u>Disclosing Party</u>") shall have the right to (i) disclose Confidential Information to any Governmental Authority only to the extent that such Confidential Information is necessary to comply with such Governmental Authority to avoid legal sanctions or penalties, including findings of criminal or civil contempt; and (ii) disclose Confidential Information with respect to any litigation arising in connection with this Agreement only to the extent that such Confidential Information is required by law, rule, regulation, procedure, subpoena, court order or court requirement, or is material to the issues involved in or determinative to the outcome of such litigation; provided, however, that the Disclosing Party shall first (A) give the other Party (the "<u>Non-Disclosing Party</u>") as much prior notice of disclosure as is reasonably practicable, or if prior notice is not reasonably practicable, then as expeditiously as possible, to permit the Non-Disclosing Party to seek any protective order or other confidentiality protection as the Non-Disclosing Party, in its sole discretion and at its sole expense, may elect to seek; and (B) reasonably cooperate with the Non-Disclosing Party in protecting the Confidential Information that is to be disclosed, with such duty of cooperation not requiring the Disclosing Party to initiate or participate in any litigation or incur more than de minimis costs or expenses.

(b)     Either Party shall have the right to disclose Confidential Information to (i) its agents, advisors, auditors, legal counsel and insurers; (ii) its Affiliates; (iii) Lenders, potential Lenders, investors, potential investors, rating agencies and other members of the public in connection with the financing of the development, construction and operation of the Facility, including in connection with the listing of any shares, stocks, securities, bonds or any other similar financial instrument, but in each case only to the extent required in connection with obtaining such financing, and (iv) potential purchasers of an interest in Bosque or the Facility; provided, however, any such party receiving any Confidential Information agrees to maintain the confidentiality of such Confidential Information in accordance with the terms of this Agreement.  Lenders shall be entitled to disclose Confidential Information to any Governmental Authority or in connection with litigation to the extent and subject to the conditions under which a Disclosing Party may disclose Confidential Information as provided in Section 13.2(a). Notwithstanding the foregoing, it shall not be deemed a breach of this Section 13.2(b) if a Party discloses the terms or conditions of a Commodity Transaction or Other Transaction (other than the name and any other identifying information relating to the other Party), provided that the name of any other identifying information relating to the other Party or may be disclosed only to an entity that aggregates and reports to the public price data on an aggregate basis.

## ARTICLE 14
## REPRESENTATIONS AND WARRANTIES

14.1     <u>Energy Manager Representations and Warranties</u>.  Energy Manager represents and warrants to Bosque as of the Effective Date and the Services Implementation Date, that:

(a)     <u>Organization and Good Standing</u>.  Energy Manager is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Texas.

(b)     <u>Enforceability</u>.  This Agreement constitutes the legal, valid and binding obligation of Energy Manager, except as enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the rights of creditors generally, and (ii) general principles of equity.

(c)     <u>Due Authorization</u>.  The execution, delivery and performance of this Agreement by Energy Manager has been duly authorized by all requisite action and will not conflict with any provisions of any Applicable Law, or any material agreement or instrument to which it is a party or by which it, its property or assets may be bound or affected, and specifically that Energy Manager's performance under this Agreement, and the terms of any transactions entered into under this Agreement, are not subject to the jurisdiction of any state utility or public service commissions.

(d)     <u>Permits</u>.  Energy Manager has obtained and shall maintain until this Agreement is terminated all Permits required for it to perform the Services.

(e)     <u>Litigation</u>.  Energy Manager is not a party to any legal, administrative, arbitral, investigatorial or other proceeding or controversy pending or, to its knowledge, threatened, that could materially adversely affect its ability to perform its obligations under this Agreement.

14.2    <u>Bosque Representations and Warranties</u>.    Bosque represents and warrants to Energy Manager as of the Effective Date that:

(a)    <u>Organization and Good Standing</u>.    Bosque is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware.

(b)    <u>Enforceability</u>.    This Agreement constitutes the legal, valid and binding obligation of Bosque, except as enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the rights of creditors generally and (ii) general principles of equity.

(c)    <u>Due Authorization</u>.  The execution, delivery and performance of this Agreement by Bosque has been duly authorized by all requisite action and will not conflict with any provisions of any Applicable Law, or any material agreement or instrument to which it is a party or by which it, its property or assets may be bound or affected, and specifically that Bosque's performance under this Agreement, and the terms of any transactions entered into under this Agreement, are not subject to the jurisdiction of any state utility or public service commissions.

(d)    <u>Permits</u>.  Bosque has obtained or shall have obtained all Permits required to operate or conduct its respective business as contemplated in this Agreement.

(e)    <u>Litigation</u>.    Bosque is not a party to any legal, administrative, arbitral, investigatorial or other proceeding or controversy pending or, to its knowledge, threatened, that could materially adversely affect its ability to perform its obligations under this Agreement.

**ARTICLE 15**
**DISPUTE RESOLUTION**

15.1    <u>Dispute Resolution</u>.

(a)    The Parties shall make a diligent, good faith effort to resolve any dispute, controversy or claim arising out of or relating to this Agreement or any breach of this Agreement (collectively, a "<u>Dispute</u>").  If the Parties are unable to resolve amicably the Dispute within thirty (30) Days after the giving of notice by either Party to the other Party of the existence of a Dispute, then the Parties may seek to resolve such Dispute in the courts in accordance with the provisions of <u>Section 15.1(b)</u>.

(b)    Each Party irrevocably submits to the exclusive jurisdiction of (i) any court of the State of Texas sitting in Harris County and (ii) the United States District Court for the Southern District of Texas, for the purposes of any suit, action or proceeding relating to, arising out of, or in connection with this Agreement or any matter arising under this Agreement.  Each Party agrees to commence any action, suit or proceeding relating to, arising out of, or in connection with this Agreement or any matter arising under this Agreement in the United States District Court for the Southern District of Texas or, if such suit, action or proceeding may not be brought in such court for jurisdictional reasons, in any court of the State of Texas sitting in Harris County. Each Party further agrees that service of process, summons, notice or document by hand delivery or U.S. registered mail at the address specified for such Party in Section 16.5 (or such other address specified by such Party from time to time pursuant to Section 16.5) shall be

effective service of process for any action, suit or proceeding brought against such Party in any such court. Each Party irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding relating to, arising out of, or in connection with this Agreement or any matter arising under this Agreement in (x) any court of the State of Texas sitting in Harris County and (y) the United States District Court for the Southern District of Texas, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum. *TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY HEREBY IRREVOCABLY WAIVES ALL RIGHT OF TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING, OR COUNTERCLAIM RELATING TO, ARISING OUT OF, OR IN CONNECTION WITH, THIS AGREEMENT, OR ANY MATTER ARISING HEREUNDER.*

15.2    Continued Performance.  The Parties shall continue to perform under this Agreement during the pendency of any efforts to resolve a dispute under Section 15.2.

### ARTICLE 16
### MISCELLANEOUS

16.1    Severability.  The invalidity, in whole or in part, of any Section or provision of this Agreement will not affect the validity of the remainder of such Sections or provisions.

16.2    Entire Agreement.  This Agreement, which hereby expressly incorporates the Implementation Agreement and the Commodity Transactions and Other Transactions entered into pursuant to this Agreement and those agreements, and makes them part of this Agreement, contains the complete agreement between Bosque and Energy Manager with respect to the provision of Services as contained in this Agreement and supersedes all other agreements, whether written or oral, with respect to the matters contained therein.

16.3    Amendment.  No modification, amendment, or other change to this Agreement will be binding on any Party unless consented to in writing by all Parties; provided, however, that Bosque may revise the Energy Management Plans, Risk Management Strategies, Execution Strategies and the Operating and Dispatch Procedures with respect to the Facility as described in this Agreement.

16.4    Assignment.

(a)    This Agreement shall be binding upon the successors and assigns of the respective Parties, and the covenants, conditions, rights and obligations of this Agreement shall run until the Agreement is terminated.  Subject to Sections 16.4(b) and 16.4(c), no assignment of this Agreement, in whole or in part, shall be made without the prior written consent of the non-assigning Party, which consent shall not be unreasonably withheld, conditioned or delayed.  Any purported assignment of rights or delegation of performance in violation of this Section 16.4(a) is void.

(b)    Bosque shall be entitled without the consent of Energy Manager to transfer its rights and obligations under this Agreement to (i) an Affiliate of Bosque (an "Bosque Permitted Transferee"); and (ii) any purchaser of the Facility after the Effective Date.

(c)    Bosque may, without the consent of Energy Manager, assign to or otherwise create a security interest in favor of Lenders or their designee, or any other Person providing

Project Financing to Bosque, in or of Bosque's rights and interests in, under or pursuant to this Agreement and the revenues deriving from any of the rights or assets of Bosque.  Energy Manager shall cooperate with  Bosque and the Persons providing Project Financing, including entering into consent agreements with the Lenders, provided that such consent does not materially increase Energy Manager's liability under this Agreement or materially impair the rights and remedies available to Energy Manager under this Agreement.

16.5    <u>Notices</u>.

| | |
|---|---|
| If to Bosque: | PurEnergy Management Services, LLC |
| | 1732 West Genesee Street |
| | Syracuse, NY  13204 |
| | Attn: Don Scholl |
| | Telephone:  (315) 448-2266 |
| | Facsimile:  (315) 448-0264 |
| | |
| With a copy to: | Arcapita Inc. |
| | 75 Fourteenth Street, 23rd Floor |
| | Atlanta, GA 30309 |
| | Attn: Portfolio Energy Manager, Asset Based Investments |
| | |
| | Telephone: (404) 920-9000 |
| | Facsimile: (404) 920-9001 |
| | |
| and to: | William Parish |
| | Morgan, Lewis & Bockius LLP |
| | 1000 Louisiana St., Suite 4000 |
| | Houston, TX 77002 |
| | |
| | Telephone: 713-890-5190 |
| | Facsimile: 713-890-5001 |
| | |
| If to Energy Manager: | EDF Trading North America, LLC |
| | 4700 W. Sam Houston Parkway N., Suite 250 |
| | Houston, TX  77041 |
| | Attn: Vice President - ERCOT |
| | |
| | Telephone: 281-781-0333 |
| | Facsimile: 281-781-0360 |

16.6    <u>Additional Documents and Actions</u>.  Each Party agrees to execute and deliver to the other such additional documents, and take such additional actions, as may be reasonably required by the other to effect the interest of this Agreement.

16.7    <u>Waiver</u>.  Failure by any Party to exercise any of its rights under this Agreement shall not constitute a waiver of such rights.  No Party shall be deemed to have waived any right resulting from any failure to perform by another Party unless it has made such waiver specifically in writing.

16.8     Captions.  The captions contained in this Agreement are for convenience and reference only and in no way define, describe, extend or limit the scope or intent of this Agreement or the intent of any provision contained in this Agreement.  The headings are inserted for convenience and are to be ignored for the purposes of construction.  The Schedules to this Agreement form part of this Agreement and will be of full force and effect as though they were expressly set forth in the body of this Agreement.

16.9     Survival.  Notwithstanding any provisions to the contrary in this Agreement, the obligations in Articles 6, 8, 11, 12 and 13, and any other indemnification obligations in this Agreement shall survive the expiration or termination of this Agreement for a period of twenty-four (24) months therefrom.

16.10    No Third Party Beneficiary.  This Agreement is for the sole and exclusive benefit of the Parties and shall not create a contractual relationship with, or cause of action in favor of, any Third Party; provided, however, that BosPower Development LLC is intended to be a third party beneficiary of Section 16.4.

16.11    Counterparts.  This Agreement may be executed in one or more counterparts each of which shall be deemed an original and all of which shall be deemed one and the same Agreement.

16.12    Governing Law.    THIS AGREEMENT SHALL BE INTERPRETED AND CONSTRUED ACCORDING TO THE LAWS OF THE STATE OF TEXAS, EXCLUSIVE OF ITS CONFLICTS OF LAWS PRINCIPLES.

[*The signatures are on the next page.*]

**IN WITNESS WHEREOF**, each of the Parties has caused this Energy Management Agreement to be executed by its duly authorized officer, each as of the day and year first above written.

**BOSQUE POWER COMPANY, LLC**

By:_____

    Name: Brian R McCabe

    Title: Authorized Representative


**EDF TRADING NORTH AMERICA, LLC**

By:_____

    Name:

    Title

*[Signature page to Energy Management Agreement.]*

**IN WITNESS WHEREOF**, each of the Parties has caused this Energy Management Agreement to be executed by its duly authorized officer, each as of the day and year first above written.

**BOSQUE POWER COMPANY, LLC**

By:_____

    Name:

    Title:  Authorized Representative

**EDF TRADING NORTH AMERICA, LLC**

By:_____

    Name:      GRIFF JONES

    Title      CHIEF EXECUTIVE OFFICER

[*Signature page to Energy Management Agreement.*]

**Exhibit A**

**1992 ISDA Master Agreement, Form of Schedule to the
1992 ISDA Master Agreement Together with the
ISDA Power, Gas and Credit Support Annexes**

**[ATTACHED]**

**(Multicurrency — Cross Border)**

# ISDA ®

International Swaps and Derivatives Association, Inc.

# MASTER AGREEMENT

dated as of February 1, 2010

EDF TRADING NORTH AMERICA, LLC ("Party A") and BOSQUE POWER COMPANY, LLC ("Party B") have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows: —

**1.**       **Interpretation**

(a)       *Definitions*. The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)       *Inconsistency*. In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)       *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

**2.**       **Obligations**

(a)       *General Conditions*.

(i)       Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)       Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency.  Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement

(iii)       Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

(b)      *Change of Account*. Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)      *Netting*. If on any date amounts would otherwise be payable:—

(i) in the same currency; and

(ii) in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)      *Deduction or Withholding for Tax.*

(i)      *Gross-Up*. All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

(1)      promptly notify the other party ("Y") of such requirement;

(2)      pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

(3)      promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

(4)      if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

(A)      the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

(B)      the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action

ISDA® 1992

taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

(ii)    *Liability*. If: —

(1)    X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)    X does not so deduct or withhold; and

(3)    a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)    *Default Interest; Other Amounts*. Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

## 3.    Representations

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)    *Basic Representations*.

(i)    *Status*. It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)    *Powers*. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii)    *No Violation or Conflict*. Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)    *Consents*. All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been

obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)      **Obligations Binding**. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b)      **Absence of Certain Events**. No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)      **Absence of Litigation**. There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)      **Accuracy of Specified Information**. All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)      **Payer Tax Representation**. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)      **Payee Tax Representations**. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

**4.      Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)      **Furnish Specified Information**. It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

(i)       any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

(ii)      any other documents specified in the Schedule or any Confirmation; and

(iii)     upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)      ***Maintain Authorisations***. It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)      ***Comply with Laws***. It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)      ***Tax Agreement***. It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)      ***Payment of Stamp Tax***. Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated, organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

**5.      Events of Default and Termination Events**

(a)      ***Events of Default***. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i)      ***Failure to Pay or Deliver***. Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)      ***Breach of Agreement***. Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)      ***Credit Support Default***.

(1)      Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)      the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)      the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)      ***Misrepresentation.*** A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider

of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)     ***Default under Specified Transaction***. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)    ***Cross Default***. If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii)   ***Bankruptcy***. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: —

> (1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii)  ***Merger Without Assumption***. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: —

**ISDA® 1992**

(1)      the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2)      the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)      ***Termination Events***. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

(i)      ***Illegality***. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party): —

(1)      to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2)      to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii)      ***Tax Event***. Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iii)      ***Tax Event Upon Merger***. The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

(iv)      ***Credit Event Upon Merger***. If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii)

but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(v)     ***Additional Termination Event***. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)     ***Event of Default and Illegality***. If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default..

## 6.     Early Termination

(a)     ***Right to Terminate Following Event of Default***. If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)     ***Right to Terminate Following Termination Event***.

(i)     ***Notice***. If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)     ***Transfer to Avoid Termination Event***. If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)     ***Two Affected Parties***. If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)     ***Right to Terminate***. If: —

**ISDA® 1992**

(1) a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2) an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)  **Effect of Designation.**

(i)  If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii) Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)  **Calculations.**

(i)  **Statement**. On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)  **Payment Date**. An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)  **Payments on Early Termination**. If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

**ISDA® 1992**

(i)    **Events of Default**. If the Early Termination Date results from an Event of Default: —

    (1)    *First Method and Market Quotation*. If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

    (2)    *First Method and Loss*. If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

    (3)    *Second Method and Market Quotation*. If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

    (4)    *Second Method and Loss*. If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)    **Termination Events**. If the Early Termination Date results from a Termination Event: —

    (1)    *One Affected Party*. If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

    (2)    *Two Affected Parties*. If there are two Affected Parties: —

        (A)    if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

        (B)    if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

        **ISDA® 1992**

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)    *Adjustment for Bankruptcy*. In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)    *Pre-Estimate*. The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

## 7.    Transfer

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: —

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

## 8.    Contractual Currency

(a)    *Payment in the Contractual Currency*. Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement.  If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments*. To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from

any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)     **Separate Indemnities**. To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)     **Evidence of Loss**. For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

## 9.     Miscellaneous

(a)     **Entire Agreement**.  This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)     **Amendments**.  No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)     **Survival of Obligations**. Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)     **Remedies Cumulative**. Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)     **Counterparts and Confirmations**.

    (i)     This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

    (ii)     The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall he entered into as soon as practicable and may he executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)     **No Waiver of Rights**. A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)     **Headings**. The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

## 10.     Offices; Multibranch Parties

(a)     If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)     Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)     If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

## 11.     Expenses

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

## 12.     Notices

(a)     ***Effectiveness***. Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

> (i)     if in writing and delivered in person or by courier, on the date it is delivered;

> (ii)     if sent by telex, on the date the recipient's answerback is received;

> (iii)     if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

> (iv)     if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

> (v)     if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)     ***Change of Addresses***. Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

## 13.     Governing Law and Jurisdiction

(a)     ***Governing Law***. This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

**ISDA® 1992**

(b)     *Jurisdiction*. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

(i)     submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii) waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)     *Service of Process*. Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)     *Waiver of Immunities*. Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 14.    Definitions

As used in this Agreement:—

"*Additional Termination Event*" has the meaning specified in Section 5(b).

"*Affected Party*" has the meaning specified in Section 5(b).

"*Affected Transactions*" means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

"*Affiliate*" means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

"*Applicable Rate*" means:—

(a)     in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)      in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)      in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)      in all other cases, the Termination Rate.

**"Burdened Party"** has the meaning specified in Section 5(b).

**"Change in Tax Law"** means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

**"consent"** includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

**"Credit Event Upon Merger"** has the meaning specified in Section 5(b).

**"Credit Support Document"** means any agreement or instrument that is specified as such in this Agreement.

**"Credit Support Provider"** has the meaning specified in the Schedule.

**"Default Rate"** means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

**"Defaulting Party"** has the meaning specified in Section 6(a).

**"Early Termination Date"** means the date determined in accordance with Section 6(a) or 6(b)(iv).

**"Event of Default"** has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

**"Illegality"** has the meaning specified in Section 5(b).

**"Indemnifiable Tax"** means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

**"law"** includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and **"lawful"** and **"unlawful"** will be construed accordingly.

**"Local Business Day"** means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the

relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the

criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of: —

(a)      the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)      such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meanings specified in the Schedule.

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

**ISDA® 1992**

***"Termination Currency"*** has the meaning specified in the Schedule.

***"Termination Currency Equivalent"*** means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

***"Termination Event"*** means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

***"Termination Rate"*** means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

***"Unpaid Amounts"*** owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.


EDF TRADING NORTH AMERICA, LLC          BOSQUE POWER COMPANY, LLC


By: ...............................................................     By: ..........................................................................
Name:                                                                 Name:
Title:                                                                Title:  Authorized Representative
Date: February 1, 2010                                                Date:  February 1, 2010

**SCHEDULE**
**to the**
**1992 ISDA MASTER AGREEMENT**
**(Multicurrency - Cross Border)**

dated as of February 1, 2010

between

| **EDF Trading North America, LLC** | and | **Bosque Power Company, LLC** |
|:---:|:---:|:---:|
| **("Party A")** | | **("Party B")** |
| being a limited liability company | | being a limited liability company |
| organized and existing under the laws of | | organized and existing under the laws of |
| the State of Texas | | the State of Delaware |

The ISDA Master Agreement, this attached Schedule, together with all Annexes, Exhibits, and Schedules thereto, and each Transaction thereunder and Confirmation thereof, (each as amended from time to time, the "*Agreement*") are intended to be an appendix to the Energy Management Agreement between Party A and Party B (the "*EMA*"), and are not intended to modify any of the terms, conditions or obligations set forth in the EMA. In the event of any inconsistency between other parts of this Agreement and any Confirmation hereunder, such Confirmation shall prevail.

This Agreement, and any Transactions hereunder with a Trade Date prior to the Services Implementation Date, shall become effective upon the occurrence of the Services Implementation Date, as such term is defined in the EMA.

Notwithstanding any other provisions of this Agreement (including provisions of this Schedule), each party's rights and obligations with respect to (i) payments and invoices (as addressed by Section 2 of the Agreement and Parts 7 and 8 of this Schedule); (ii) early termination and setoff (as addressed by Section 6 of the Agreement); (iii) transfers (as addressed by Section 7 of the Agreement); (iv) expenses (as addressed by Section 11 of the Agreement); (v) notices (as addressed by Section 12 of the Agreement); and (vi) confidentiality (as addressed by Part 5(j) of this Schedule), shall be as set forth in the EMA and shall not be governed by this Agreement or any Confirmations hereunder; *provided, however*, that if the EMA is terminated or Party B is no longer a party to the EMA pursuant to the provisions of the EMA, and Transactions continue beyond the date of such event, then each party's rights and obligations with respect to all such Transactions and the matters set forth above shall be governed by this Agreement and any Confirmations hereunder.

**PART 1**
**TERMINATION PROVISIONS**

(a)     *"Specified Entity"* means in relation to Party A, for the purpose of:

Section 5(a)(v)                    *N/A*

|   |   |
|---|---|
| Section 5(a)(vi) | *N/A* |
| Section 5(a)(vii) | *N/A* |
| Section 5(b)(iv) | *N/A* |

And in relation to Party B, for the purpose of:

|   |   |
|---|---|
| Section 5(a)(v) | *N/A* |
| Section 5(a)(vi) | *N/A* |
| Section 5(a)(vii) | *N/A* |
| Section 5(b)(iv) | *N/A* |

(b)     "*Specified Transaction*" will have the meaning specified in Section 14 of this Agreement except that such term shall be amended by including within that definition the following additional sentences: "Specified Transactions shall also include all agreements for the purchase, sale or transfer of any commodity or any other commodity trading transaction, including, without limitation, electric energy, capacity, ancillary services, electric transmission services, emissions, petroleum, natural gas, coal, fuel transportation services, and the products or by-products of any of the foregoing, including Power Transactions, Gas Transactions and all other Transactions defined in the Commodity Definitions.  The term Transaction as used in this Agreement shall mean a Specified Transaction."

(c)     The "*Cross Default*" provisions of Section 5(a)(vi): will apply to Party A and will apply to Party B; *provided* that for so long as Other Eligible Support in the amount specified for any Transaction constitutes Posted Credit Support then the provisions of Section 5(a)(vi) shall not apply to Party B.

If such provisions apply then:

"*Specified Indebtedness*" will have the meaning specified in Section 14 of this Agreement.

"*Threshold Amount*" means:

(i)     With respect to Party A: 3% of Party A's or its Credit Support Provider's (as applicable) Shareholder Equity as reported in its most recent audited or quarterly consolidated financial statements;

(ii)    With respect to Party B: 3% of Party B's or its Credit Support Provider's (as applicable) Shareholder Equity as reported in its most recent audited or quarterly consolidated financial statements; and

(iii)   For the purposes of this definition of Threshold Amount, "Shareholder Equity" means, at any time, the amount of paid-in capital in respect of all issued and fully-paid shares of the share capital of the relevant entity, together with the contributed surplus, the cumulative translation adjustment (if any) and the retained earnings calculated in accordance

- 3 -

with generally accepted accounting principles in the country in which that entity is organized, consistently applied.

(d)     Section 5(a)(vi)(1) is amended by deleting ", or becoming capable at such time of being declared".

(e)     The *"Credit Event Upon Merger"* provisions of Section 5(b)(iv) will apply to Party A and Party B as amended as follows:

Section 5(b)(iv) is hereby amended by adding the following phrase to the end thereof:

"*provided, however*, that the foregoing event shall not constitute a Termination Event (A) if after such action or event the resulting, surviving, or transferee entity (which entity is the successor-in-interest to such party) is directly or indirectly owned or controlled by such party's Credit Support Provider, if any, and the Credit Support Documents supporting such party's obligations remain in full force and effect, or (B) so long as in connection with or after such action or event "X" or its successor or transferee provides (or causes to be provided) to the other party ("Y") within two Local Business Days of Y's written demand therefore (i) Eligible Credit Support in an amount satisfactory to Y in its sole discretion, or (ii) if no such Credit Support Documents are effective, a Credit Support Annex or other Credit Support Document, in a form and substance reasonably acceptable to Y.  If such Eligible Credit Support is provided, it shall be in addition to any Eligible Credit Support required under the ISDA Credit Support Annex attached hereto.

(f)     The *"Automatic Early Termination"* provision of Section 6(a) will not apply to Party A or to Party B.

(g)     *Payments on Early Termination.*  For the purpose of Section 6(e) of this Agreement:

(i)      Loss will apply; and

(ii)     The Second Method will apply.

(h)     "*Termination Currency*" means U.S. Dollars.

(i)     *Additional Termination Event* shall be the termination of the EMA; *provided, however*, that this Additional Termination Event shall not apply if: (i) it is waived by mutual agreement of the Parties; or (ii) Party B transfers its rights and obligations under this Agreement pursuant to Section 7 or Part 4(k) of this Agreement.

(j)     The provisions of Section 5(a)(vii) shall not apply to Party B.

- 4 -

## PART 2
## TAX REPRESENTATIONS

(a)     ***Payer Representations.***   For the purpose of Section 3(e) of this Agreement, Party A will make the following representation and Party B will make the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 2(e), 6(d)(ii) or 6(e) of this Agreement) to be made by it to the other party under this Agreement.  In making this representation, it may rely on (i) the accuracy of any representations made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction of the agreement contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, *provided* that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

(b)     ***Payee Representations.*** For the purpose of Section 3(f) of this Agreement, Party A and Party B make the representations specified below, if any:

(i)     For the purpose of Section 3(f) of this Agreement, Party A represents that it is a limited liability company organized and existing under the laws of the State of Texas and that it is a "U.S. Person" within the meaning of United States Treasury Regulation Section 1.1441-4(a)(3)(ii).

(ii)     For the purpose of Section 3(f) of this Agreement, Party B represents that it is a limited liability company organized and existing under the laws of the State of Delaware and that it is a "U.S. Person" within the meaning of United States Treasury Regulation Section 1.1441-4(a)(3)(ii).

## PART 3
## AGREEMENT TO DELIVER DOCUMENTS

For the purpose of Section 4(a)(i) of this Agreement, each party agrees to deliver the following documents, as applicable:

(a)     Tax forms, documents or certificates to be delivered are:

| *Party required to deliver document* | *Form/Document/ Certificate* | *Date by which to be delivered* |
|---|---|---|
| Party A and Party B | An executed United States Internal Revenue Service Form | (i) Upon the execution of this Agreement; (ii) promptly upon |

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered |
|---|---|---|
| | W-9 (or any successor thereto) | reasonable demand by the other party; and (iii) promptly upon learning that any such form previously provided by the party has become obsolete or incorrect. |
| Party A and Party B | Uniform Sales & Use Tax Certificate – Multijurisdiction or other similar applicable resale certificates. | (i) Upon the execution of this Agreement; (ii) promptly upon reasonable demand by the other party; and (iii) promptly upon learning that any such form previously provided by the party has become obsolete or incorrect. |

(b)    Other documents to be delivered are:

| Party required to deliver document | Form/Document Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party A and Party B | Copies of documents required to evidence authority to enter this Agreement or any Credit Support Document. | Upon Execution | Yes |
| Party A and Party B | A duly executed incumbency certificate of such party certifying the name, true signature and authority of each person authorized to execute this Agreement and enter into Transactions for the party. | Upon Execution | Yes |
| Party A and Party B | Such other reasonable documentation (including financial information) which the other party may reasonably request in connection with any Transaction. | Promptly upon request | Yes |
| Party A and Party B | Copy of Annual Report containing audited consolidated | Promptly upon request if such Financial | Yes |

| Party required to deliver document | Form/Document Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| | financial statements of the Party or its Credit Support Provider, if applicable. | Statement is not available on "SEDAR", "EDGAR" or on the party's home page on the World Wide Web | |
| Party A and Party B | Copy of quarterly unaudited consolidated financial statements of the Party or its Credit Support Provider, if applicable. | Promptly upon request if such Financial Statement is not available on "SEDAR", "EDGAR" or on the party's home page on the World Wide Web. | Yes |
| Party A and Party B | Duly executed copy of Credit Support Document(s) specified in 4(f) of this Schedule | Promptly upon request | No |

## PART 4
## MISCELLANEOUS

(a)    ***Addresses for Notices.***  For the purpose of Section 12(a) of this Agreement:

Address for Notices to Party A:

Address:    EDF Trading North America, LLC
4700 West Sam Houston Parkway North, Suite 250
Houston, Texas  77041

Attention:    Contracts Administration
Telephone No.:  281-781-0333
Facsimile No.:   281-781-0360

With a Copy To:

Address:    Same as above
Attention:    General Counsel
Telephone:    281-653-5811
Facsimile:    281-781-0360

Address for Notices to Party B:

|            |                                          |
|------------|------------------------------------------|
| Address:   | Bosque Power Company, LLC                |
|            | c/o PurEnergy Management Services, LLC   |
|            | 1732 West Genesee Street                 |
|            | Syracuse, NY  13204                      |
|            |                                          |
| Attention: | Dan Noel                                 |
| Facsimile: | (315) 448-0264                           |

With a Copy To:

|            |                                             |
|------------|---------------------------------------------|
| Address:   | Arcapita Inc.                               |
|            | 75 Fourteenth Street, 23rd Floor            |
|            | Atlanta, GA  30309                          |
| Attention: | Portfolio Manager, Asset Based Investments  |
| Facsimile: | (404) 920-9001                              |

(b)  ***Process Agent***.  For the purpose of Section 13(c) of this Agreement:

Party A appoints as its Process Agent: Not Applicable.
Party B appoints as its Process Agent: Not Applicable.

(c)  ***Offices***.  The provisions of Section 10(a) will apply to this Agreement.

(d)  ***Multibranch Party.***  For the purpose of Section 10(c) of this Agreement:

(i)  Party A is not a Multibranch Party.

(ii)  Party B is not a Multibranch Party.

(e)  ***Calculation Agent.***  The Calculation Agent is Party A, *provided, however*, if an Event of Default has occurred and is continuing with respect to Party A, the Calculation Agent shall be Party B (or any designated third party mutually agreed to by the parties) until such time as Party A is no longer a Defaulting Party or an Affected Party.  No failure by a party to perform any duties of the Calculation Agent under this Agreement shall be construed as an Event of Default or Termination Event under Sections 5(a) or (b) of this Agreement.

(f)  ***Credit Support Document.***  Details of Credit Support Documents are as follows:

(i)  With respect to Party A and B, the Credit Support Annex to the Schedule to the Master Agreement between Party A and Party B, attached hereto.

(ii)  With respect to Party A, the guarantee from its Credit Support Provider in the form attached hereto as Exhibit A.

(iii)  With respect to Party A and B any Eligible Credit Support.

(g)    *Credit Support Provider*.

    (i)    Credit Support Provider means in relation to Party A: EDF Trading Limited.

    (ii)    Credit Support Provider means in relation to Party B: Not Applicable.

(h)    *Governing Law.*  This Agreement will be governed by and construed in accordance with the laws of the State of New York (without giving effect to any provision of New York law that would cause another jurisdiction's laws to be applied).

(i)    *Netting of Payments.*  The limitation set forth in subparagraph (ii) of Section 2(c) of this Agreement shall not apply with the result that the netting contemplated by Section 2(c) of this Agreement applies to all Transactions.

(j)    *"Affiliate"* will have the meaning in Section 14 of this Agreement, *provided however*, that (i) with respect to Party A, the term "Affiliate" shall not be construed to include EDF Development, Inc. or any of its affiliated or subsidiary companies (other than EDF Trading North America, LLC), or EDF Nouvelles, Inc. or any of its affiliated or subsidiary companies (other than EDF Trading North America, LLC) and (ii) Party B shall have no "Affiliates."

(k)    *"Transfer"* In addition to transfers under Sections 7(a) and 7(b):

    Party B may transfer this Agreement, without the consent of Party A, if:

      (1) the transferee of Party B agrees in writing to be bound by the terms and conditions of this Agreement and delivers such tax and enforceability assurances as Party A may reasonably request;

      (2) the transferee or its credit support provider either has an existing support agreement in place with Party A, or if it does not have an existing credit support agreement in place with Party A, such transferee or its credit support provider meets Party A's internal credit and other risk management policies and standards then in effect and consistently applied;

      (3) Party B and its Credit Support Provider represent that they have performed all of their material obligations arising under this Agreement prior to the transfer; and

      (4) Party A and the transferee of Party B effectuate the assignment by entering into a separate ISDA agreement that is materially the same as this Agreement.

    Upon compliance by Party B and the transferee of Party B with the foregoing terms and conditions: (i) Party B will be released from any and all obligations under this Agreement with respect to Party A that arise after such assignment; and (ii) Party A will be released from any and all obligations under this Agreement with respect to Party B that arise after such assignment.

The transfer of this Agreement will also have the effect of transferring all of the Transactions under this Agreement that are in effect at the time of such transfer; provided, however, Party B shall not transfer less than all of the Transactions under this Agreement unless Party A has consented to such partial transfer in its sole discretion.

## PART 5
## OTHER PROVISIONS

(a)   ***Incorporation of Definitions.***   Unless otherwise specified in a Confirmation, this Agreement and each Confirmation incorporates, and is subject to and governed by, the 2005 ISDA Commodity Derivatives Definitions (the "Commodity Definitions") and the 2000 ISDA (the "Definitions") as published by the International Swaps and Derivatives Association, Inc. on the date of this Agreement.  If there is any conflict between the provisions of this Agreement and the provisions of the Commodity Definitions or the Definitions, the provisions of this Agreement apply. If there is any conflict between the Commodity Definitions and the Definitions, the Commodity Definitions apply. If there is any conflict between the provisions of this Agreement and a Confirmation, the provisions of the Confirmation apply. The references in the Definitions to "Swap Transaction" are deemed to be references to any Transaction under this Agreement.

(b)   ***Additional Representations.***   The following representations are given by each party and are incorporated as representations given under Section 3 of the Agreement:

(i)     Each party represents that it is entering into this Agreement, any Credit Support Document to which it is a party, each Transaction, and each other document executed and delivered in accordance with this Agreement as principal and not as agent or in any other capacity, fiduciary or otherwise;

(ii)    With respect to each Transaction based on the price of a commodity, each party represents to the other party, on the date the Transaction is entered into, that it is entering into the Transaction in conjunction with a line of its business (including financial intermediation services) or the financing of a line of its business;

(iii)   Each party represents that in connection with the negotiation of, the entering into, and the confirming of the execution of, this Agreement, any Credit Support Document to which it is a party, each Transaction and any other documentation relating to this Agreement to which it is a party hereto or thereto or that it is required by this Agreement to deliver:

(A)    the other party hereto or thereto is not acting as a fiduciary or financial or investment advisor for it;

(B)    it is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (except such

representations as may be expressly set forth in this Agreement, in such Credit Support Document or in any Confirmation);

(C)    the other party hereto or thereto has not given to it (directly or indirectly through any other person) any assurance, guarantee, or representation whatsoever as to the expected or projected success, profitability, return, performance, result, effect, consequence, or benefit (either legal, regulatory, tax, financial, accounting, or otherwise) of this Agreement, such Credit Support Document, such Transaction or other documentation;

(D)    it has consulted with its own legal, regulatory, tax, business, investment, financial, and accounting advisors to the extent it has deemed necessary, and it has made its own investment, hedging, and trading decisions (including decisions regarding the suitability of any Transaction pursuant to this Agreement) based upon its own judgment and upon any advice from such advisors as it has deemed necessary and not upon any view expressed by the other party hereto or thereto;

(E)    it has determined that all trading decisions have been the result of arm's length negotiations between the parties;

(F)    it is entering into this Agreement, such Credit Support Document, each Transaction and any other documentation relating to this Agreement with a full understanding of all of the terms, conditions and risks hereof and thereof (economic and otherwise), and it is capable of assuming and willing to assume (financially and otherwise) those risks; and

(G)    it is a sophisticated investor.

(c)    ***Transaction Procedure***.

(i)    From time to time, the parties may enter into Transactions under and governed by this Agreement.  The parties agree that the essential terms of each Transaction to be entered into hereunder may be orally agreed upon over the telephone.  An oral agreement in respect of any Transaction shall be considered binding, valid and enforceable for all purposes.

(ii)    Following any oral agreement on the terms of a Transaction, Party A shall complete and sign a Confirmation recording the agreed upon terms and forward same to Party B.  Party B shall either execute and return the Confirmation or return the Confirmation with applicable corrections, if any, within three (3) Local Business Days of receipt of the Confirmation. Failure of Party A to complete and sign a Confirmation shall not affect the validity or enforceability of the Transaction.  Any dispute in respect of a Confirmation raised within the applicable three (3) Local Business Day period shall be resolved in good faith and with reference to the recorded telephone negotiations of the Transaction.  Any such tape recordings may be submitted into evidence in respect of any Proceedings or arbitration related to this

Agreement or any Transaction and such shall be the preferred evidence of the terms of such Transaction. Failure by Party B to respond to any Confirmation within the three (3) Local Business Day period after receipt shall not adversely affect the binding, valid and enforceable nature of any Transaction.

(iii)    If a payment date does not fall on a Local Business Day payments shall be made on the next Local Business Day.

(d)    **Rounding.** Prices for the following shall be rounded as follows:

| Commodity Pricing in Megawatt Hours: | rounded to the nearest fourth decimal place |
|---|---|
| Commodity Pricing in MMBtu: | rounded to the nearest fourth decimal place |
| All Dollar amounts: | rounded to the nearest cent |

(e)    **Bank Fees.**    Each Party making a payment to the other Party shall be responsible for any bank fees or charges associated with such payment and shall not deduct such fees from the payment owed to the other party.

(f)    **Setoff.**    The following subsection (f) is added to Section 6:

"(f) **Setoff.** Any amount ("Early Termination Amount") payable to one party ("Payee") by the other party ("Payer") under Section 6(e), in circumstances where there is a Defaulting Party or one Affected Party in the case where a Termination Event under Section 5(b)(iv) has occurred, will, at the option of the party ("X") other than the Defaulting Party or the Affected Party (and without prior notice to the Defaulting Party or the Affected Party), be reduced by means of set off against any amount(s) ("Other Agreement Amount") payable (whether at such time or in the future or upon the occurrence of a contingency) by the Payee to the Payer (irrespective of the currency, place of payment or booking office of the obligation) under any other agreement(s) between the Payee and the Payer  or instrument(s) or undertaking(s) issued or executed by the Payee to, or in the favor of, the Payer (and the Other Agreement Amount will be discharged promptly and in all respects to the extent it is so set-off).  X will give notice to the other party of any set-off effected under this paragraph.

For this purpose, either the Early Termination Amount or the Other Agreement Amount (or the relevant portion of such amounts) may be converted by X into the currency in which the other is denominated at the rate of exchange at which such party would be able, acting in a reasonable manner and in good faith, to purchase the relevant amount of such currency.  The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the relevant currency.

If any obligation is unascertained, X may in good faith estimate that obligation and set-off in respect of the estimate, subject to the relevant party accounting to the other party when the obligation is ascertained.  Nothing in this paragraph shall be effective to create

a charge or other security interest. This paragraph shall be without prejudice and in addition to any right of set-off, combination of accounts, lien or other right to which any party is at any time otherwise entitled (whether by operation of law, contract or otherwise)."

(g) ***Bankruptcy Provision***.

   (i)    Each transfer of funds, securities or other property under this Agreement or any Transaction constitutes a transfer entitled to the protections of Section 546 of Title 11 of the United States Code or similar or parallel Canadian legislation (either, the "Bankruptcy Code").

   (ii)   The rights given to each party hereunder upon an Event of Default by the other to cause the liquidation and termination of Transactions under this Agreement and to setoff mutual debts and claims in connection therewith, are entitled to the protections of Sections 559, 560 and 561 of the Bankruptcy Code.

(h) ***Notice of Events of Default/Termination Events.***  Each party agrees that, upon learning of the occurrence of any event, circumstance, matter or thing or the commencement or likely commencement of same that constitutes (or would, with the giving of notice or the passage of time or both would constitute) an Event of Default or Termination Event with respect to such party, it shall promptly give notice to the other in respect of same.

(i) ***Severability.***  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction only, be ineffective to the limited extent of such prohibition or unenforceability unless such severance shall materially impair the benefits of the remaining portions of this Agreement or materially change the reciprocal obligations of the parties (provided that this severability provision shall not apply in the event that any of Sections 2, 5, 6, 13 and to the extent it relates thereto Section 14 of this Agreement is held to be invalid or unenforceable).  Any severance shall occur without otherwise invalidating or adversely affecting the validity or enforceability of the remainder of this Agreement in such jurisdiction or invalidating or adversely affecting the validity or enforceability of this Agreement as a whole in any other jurisdiction.  The parties agree that if severance is required, they shall in good faith, negotiate a replacement for the prohibited or unenforceable provision, the economic effect of which approximates as close as possible that of the prohibited or unenforceable provision.

(j) ***WAIVER OF JURY TRIAL.***  EACH PARTY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUIT, ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY CREDIT SUPPORT DOCUMENT.  EACH PARTY:

   (i)    CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY OR ANY CREDIT SUPPORT PROVIDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE OTHER PARTY WOULD NOT, IN THE EVENT OF A SUIT, ACTION OR PROCEEDING, SEEK TO ENFORCE THE FOREGOING WAIVER; AND

- 13 -

    (ii)    ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND PROVIDE FOR ANY CREDIT SUPPORT DOCUMENT, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

(k)    ***Market Disruption Events.*** The following Market Disruption Events set forth in Section 7.4 of the Commodity Definitions shall apply to this Agreement:

    (i)    Price Source Disruption
    (ii)    Trading Disruption
    (iii)    Disappearance of Commodity Reference Price
    (iv)    Material Change in Formula
    (v)    Material Change in Content

(l)    ***Disruption Fallbacks.*** The following Disruption Fallbacks set forth in Section 7.5 of the Commodity Definitions shall apply to this Agreement:

    1.    Fallback Reference Price
    2.    Negotiated Fallback
    3.    Postponement, provided that the "Maximum Days of Disruption" shall be three (3) days
    4.    Dealer Fallback (defined below)
    5.    No Fault Termination

Dealer Fallback means that the Relevant Price will be determined and calculated as set forth in the definition "Commodity-Reference Dealers" (on the basis that the Relevant Price is the Specified Price as used in that definition, and provided that where the Specified Price for a Transaction is determined on an hourly basis, all references to Pricing Date shall be read as Pricing Hour), with each party selecting in good faith two (2) independent, impartial and unaffiliated Reference Dealers in the relevant market which satisfy all the criteria that a party applies generally at the time in deciding whether to offer or to make an extension of credit or to enter into a transaction comparable to the Transaction(s) that is affected by the Market Disruption Event and the Relevant Price shall be the arithmetic mean of the four (4) prices so obtained and such calculation shall be binding and conclusive absent manifest error. If one party obtains two (2) prices and the other party obtains one (1) price the arithmetic mean of the three (3) prices shall be used. If the parties have not obtained three (3) prices on or before the sixth Local Business Day following the first Pricing Date on which the Market Disruption Event occurred or existed, or if a determination of the Relevant Price cannot be obtained from at least three Reference Dealers, the next applicable Disruption Fallback will apply to the Transaction.

Notwithstanding the foregoing, in the case of a Transaction with a Commodity Reference Price of NATURAL GAS - NYMEX and the occurrence of a Market Disruption Event, "Postponement" shall be inserted as the first Disruption Fallback and the "Maximum Days of Disruption" during the relevant Calculation Period shall be such number of Days

as exist from the date of such Market Disruption Event to the last Pricing Date during such Calculation Period. "Maximum Days of Disruption" for all other Transactions shall be 3 business days.

(m)   ***Termination of Master Swap Agreement.***   If there are no Transactions (or any present or future payment obligations, contingent or otherwise, thereunder) outstanding under this Agreement, either party may, upon 30 Local Business Days notice to the other, terminate this Agreement.  Such termination shall not prejudice any rights or obligations that may have accrued prior to such termination.

(n)   ***Illegality.***   In respect of Section 5(b)(i), an additional provision is added as follows:

> "(3)  or any Specified Entity or Credit Support Provider of a party to perform any contingent or other obligation which the Specified Entity or Credit Support Provider has under or in relation to any Transaction."

(o)   ***Consent to Recording.***   Each party consents to the recording of all telephone conversations between its employees and agents and the employees and agents of the other party, and each party represents and warrants that its employees and agents have consented to all such recordings.  Any resulting recordings and other evidence may be introduced to prove a Transaction between the parties and to establish any matters pertinent to a Transaction.

(p)   ***Limitation of Liability.***   No party is liable for or required to pay incidental, consequential or indirect damages (whether or not arising from its negligence) to any other party, but nothing in this provision affects the enforceability of Section 6(e) of this Agreement.  If and to the extent any payment required to be made pursuant to this Agreement is deemed to constitute liquidated damages, the parties acknowledge and agree that such damages are difficult or impossible to determine and that such payment is intended to be a reasonable approximation of the amount of the damages and not a penalty.

(q)   ***Confidentiality.***   Each party agrees that this Agreement and all other documents relating to this Agreement and any information provided to it or its Credit Support Provider, if any, in connection therewith will be used only for purposes related to its relationship with the other party and will be kept confidential, subject to the following exceptions:

(i)      disclosure of information to affiliates, directors, employees, regulators, counsel, auditors, agents or other advisors of a party to whom it is necessary to show the information for purposes related to its relationship with the other party, each of whom will be informed of the confidential nature of the information;

(ii)     disclosure of information in any statement or testimony pursuant to a subpoena, summons or order by any court, government body, agency or authority, or otherwise required by law, order, regulation, ruling or in connection with applicable litigation;

(iii)    disclosure of information upon the request or demand of any regulatory authority;

- 15 -

(iv)    disclosure of information to potential or actual assignees, participants and/or other transferee of an interest whether or not extending credit related to any contemplated transaction;

(v)    disclosure of information to third parties, on a "no names" basis for the sole purpose of calculating a published index;

(vi)    disclosure of information about one of the parties that (a) is or becomes generally available to the public other than as a result of a disclosure by the other party or its representatives; (b) becomes available to the other party on a non-confidential basis from a source other than that party or one of its agents or (c) was known to the other party on a non-confidential basis or independently developed by the other party prior to its disclosure to the other party by that party or one of its agents; or

(vii)    disclosure of information to a rating agency in connection with such party's credit rating.

With respect to information provided with respect to a Transaction, this obligation shall survive for a period of one year following the expiration or termination of a Transaction. With respect to information provided with respect to this Agreement, this obligation shall survive for a period of one year following the expiration or termination of this Agreement.

(r)    ***Reference Market-makers.***  The definition of "Reference Market-makers" in Section 14 is hereby amended by inserting the phrase "non-affiliated" before the word "dealers" and by deleting clause (b) thereof.

(s)    ***Change of Account.***  Section 2(b) is hereby amended by adding the following at the end thereof:

"and provided that, unless the other party consents (which consent shall not be unreasonably withheld), such new account shall be in the same tax jurisdiction as the original account."

## PART 6
## PHYSICALLY SETTLED POWER TRANSACTIONS

(a)    ***Elective Provisions.***

(i)    (a)(ii) ____ Applicability of Part 6 to Outstanding Power Transactions.  If not checked, not applicable.

(ii)    (a)(iii) ____ Applicability of Outstanding Credit Support held by a party in connection with Outstanding Power Transactions.  If not checked, not applicable.

(iii)    (c) ____ Accelerated Payment Damages.  If not checked, not applicable.

(iv)    (d)(ii):  Timeliness of Payment

    _____    Option A
    ___√___    Option B

If neither is checked, Option B shall be deemed to apply.

(v)    (h)(i):  Wholesale Power Tariffs

   __√__  Party A Electric Tariff.  Tariff/Date/Docket

Tariff: <u>FERC Rate Schedule</u>  Dated: <u>June 11, 2003</u>   Docket Number: <u>ER03-774-000</u>

   _____   Party B Electric Tariff.  Tariff/Date/Docket
Tariff: ●            Dated: ●               Docket Number: ●

<u>If not checked, not applicable.</u>

(vi)    (h)(ii) __√__ Applicability of Severability provision.  If not checked, not applicable.

(vii)    (h)(iii) __√__ Applicability of FERC Standard of Review and Certain Covenants and Waivers.  If not checked, not applicable."

## PART 7
## PHYSICALLY SETTLED GAS TRANSACTIONS

(a)    ***Elective Provisions***.

(i)    **(a)(ii) - Outstanding Gas Transactions.** This Part 7 shall apply to the following pre-existing Gas Transactions pursuant to clause (a)(ii):

   ___   Option A: All Gas Transactions outstanding between the parties as of the date this Part 7 becomes effective.

   ___ Option B: The Gas Transactions listed in Schedule 1 to this Part 7.

 __√__ Option C: None of the Gas Transactions between the parties that were executed prior to the date this Part 7 becomes effective.

If none of the above options is selected, Option A shall apply.

(ii)    **(a)(iii) - Outstanding Gas Credit Support**

   ___   Outstanding Gas Credit Support held by a party in connection with Outstanding Gas Transactions shall be deemed to have been delivered under and in connection with this Agreement pursuant to clause (a)(iii).

If not checked, not applicable.

- 17 -

(iii)　　**(b)(ii) - Performance Obligation (remedy for breach of Firm obligation)**

　_√_ Option A: Cover Standard
　___ Option B: Spot Price Standard

If neither option is selected, Option A shall apply.

(iv)　　**(e) – Taxes**

　_√__ Option A: Buyer Pays At and After Delivery Point
　____ Option B: Seller Pays Before and At Deliver Point

If neither option is selected, Option A shall apply.

(v)　　**(f)(ii) - Payment Date**

　_√_ Option A: the later of the 25th Day of Month following Month of delivery or 10 Days after receipt of the invoice by Buyer (provided that if the Payment Date is not a Local Business Day, payment is due on the next Local Business Day following that date).

___ Option B: the later of the ___ Day of Month following Month of delivery or 10 Days after receipt of the invoice by Buyer (provided that if the Payment Date is not a Local Business Day, payment is due on the next Local Business Day following that date).

___ Option C: Notwithstanding anything to the contrary in the Schedule, payments with respect to both Gas Transactions and Power Transactions (as defined separately in the Schedule) will be netted and payable on or before the later of the 20th Day of Month following Month of delivery or 10 Days after receipt of the invoice by Buyer (provided that if the Payment Date is not a Local Business Day, payment is due on the next Local Business Day following that date).

___ Option D: Notwithstanding anything to the contrary in the Schedule, payments with respect to both Gas Transactions and Power Transactions (as defined separately in the Schedule) will be netted and payable on or before the later of the 25th Day of Month following Month of delivery or 10 Days after receipt of the invoice by Buyer (provided that if the Payment Date is not a Local Business Day, payment is due on the next Local Business Day following that date).

If none of the above options is selected, Option A shall apply.

(vi)　　**(k)(xxii) - Alternative to Spot Price Index.** The Spot Price Index will be mutually agreed by the parties.

(b)　　***Notices for Gas Transactions***.

**PARTY A:**
**EDF Trading North America, LLC**
**Invoices:**
As set forth in Part 4 of the Schedule unless otherwise set forth below:

**PARTY B:**
**Bosque Power Company, LLC**
**Invoices:**
As set forth in Part 4 of the Schedule unless otherwise set forth below:

Bosque Power Company, LLC
P.O. Box 5436
Laguna Park, TX  76644

Attn.:  Gas Accounting
Phone: 281.653.5805
Facsimile:  281.653.1034

Attn.:  Angelena Morris
Phone:  (254) 622-2110
Facsimile:  (254) 622-2235

**Nominations:**
As set forth in Part 4 of the Schedule unless otherwise set forth below:

**Nominations:**
As set forth in Part 4 of the Schedule unless otherwise set forth below:

Bosque Power Company, LLC
P.O. Box 5436
Laguna Park, TX  76644

Attn.:  Gas Trader
Phone: 281.781.0333
Facsimile:  281.781.0360

Attn.:  Angelena Morris
Phone:  (254) 622-2110
Facsimile:  (254) 622-2235

**Confirmations:**
As set forth in Part 4 of the Schedule unless otherwise set forth below:

**Confirmations:**
As set forth in Part 4 of the Schedule unless otherwise set forth below:

Bosque Power Company, LLC
P.O. Box 5436
Laguna Park, TX  76644

Attn.:  Confirmation Department
Phone:  281.653.5805
Facsimile:  281.653.1034

Attn.:  Angelena Morris
Phone:  (254) 622-2110
Facsimile:  (254) 622-2235

**Option Exercise:**
As set forth in Part 4 of the Schedule unless otherwise set forth below:

**Option Exercise:**
As set forth in Part 4 of the Schedule unless otherwise set forth below:

Bosque Power Company, LLC
P.O. Box 5436
Laguna Park, TX  76644

| | |
|---|---|
| Attn.:  Gas Trader | Attn.:  Angelena Morris |
| Phone: 281.781.0333 | Phone:  (254) 622-2110 |
| Facsimile:  281.781.0360 | Facsimile:  (254) 622-2235 |

☒**Wire Transfer - or - ☐ACH (check one box):**
As set forth in Part 5 of the Schedule unless otherwise set forth below:

Bank:      Wells Fargo Bank, N.A.
ABA:        121000248
Account:  4121947964
Other Details: _____

☒**Wire Transfer - or - ☐ACH (check one box):**
As set forth in Part 5 of the Schedule unless otherwise set forth below

Bank:      JPMorgan Chase Bank
ABA:        021000021
A/C:         9009000150
Account:  E20825 – Bosque Power/Credit
              Suisse – Revenue Account

[*signature page follows*]

*Schedule to ISDA Master Agreement*

- 20 -

Agreed to by the undersigned this 1st day of February, 2010.

**EDF Trading North America, LLC**          **Bosque Power Company, LLC**


Signature: _____          Signature: _____
Name:                                        Name:
Title:                                       Title: Authorized Representative

**EXHIBIT A**

**<u>Form of Guarantee</u>**

**[Attached]**

<u>PARENT GUARANTEE</u>

EDF TRADING NORTH AMERICA, LLC ("Party A") and BOSQUE POWER COMPANY, LLC ("Party B") have entered into an ISDA Master Agreement dated as of February 1, 2010, as amended from time to time (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, EDF TRADING LIMITED, a corporation organized and existing under the laws of the laws of England and Wales ("Guarantor"), hereby agrees to the following:

(a)     Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A in connection with each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement (whether at maturity, by acceleration or otherwise) with such amounts not to exceed Fifteen Million Dollars ($15,000,000) in the aggregate. Guarantor hereby agrees that within ten (10) business days of written demand by Party B, Guarantor shall pay or cause to be paid any such amounts that are due and payable to Party B.

(b)     Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)     Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into any amendments to the Agreement, additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived) provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)     This Guarantee shall remain in full force and effect until the first to occur of: (i) receipt by Party B of a written notice of termination from Guarantor, or (ii) none of the obligations of Party A remain outstanding. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e)     Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in the Master Agreement affecting Party A or Guarantor.

(f)     Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

(g)     Guarantor shall have no right of subrogation with respect to any payments made under this Guarantee until all obligations of the Party A under the Agreement are paid in full.

(h)     Guarantor represents and warrants (which representations and warranties shall be deemed to have been made by Guarantor on the date of each Transaction) that:

i.     Guarantor is a corporation duly incorporated, validly existing and in good standing under the laws of England and Wales.

ii.     Guarantor has the legal capacity and the legal right to execute and deliver this Guarantee and to perform Guarantor's obligations hereunder;

iii.     no consent or authorization of, filing with, or other act by or in respect of, any governmental authority and no consent of any other person (including, without limitation, any creditor of Guarantor) is required in connection with the execution, delivery, performance, validity or enforceability of this Guarantee;

iv.     this Guarantee has been duly executed and delivered by Guarantor and constitutes a legal, valid and binding obligation of Guarantor enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws; and

v.     the execution, delivery and performance of this Guarantee will not violate any provision of the certificate of incorporation, by laws or other organizational documents of Guarantor, or any law, treaty, rule or regulation or determination of an arbitrator, a court or other governmental authority, applicable to or binding upon Guarantor or any of its property or to which Guarantor or any of its property is subject.

(i)     No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege, and no waiver by Party B of any right or remedy hereunder on anyone occasion shall be construed as a bar to any right or remedy which Party B would otherwise have on any future occasion. No failure to exercise, nor any delay in exercising, any right, power or privilege hereunder shall operate as a waiver thereof. The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any other rights or remedies provided by law.

(j)     If any term, provision, covenant, or condition of this Guarantee, or the application thereof to any party or circumstance, shall be held to be illegal, invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Guarantee had been executed with the illegal, invalid or unenforceable portion eliminated, so long as this Guarantee as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Guarantee and the deletion of such portion of this Guarantee will not substantially impair the respective benefits or expectations of the parties to this Guarantee.

(k)     Any demand, Notice and other communications to be given under this Guarantee by Guarantor or Party B, shall be in writing and shall be delivered personally, or by commercial courier, or by certified or registered class mail or faxed to:

**As to Party A:**

EDF Trading North America, LLC
Attention: General Counsel
4700 W. Sam Houston Pkwy., N., Suite 250
Houston, TX 77041
Fax: 281-781-0360

With a copy to:

EDF Trading Limited
80 Victoria Street
3rd Floor, Cardinal Place
London, England SW1E 5JL
Attention: Robert Quick

**As to Party B:**

Bosque Power Company, LLC
c/o PurEnergy Management Services, LLC
1732 West Genesee Street
Syracuse, NY  13204
Attn: Dan Noel
Fax: (315) 448-0264

With a copy to:

Arcapita Inc.
75 Fourteenth Street, 23rd Floor
Atlanta, GA  30309
Attention:  Portfolio Manager, Asset Based Investments
Fax:  (404) 920-9001

Notices sent in accordance with the provision above will be deemed received on the day received if delivered personally; two (2) business days after shipment if sent by commercial courier; four (4) business days after mailing if sent by certified or registered class-mail; on the next business day if served by fax when the sender has a machine confirmation as to when and to whom the Notice was sent. Notices sent by fax shall be confirmed promptly after transmission in writing by certified mail.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York without regard to conflicts of laws principles. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement. Each party irrevocably submits to the non-exclusive jurisdiction of the United States District Court for the Southern District of New York located in the Borough of Manhattan, New York, or, if such court declines to exercise or does not have jurisdiction, in any New York State court in the Borough of Manhattan, and to service a process by certified mail, delivery to the party at the address indicated in the Guarantee. Further, each party waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any proceedings relating to this Guarantee. Nothing in the Guarantee precludes either party from bringing proceedings in any other jurisdiction in order to enforce any judgment obtained in any proceeding referred to in this paragraph, nor will the bringing of such enforcement proceedings in anyone or more jurisdictions preclude the bringing of enforcement proceedings in any other jurisdiction.

*(The remainder of this page has been intentionally left blank.)*

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

EDF TRADING LIMITED


By: _____

Name: _____

Title: _____

Date: _____

**(Bilateral Form)**                    **(ISDA Agreements Subject to New York Law Only)**



International Swaps and Derivatives Association, Inc.

# CREDIT SUPPORT ANNEX

to the Schedule to the
**MASTER AGREEMENT**
dated as of February 1, 2010

between

EDF TRADING NORTH AMERICA, LLC                    BOSQUE POWER COMPANY, LLC
…………………….............................................  and  …………………….............................................
("Party A")                                                 ("Party B")

This Annex supplements, forms part of, and is subject to, the above-referenced Agreement, is part of its Schedule and is a Credit Support Document under this Agreement with respect to each party.

Accordingly, the parties agree as follows:—

**Paragraph 1. Interpretation**

(a)        ***Definitions and Inconsistency.*** Capitalized terms not otherwise defined herein or elsewhere in this Agreement have the meanings specified pursuant to Paragraph 12, and all references in this Annex to Paragraphs are to Paragraphs of this Annex. In the event of any inconsistency between this Annex and the other provisions of this Schedule, this Annex will prevail, and in the event of any inconsistency between Paragraph 13 and the other provisions of this Annex, Paragraph 13 will prevail.

(b)        ***Secured Party and Pledgor.*** All references in this Annex to the "Secured Party" will be to either party when acting in that capacity and all corresponding references to the "Pledgor" will be to the other party when acting in that capacity; *provided, however,* that if Other Posted Support is held by a party to this Annex, all references herein to that party as the Secured Party with respect to that Other Posted Support will be to that party as the beneficiary thereof and will not subject that support or that party as the beneficiary thereof to provisions of law generally relating to security interests and secured parties.

**Paragraph 2. Security Interest**

Each party, as the Pledgor, hereby pledges to the other party, as the Secured Party, as security for its Obligations, and grants to the Secured Party a first priority continuing security interest in, lien on and right of Set-off against all Posted Collateral Transferred to or received by the Secured Party hereunder. Upon the Transfer by the Secured Party to the Pledgor of Posted Collateral, the security interest and lien granted hereunder on that Posted Collateral will be released immediately and, to the extent possible, without any further action by either party.

Copyright © 1994 by International Swaps and Derivatives Association, Inc.

**Paragraph 3. Credit Support Obligations**

(a)       ***Delivery Amount.*** Subject to Paragraphs 4 and 5, upon a demand made by the Secured Party on or promptly following a Valuation Date, if the Delivery Amount for that Valuation Date equals or exceeds the Pledgor's Minimum Transfer Amount, then the Pledgor will Transfer to the Secured Party Eligible Credit Support having a Value as of the date of Transfer at least equal to the applicable Delivery Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the ***"Delivery Amount"*** applicable to the Pledgor for any Valuation Date will equal the amount by which:

(i) the Credit Support Amount

exceeds

(ii) the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party.

(b)       ***Return Amount***. Subject to Paragraphs 4 and 5, upon a demand made by the Pledgor on or promptly following a Valuation Date, if the Return Amount for that Valuation Date equals or exceeds the Secured Party's Minimum Transfer Amount, then the Secured Party will Transfer to the Pledgor Posted Credit Support specified by the Pledgor in that demand having a Value as of the date of Transfer as close as practicable to the applicable Return Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the "***Return Amount***" applicable to the Secured Party for any Valuation Date will equal the amount by which:

(i) the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party

exceeds

(ii) the Credit Support Amount.

***"Credit Support Amount"*** means, unless otherwise specified in Paragraph 13, for any Valuation Date (i) the Secured Party's Exposure for that Valuation Date plus (ii) the aggregate of all Independent Amounts applicable to the Pledgor, if any, minus (iii) all Independent Amounts applicable to the Secured Party, if any, minus (iv) the Pledgor's Threshold; *provided, however,* that the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields a number less than zero.

**Paragraph 4. Conditions Precedent, Transfer Timing, Calculations and Substitutions**

(a)       ***Conditions Precedent***. Each Transfer obligation of the Pledgor under Paragraphs 3 and 5 and of the Secured Party under Paragraphs 3, 4(d)(ii), 5 and 6(d) is subject to the conditions precedent that:

(i) no Event of Default, Potential Event of Default or Specified Condition has occurred and is continuing with respect to the other party; and

(ii) no Early Termination Date for which any unsatisfied payment obligations exist has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the other party.

(b)       ***Transfer Timing***. Subject to Paragraphs 4(a) and 5 and unless otherwise specified, if a demand for the Transfer of Eligible Credit Support or Posted Credit Support is made by the Notification Time, then the relevant Transfer will be made not later than the close of business on the next Local Business Day; if a demand is made after the Notification Time, then the relevant Transfer will be made not later than the close of business on the second Local Business Day thereafter.

(c)       ***Calculations***. All calculations of Value and Exposure for purposes of Paragraphs 3 and 6(d) will be made by the Valuation Agent as of the Valuation Time. The Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) of its calculations not later than the Notification Time on the Local Business

2

Day following the applicable Valuation Date (or in the case of Paragraph 6(d), following the date of calculation).

(d)    ***Substitutions*.**

(i) Unless otherwise specified in Paragraph 13, upon notice to the Secured Party specifying the items of Posted Credit Support to be exchanged, the Pledgor may, on any Local Business Day, Transfer to the Secured Party substitute Eligible Credit Support (the "Substitute Credit Support"); and

(ii) subject to Paragraph 4(a), the Secured Party will Transfer to the Pledgor the items of Posted Credit Support specified by the Pledgor in its notice not later than the Local Business Day following the date on which the Secured Party receives the Substitute Credit Support, unless otherwise specified in Paragraph 13 (the "Substitution Date"); *provided* that the Secured Party will only be obligated to Transfer Posted Credit Support with a Value as of the date of Transfer of that Posted Credit Support equal to the Value as of that date of the Substitute Credit Support.

## Paragraph 5. Dispute Resolution

If a party (a "Disputing Party") disputes (I) the Valuation Agent's calculation of a Delivery Amount or a Return Amount or (II) the Value of any Transfer of Eligible Credit Support or Posted Credit Support, then (1) the Disputing Party will notify the other party and the Valuation Agent (if the Valuation Agent is not the other party) not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (2) subject to Paragraph 4(a), the appropriate party will Transfer the undisputed amount to the other party not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (3) the parties will consult with each other in an attempt to resolve the dispute and (4) if they fail to resolve the dispute by the Resolution Time, then:

(i) In the case of a dispute involving a Delivery Amount or Return Amount, unless otherwise specified in Paragraph 13, the Valuation Agent will recalculate the Exposure and the Value as of the Recalculation Date by:

(A) utilizing any calculations of Exposure for the Transactions (or Swap Transactions) that the parties have agreed are not in dispute;

(B) calculating the Exposure for the Transactions (or Swap Transactions) in dispute by seeking four actual quotations at mid-market from Reference Market-makers for purposes of calculating Market Quotation, and taking the arithmetic average of those obtained; *provided* that if four quotations are not available for a particular Transaction (or Swap Transaction), then fewer than four quotations may be used for that Transaction (or Swap Transaction); and if no quotations are available for a particular Transaction (or Swap Transaction), then the Valuation Agent's original calculations will be used for that Transaction (or Swap Transaction); and

(C) utilizing the procedures specified in Paragraph 13 for calculating the Value, if disputed, of Posted Credit Support.

(ii) In the case of a dispute involving the Value of any Transfer of Eligible Credit Support or Posted Credit Support, the Valuation Agent will recalculate the Value as of the date of Transfer pursuant to Paragraph 13.

Following a recalculation pursuant to this Paragraph, the Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) not later than the Notification Time on the Local Business Day following the Resolution Time. The appropriate party will, upon demand following that notice by the Valuation Agent or a resolution pursuant to (3) above and subject to Paragraphs 4(a) and 4(b), make the appropriate Transfer.

**Paragraph 6. Holding and Using Posted Collateral**

(a)　　*Care Of Posted Collateral.* Without limiting the Secured Party's rights under Paragraph 6(c), the Secured Party will exercise reasonable care to assure the safe custody of all Posted Collateral to the extent required by applicable law, and in any event the Secured Party will be deemed to have exercised reasonable care if it exercises at least the same degree of care as it would exercise with respect to its own property. Except as specified in the preceding sentence, the Secured Party will have no duty with respect to Posted Collateral, including, without limitation, any duty to collect any Distributions, or enforce or preserve any rights pertaining thereto.

(b)　　*Eligibility to Hold Posted Collateral; Custodians.*

(i) *General.* Subject to the satisfaction of any conditions specified in Paragraph 13 for holding Posted Collateral, the Secured Party will be entitled to hold Posted Collateral or to appoint an agent (a "Custodian") to hold Posted Collateral for the Secured Party. Upon notice by the Secured Party to the Pledgor of the appointment of a Custodian, the Pledgor's obligations to make any Transfer will be discharged by making the Transfer to that Custodian. The holding of Posted Collateral by a Custodian will be deemed to be the holding of that Posted Collateral by the Secured Party for which the Custodian is acting.

(ii) *Failure to Satisfy Conditions.* If the Secured Party or its Custodian fails to satisfy any conditions for holding Posted Collateral, then upon a demand made by the Pledgor, the Secured Party will, not later than five Local Business Days after the demand, Transfer or cause its Custodian to Transfer all Posted Collateral held by it to a Custodian that satisfies those conditions or to the Secured Party if it satisfies those conditions.

(iii) *Liability.* The Secured Party will be liable for the acts or omissions of its Custodian to the same extent that the Secured Party would be liable hereunder for its own acts or omissions.

(c)　　*Use of Posted Collateral.* Unless otherwise specified in Paragraph 13 and without limiting the rights and obligations of the parties under Paragraphs 3, 4(d)(ii), 5, 6(d) and 8, if the Secured Party is not a Defaulting Party or an Affected Party with respect to a Specified Condition and no Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then the Secured Party will, notwithstanding Section 9-207 of the New York Uniform Commercial Code, have the right

to:

(i) sell, pledge, rehypothecate, assign, invest, use, commingle or otherwise dispose of, or otherwise use in its business any Posted Collateral it holds, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor; and

(ii) register any Posted Collateral in the name of the Secured Party, its Custodian or a nominee for either.

For purposes of the obligation to Transfer Eligible Credit Support or Posted Credit Support pursuant to Paragraphs 3 and 5 and any rights or remedies authorized under this Agreement, the Secured Party will be deemed to continue to hold all Posted Collateral and to receive Distributions made thereon, regardless of whether the Secured Party has exercised any rights with respect to any Posted Collateral pursuant to (i) or (ii) above.

(d)　　*Distributions and Interest Amount.*

(i) *Distributions.* Subject to Paragraph 4(a), if the Secured Party receives or is deemed to receive Distributions on a Local Business Day, it will Transfer to the Pledgor not later than the following Local Business Day any Distributions it receives or is deemed to receive to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date

of calculation will be deemed to be a Valuation Date for this purpose).

 (ii) *Interest Amount*. Unless otherwise specified in Paragraph 13 and subject to Paragraph 4(a), in lieu of any interest, dividends or other amounts paid or deemed to have been paid with respect to Posted Collateral in the form of Cash (all of which may be retained by the Secured Party), the Secured Party will Transfer to the Pledgor at the times specified in Paragraph 13 the Interest Amount to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose). The Interest Amount or portion thereof not Transferred pursuant to this Paragraph will constitute Posted Collateral in the form of Cash and will be subject to the security interest granted under Paragraph 2.

## Paragraph 7. Events of Default

For purposes of Section 5(a)(iii)(l) of this Agreement, an Event of Default will exist with respect to a party if:

(i) that party fails (or fails to cause its Custodian) to make, when due, any Transfer of Eligible Collateral, Posted Collateral or the Interest Amount, as applicable, required to be made by it and that failure continues for two Local Business Days after notice of that failure is given to that party;

(ii) that party fails to comply with any restriction or prohibition specified in this Annex with respect to any of the rights specified in Paragraph 6(c) and that failure continues for five Local Business Days after notice of that failure is given to that party; or

(iii) that party fails to comply with or perform any agreement or obligation other than those specified in Paragraphs 7(i) and 7(ii) and that failure continues for 30 days after notice of that failure is given to that party.

## Paragraph 8. Certain Rights and Remedies

(a)      *Secured Party's Rights and Remedies*. If at any time (1) an Event of Default or Specified Condition with respect to the Pledgor has occurred and is continuing or (2) an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Pledgor, then, unless the Pledgor has paid in full all of its Obligations that are then due, the Secured Party may exercise one or more of the following rights and remedies:

(i) all rights and remedies available to a secured party under applicable law with respect to Posted Collateral held by the Secured Party;

(ii) any other rights and remedies available to the Secured Party under the terms of Other Posted Support, if any;

(iii) the right to Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(iv) the right to liquidate any Posted Collateral held by the Secured Party through one or more public or private sales or other dispositions with such notice, if any, as may be required under applicable law, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor (with the Secured Party having the right to purchase any or all of the Posted Collateral to be sold) and to apply the proceeds (or the Cash equivalent thereof) from the liquidation of the Posted Collateral to any amounts payable by the Pledgor with respect to any Obligations in that order as the Secured Party may elect.

Each party acknowledges and agrees that Posted Collateral in the form of securities may decline speedily in value and is of a type customarily sold on a recognized market, and, accordingly, the Pledgor is not entitled to prior

notice of any sale of that Posted Collateral by the Secured Party, except any notice that is required under applicable law and cannot be waived.

(b)  **Pledgor's Rights and Remedies.** If at any time an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then (except in the case of an Early Termination Date relating to less than all Transactions (or Swap Transactions) where the Secured Party has paid in full all of its obligations that are then due under Section 6(e) of this Agreement):

(i) the Pledgor may exercise all rights and remedies available to a pledgor under applicable law with respect to Posted Collateral held by the Secured Party;

(ii) the Pledgor may exercise any other rights and remedies available to the Pledgor under the terms of Other Posted Support, if any;

(iii) the Secured Party will be obligated immediately to Transfer all Posted Collateral and the Interest Amount to the Pledgor; and

(iv) to the extent that Posted Collateral or the Interest Amount is not so Transferred pursuant to (iii) above, the Pledgor may:

(A) Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(B) to the extent that the Pledgor does not Set-off under (iv)(A) above, withhold payment of any remaining amounts payable by the Pledgor with respect to Obligations, up to the Value of any remaining Posted Collateral held by the Secured Party, until that Posted Collateral is Transferred to the Pledgor.

(c)  **Deficiencies and Excess Proceeds.** The Secured Party will Transfer to the Pledgor any proceeds and Posted Credit Support remaining after liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b) after satisfaction in full of all amounts payable by the Pledgor with respect to any Obligations; the Pledgor in all events will remain liable for any amounts remaining unpaid after any liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b).

(d)  **Final Returns.** When no amounts are or thereafter may become payable by the Pledgor with respect to any Obligations (except for any potential liability under Section 2(d) of this Agreement), the Secured Party will Transfer to the Pledgor all Posted Credit Support and the Interest Amount, if any.

## Paragraph 9. Representations

Each party represents to the other party (which representations will be deemed to be repeated as of each date on which it, as the Pledgor, Transfers Eligible Collateral) that:

(i) it has the power to grant a security interest in and lien on any Eligible Collateral it Transfers as the Pledgor and has taken all necessary actions to authorize the granting of that security interest and lien;

(ii) it is the sole owner of or otherwise has the right to Transfer all Eligible Collateral it Transfers to the Secured Party hereunder, free and clear of any security interest, lien, encumbrance or other restrictions other than the security interest and lien granted under Paragraph 2;

(iii) upon the Transfer of any Eligible Collateral to the Secured Party under the terms of this Annex, the Secured Party will have a valid and perfected first priority security interest therein (assuming that any central clearing corporation or any third-party financial intermediary or other entity not within the control of the Pledgor involved in the Transfer of that Eligible Collateral gives the notices and takes the action

required of it under applicable law for perfection of that interest); and

(iv) the performance by it of its obligations under this Annex will not result in the creation of any security interest, lien or other encumbrance on any Posted Collateral other than the security interest and lien granted under Paragraph 2.

## Paragraph 10. Expenses

(a)      **General.** Except as otherwise provided in Paragraphs 10(b) and 10(c), each party will pay its own costs and expenses in connection with performing its obligations under this Annex and neither party will be liable for any costs and expenses incurred by the other party in connection herewith.

(b)      **Posted Credit Support.** The Pledgor will promptly pay when due all taxes, assessments or charges of any nature that are imposed with respect to Posted Credit Support held by the Secured Party upon becoming aware of the same, regardless of whether any portion of that Posted Credit Support is subsequently disposed of under Paragraph 6(c), except for those taxes, assessments and charges that result from the exercise of the Secured Party's rights under Paragraph 6(c).

(c)      **Liquidation/Application of Posted Credit Support.** All reasonable costs and expenses incurred by or on behalf of the Secured Party or the Pledgor in connection with the liquidation and/or application of any Posted Credit Support under Paragraph 8 will be payable, on demand and pursuant to the Expenses Section of this Agreement, by the Defaulting Party or, if there is no Defaulting Party, equally by the parties.

## Paragraph 11. Miscellaneous

(a)      **Default Interest.** A Secured Party that fails to make, when due, any Transfer of Posted Collateral or the Interest Amount will be obligated to pay the Pledgor (to the extent permitted under applicable law) an amount equal to interest at the Default Rate multiplied by the Value of the items of property that were required to be Transferred, from (and including) the date that Posted Collateral or Interest Amount was required to be Transferred to (but excluding) the date of Transfer of that Posted Collateral or Interest Amount. This interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(b)      **Further Assurances.** Promptly following a demand made by a party, the other party will execute, deliver, file and record any financing statement, specific assignment or other document and take any other action that may be necessary or desirable and reasonably requested by that party to create, preserve, perfect or validate any security interest or lien granted under Paragraph 2, to enable that party to exercise or enforce its rights under this Annex with respect to Posted Credit Support or an Interest Amount or to effect or document a release of a security interest on Posted Collateral or an Interest Amount.

(c)      **Further Protection.** The Pledgor will promptly give notice to the Secured Party of, and defend against, any suit, action, proceeding or lien that involves Posted Credit Support Transferred by the Pledgor or that could adversely affect the security interest and lien granted by it under Paragraph 2, unless that suit, action, proceeding or lien results from the exercise of the Secured Party's rights under Paragraph 6(c).

(d)      **Good Faith and Commercially Reasonable Manner.** Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner.

(e)      **Demands and Notices.** All demands and notices made by a party under this Annex will be made as specified in the Notices Section of this Agreement, except as otherwise provided in Paragraph 13.

(f)      **Specifications of Certain Matters.** Anything referred to in this Annex as being specified in Paragraph 13 also may be specified in one or more Confirmations or other documents and this Annex will be construed accordingly.

**Paragraph 12. Definitions as Used in this Annex:**

As used in this Annex:-

"**Cash**" means the lawful currency of the United States of America.

"**Credit Support Amount**" has the meaning specified in Paragraph 3.

"**Custodian**" has the meaning specified in Paragraphs 6(b)(i) and 13.

"**Delivery Amount**" has the meaning specified in Paragraph 3(a).

"**Disputing Party**" has the meaning specified in Paragraph 5.

"**Distributions**" means with respect to Posted Collateral other than Cash, all principal, interest and other payments and distributions of cash or other property with respect thereto, regardless of whether the Secured Party has disposed of that Posted Collateral under Paragraph 6(c). Distributions will not include any item of property acquired by the Secured Party upon any disposition or liquidation of Posted Collateral or, with respect to any Posted Collateral in the form of Cash, any distributions on that collateral, unless otherwise specified herein.

"**Eligible Collateral**" means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

"**Eligible Credit Support**" means Eligible Collateral and Other Eligible Support.

"**Exposure**" means for any Valuation Date or other date for which Exposure is calculated and subject to Paragraph 5 in the case of a dispute, the amount, if any, that would be payable to a party that is the Secured Party by the other party (expressed as a positive number) or by a party that is the Secured Party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(2)(A) of this Agreement as if all Transactions (or Swap Transactions) were being terminated as of the relevant Valuation Time; *provided* that Market Quotation will be determined by the Valuation Agent using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation").

"**Independent Amount**" means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

"**Interest Amount**" means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Posted Collateral in the form of Cash held by the Secured Party on that day, determined by the Secured Party for each such day as follows:

(x) the amount of that Cash on that day; multiplied by

(y) the Interest Rate in effect for that day; divided by

(z) 360.

"**Interest Period**" means the period from (and including) the last Local Business Day on which an Interest Amount was Transferred (or, if no Interest Amount has yet been Transferred, the Local Business Day on which Posted Collateral in the form of Cash was Transferred to or received by the Secured Party) to (but excluding) the Local Business Day on which the current Interest Amount is to be Transferred.

"**Interest Rate**" means the rate specified in Paragraph 13.

"**Local Business Day,**" unless otherwise specified in Paragraph 13, has the meaning specified in the Definitions Section of this Agreement, except that references to a payment in clause (b) thereof will be deemed to include

a Transfer under this Annex.

"*Minimum Transfer Amount*" means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

"*Notification Time*" has the meaning specified in Paragraph 13.

"*Obligations*" means, with respect to a party, all present and future obligations of that party under this Agreement and any additional obligations specified for that party in Paragraph 13.

"*Other Eligible Support*" means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

"*Other Posted Support*" means all Other Eligible Support Transferred to the Secured Party that remains in effect for the benefit of that Secured Party.

"*Pledgor*" means either party, when that party (i) receives a demand for or is required to Transfer Eligible Credit Support under Paragraph 3(a) or (ii) has Transferred Eligible Credit Support under Paragraph 3(a).

"*Posted Collateral*" means all Eligible Collateral, other property, Distributions, and all proceeds thereof that have been Transferred to or received by the Secured Party under this Annex and not Transferred to the Pledgor pursuant to Paragraph 3(b), 4(d)(ii) or 6(d)(i) or released by the Secured Party under Paragraph 8. Any Interest Amount or portion thereof not Transferred pursuant to Paragraph 6(d)(ii) will constitute Posted Collateral in the form of Cash.

"*Posted Credit Support*" means Posted Collateral and Other Posted Support.

"*Recalculation Date*" means the Valuation Date that gives rise to the dispute under Paragraph 5; *provided, however,* that if a subsequent Valuation Date occurs under Paragraph 3 prior to the resolution of the dispute, then the "Recalculation Date" means the most recent Valuation Date under Paragraph 3.

"*Resolution Time*" has the meaning specified in Paragraph 13.

"*Return Amount*" has the meaning specified in Paragraph 3(b).

"*Secured Party*" means either party, when that party (i) makes a demand for or is entitled to receive Eligible Credit Support under Paragraph 3(a) or (ii) holds or is deemed to hold Posted Credit Support.

"*Specified Condition*" means, with respect to a party, any event specified as such for that party in Paragraph 13.

"*Substitute Credit Support*" has the meaning specified in Paragraph 4(d)(i).

"*Substitution Date*" has the meaning specified in Paragraph 4(d)(ii).

"*Threshold*" means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

"*Transfer*" means, with respect to any Eligible Credit Support, Posted Credit Support or Interest Amount, and in accordance with the instructions of the Secured Party, Pledgor or Custodian, as applicable:

> (i) in the case of Cash, payment or delivery by wire transfer into one or more bank accounts specified by the recipient;

> (ii) in the case of certificated securities that cannot be paid or delivered by book-entry, payment or delivery in appropriate physical form to the recipient or its account accompanied by any duly executed

instruments of transfer, assignments in blank, transfer tax stamps and any other documents necessary to constitute a legally valid transfer to the recipient;

(iii) in the case of securities that can be paid or delivered by book-entry, the giving of written instructions to the relevant depository institution or other entity specified by the recipient, together with a written copy thereof to the recipient, sufficient if complied with to result in a legally effective transfer of the relevant interest to the recipient; and

(iv) in the case of Other Eligible Support or Other Posted Support, as specified in Paragraph 13.

"*Valuation Agent*" has the meaning specified in Paragraph 13.

"*Valuation Date*" means each date specified in or otherwise determined pursuant to Paragraph 13.

"*Valuation Percentage*" means, for any item of Eligible Collateral, the percentage specified in Paragraph 13.

"*Valuation Time*" has the meaning specified in Paragraph 13.

"*Value*" means for any Valuation Date or other date for which Value is calculated and subject to Paragraph 5 in the case of a dispute, with respect to:

(i) Eligible Collateral or Posted Collateral that is:

(A) Cash, the amount thereof, and

(B) A security, the bid price obtained by the Valuation Agent multiplied by the applicable Valuation Percentage, if any;

(ii) Posted Collateral that consists of items that are not specified as Eligible Collateral, zero; and

(iii) Other Eligible Support and Other Posted Support, as specified in Paragraph 13.

**PARAGRAPH 13**
**to the**
**CREDIT SUPPORT ANNEX**
**to the**
**1992 ISDA BASED MASTER AGREEMENT**

dated as of February 1, 2010

between

| **EDF Trading North America, LLC** | and | **Bosque Power Company, LLC** |
|---|---|---|
| **("Party A")** | | **("Party B")** |
| being a limited liability company | | being a limited liability company |
| organized and existing under the laws of | | organized and existing under the laws of |
| the State of Texas | | the State of Delaware |

**Introductory Provisions**

This Credit Support Annex, Paragraph 13 Elections and Variables, the Energy Management Agreement between Party A and Party B, as amended, from time to time (the "*EMA*"), and the ISDA Master Agreement between Party A and Party B, as amended, from time to time (the "*Master Agreement*"), are intended to be a single integrated agreement and this Annex forms part of, and is subject to, each of the EMA and the Master Agreement; *provided*, *however*, that in the event of any inconsistency between this Annex and the EMA, this Annex shall prevail.

Party A and Party B intend that this Annex: (i) constitutes a Credit Support Document with respect to the Master Agreement; and (ii) supports Party A's and Party B's respective obligations under the EMA and the Master Agreement.

**Paragraph 13 – Elections and Variables**

(a)　　**Security Interest for "Obligations"** – The term "Obligations" as used in this Annex includes the parties' respective obligations under the EMA and the Master Agreement.

(b)　　**Credit Support Obligations**

(i)　　**Delivery Amount, Return Amount and Credit Support Amount:**

(A)　　**Delivery Amount** has the meaning specified in Paragraph 3(a).
(B)　　**Return Amount** has the meaning specified in Paragraph 3(b).
(C)　　**Credit Support Amount** has the meaning specified in Paragraph 3; *provided, however* that, with respect to Party B, the Credit Support Amount shall never exceed:

- 2 -

(1)  $5,000,000 for Day-Ahead Commodity Transactions and Short-Term Commodity Transactions for 100% of the Facility's Capacity up to the next full calendar quarter;

(2)  $10,000,000 for Day-Ahead Commodity Transactions and Short-Term Commodity Transactions for 50% of the Facility's Capacity up to one calendar year in duration; and

(3)  $20,000,000 for Day-Ahead Commodity Transactions and Short-Term Commodity Transactions for 100% of the Facility's Capacity up to one calendar year in duration.

(ii)  **Eligible Collateral –** The following items will qualify as "Eligible Collateral" for the party specified:

|  | _Party A_ | _Party B_ | _Valuation Percentage_ |
|---|---|---|---|
| USD Cash | [X] | [X] | 100% |

(iii)  **Other Eligible Support –** The following items will qualify as "Other Eligible Support" for the party specified: Letters of Credit

|  | _Party A_ | _Party B_ | _Valuation Percentage_ |
|---|---|---|---|
| Letters of Credit (as defined in Paragraph 13(j)) | [X] | [X] | 100% of the Value of the Other Eligible Support unless (i) a Letter of Credit Default shall apply with respect to such Letter of Credit, or (ii) fewer than ten (10) days remain prior to the expiration of such Letter of Credit, in either of which case the Valuation Percentage shall be zero. |

(iv)  **Thresholds –**

(1)  **Independent Amount** means with respect to both Party A and Party B – for each Transaction at any time, zero, unless otherwise specified in the Confirmation.

(2)  **Thresholds –**

(A)  _**"Threshold"**_ means, with respect to Party A, $15,000,000 and, with respect to Party B, zero.

- 3 -

(B) *"Minimum Transfer Amount"* means, with respect to Party A: $100,000.00, unless the Threshold for Party A is zero, in which case the Minimum Transfer Amount for Party A will be $1.00.

*"Minimum Transfer Amount"* means, with respect to Party B: $100,000.00, unless the Threshold for Party B is zero, in which case the Minimum Transfer Amount for Party B will be $1.00.

(C) *Rounding.* The Delivery Amount will be rounded up to the nearest integral amount of $100,000. The Return Amount will be rounded down to the nearest integral amount of $100,000.

(c) **Valuation and Timing** –

(i) **Valuation Agent** means, for purposes of Paragraphs 3 and 5, the party making the demand under Paragraph 3; for purposes of Paragraph 4(d), the Secured Party for purposes of calculating the Value of the Substitute Credit Support and Posted Credit Support involved in the substitution; and for purposes of Paragraph 6(d), the Secured Party receiving or deemed to receive the Distributions or the Interest Amount, as applicable; *provided*, *however*, that in all cases, if an Event of Default or Potential Event of Default has occurred and is continuing with respect to the party designated as the Valuation Agent, then in such case and for so long as the Event of Default or Potential Event of Default continues the other party will be the Valuation Agent.

(ii) **Valuation Date** means any Local Business Day.

(iii) **Valuation Time** means the close of business on the Local Business Day before the Valuation Date or date of calculation, as applicable *provided* that the calculations of Value and Exposure will be made as of approximately the same time on the same date.

(iv) **Notification Time** means 1:00 p.m. New York, New York time on a Local Business Day.

(v) **Transfer Timing** has the meaning specified in Paragraph 4(b), except that if the Eligible Credit Support to be provided is a Letter of Credit and a demand for the Transfer is made by the Notification Time, then the relevant Transfer will be made not later than the close of business on the second Local Business Day thereafter; if a demand is made after the Notification Time, then the relevant Transfer will be made not later than the close of business on the third Local Business Day thereafter.

(d) **Conditions Precedent and Secured Party's Rights and Remedies** – The following Termination Event(s) will be a "Specified Condition" for the party specified (that party being the Affected Party if the Termination Event occurs with respect to that party):

- 4 -

|  | *Party A* | *Party B* |
|---|---|---|
| Illegality | [ X ] | [ X ] |
| Credit Event Upon Merger | [ X ] | [ X ] |
| Additional Termination Event(s): | None | None |

(e) **Substitution**

    (i)     **Substitution Date –** has the meaning specified in Paragraph 4(d)(ii).

    (ii)     **Consent** – The Pledgor is required to obtain the Secured Party's consent for any substitution pursuant to Paragraph 4(d).

(f) **Dispute Resolution**

    (i)     **Resolution Time** – means 1:00 p.m., New York, New York time, on the Local Business Day following the date on which the notice is given that gives rise to a dispute under Paragraph 5.

    (ii)     **Value** – For the purpose of Paragraph 5(i)(C) and 5(ii), the Value of Posted Credit Support will be calculated using the Valuation Percentages established in Paragraph 13(b)(ii) and 13(b)(iii).

    (iii)     **Alternative** – The provisions of Paragraph 5 apply, except that, pending the resolution of a dispute, Transfer of the undisputed Value of Eligible Credit Support or Posted Credit Support involved in the relevant demand is, if the demand is made at or before the Notification Time, due as provided in Paragraph 5, and, if the demand is made after the Notification Time, due on the second Local Business Day after the demand.

(g) **Holding and Using Posted Collateral**

    (i)     **Eligibility to Hold Posted Collateral; Custodians**

    Party A and its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b) *provided* that the following conditions applicable to it are satisfied:

    (1)     Party A is not a Defaulting Party.

    (2)     Posted Collateral may be held only in the following jurisdictions:  United States of America.

    Initially, the Custodian for Party A is:  Not Applicable.

    Party B and its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b) *provided* that the following conditions applicable to it are satisfied:

- 5 -

    (1)    Party B is not a Defaulting Party.

    (2)    Posted Collateral may be held only in the following jurisdictions:  United States of America.

Initially, the Custodian for Party B is: Not Applicable.

Notwithstanding the foregoing, each party hereby covenants and agrees that it will cause all Posted Collateral received from the other party to be entered in one or more accounts (each, a "Collateral Account") with a domestic office of a commercial bank or trust company (which is not an Affiliate of such party) organized under the laws of the United States (or any state or a political subdivision thereof) or Canada having assets of at least $10 billion and a long-term debt rating or deposit rating of at least (i) A3 from Moody's and (ii) A- from S&P (a "Qualified Institution"), each of which accounts may include property of other parties but will bear a title indicating the Pledgor's interest in said account and the Posted Collateral in such account.  In addition, the Secured Party may direct the Pledgor to transfer or deliver Eligible Collateral directly into the Secured Party's Collateral Account(s).  The Secured Party may move the Collateral Accounts from one Qualified Institution to another upon reasonable notice to the Pledgor.  The Secured Party shall cause statements concerning the Posted Collateral transferred or delivered by the Pledgor to be sent to the Pledgor on request.

    (ii)    **Use of Posted Collateral** – The provisions of Paragraph 6(c) will apply.

(h)    **Distributions and Interest Amount**

    (i)    **Interest Rate** – The Interest Rate will be the Federal Funds effective rate published in the Federal Reserve Statistical Release H.15 for that day.

    (ii)    **Transfer of Interest Amount** – The Transfer of Interest Amount must be made on the 3rd Local Business Day of each calendar month for the preceding month and on any Local Business Day that Posted Collateral in the form of Cash is Transferred to the Pledgor pursuant to Paragraph 3(b).

    (iii)    **Alternative to Interest Amount** – The provisions of Paragraph 6(d)(ii) will apply.

(i)    **Additional Representation(s)** – None.

(j)    **Other Eligible Support and Other Posted Support**

    (i)    **"Value"** with respect to Other Eligible Support and Other Posted Support means an amount equal to the Valuation Percentages established in Paragraph 13(b)(iii) less any drawn portion of any Letter of Credit maintained by the Pledgor (or its Credit Support Provider) for the benefit of the Secured Party.

- 6 -

(ii)    **"Transfer"** with respect to Other Eligible Support and Other Posted Support means:

with respect to Other Eligible Support and Other Posted Support: With respect to any letter of credit, the creation of an unconditional right of the Secured Party for whose benefit the letter is established to draw upon that letter of credit.

(iii)    **Letter of Credit Provisions** – Other Eligible Support provided in the form of a Letter of Credit shall be subject to the following provisions:

(1)    Unless otherwise agreed in writing by the parties, each Letter of Credit shall be provided in accordance with the provisions of this Annex, and each Letter of Credit shall be maintained for the benefit of the Secured Party.  The Pledgor shall (i) renew or cause the renewal of each outstanding Letter of Credit on a timely basis as provided in the relevant Letter of Credit; and (ii) if the Qualified Institution that issued an outstanding Letter of Credit has indicated its intent not to renew such Letter of Credit (or provide a substitute Letter of Credit) at least thirty (30) Business Days prior to the expiration of the outstanding Letter of Credit; or (iii) if a Qualified Institution issuing a Letter of Credit shall fail to honor the Secured Party's properly documented request to draw on an outstanding Letter of Credit, the Pledgor shall provide for the benefit of the Secured Party: (x) a substitute Letter of Credit, that is issued by a Qualified Institution acceptable to the Secured Party, other than the Qualified Institution failing to honor the outstanding Letter of Credit; or (y) post eligible Collateral, in each case within two (2) Local Business Days after the Pledgor receives notice of such refusal, *provided* that, as a result of Pledgor's failure to perform in accordance with (i), (ii), or (iii) above, the Delivery Amount applicable to the Pledgor equals or exceeds the Pledgor's Minimum Transfer Amount.

(2)    As one method of providing Eligible Credit Support, the Pledgor may increase the amount of an outstanding Letter of Credit or establish one or more additional Letters of Credit.

(3)    (i)    A Letter of Credit shall provide that the Secured Party may draw upon the Letter of Credit in an amount (up to the face amount for which the Letter of Credit has been issued) that is equal to all amounts that are due and owing from the Pledgor, but have not been paid to the Secured Party within the time allowed for such payments under this Agreement (including any related notice or grace period or both).  A Letter of Credit shall provide that a drawing be made on the Letter of Credit upon submission to the Qualified Institution issuing the Letter of Credit of one or more certificates specifying the amounts due and owing to the Secured Party in accordance with the specific requirements of the Letter of Credit.

(ii)     If the Pledgor shall fail to renew, substitute, or sufficiently increase the amount of an outstanding Letter of Credit (as the case may be), or establish one or more additional Letters of Credit, or otherwise provide sufficient Eligible Credit Support and if the Delivery Amount applicable to the Pledgor equals or exceeds the Pledgor's Minimum Transfer Amount as a result of such failure, then the Secured Party may draw on the entire, undrawn portion of any outstanding Letter of Credit upon submission to the Qualified Institution issuing such Letter of Credit of one or more certificates specifying the amounts due and owing to the Secured Party in accordance with the specific requirements of the Letter of Credit. The Pledgor shall remain liable for any amounts due and owing to the Secured Party and remaining unpaid after the application of the amounts so drawn by the Secured Party.

(4)     If a party's Credit Support Provider furnishes a Letter of Credit hereunder, the amount otherwise required under such Letter of Credit may at the option of such Credit Support Provider be reduced by the amount of any Letter of Credit established by such party (but only for such time as such party's Letter of Credit is in effect). In the event a party is required to furnish a Letter of Credit hereunder, the amount otherwise required under such Letter of Credit may at the option of such party be reduced by the amount of any Letter of Credit established by such party's Credit Support Provider (but only for such time as such Credit Support Provider's Letter of Credit is in effect).

(5)     Upon the occurrence of a Letter of Credit Default, the Pledgor agrees to deliver a substitute Letter of Credit or other Eligible Credit Support to the Secured Party in an amount at least equal to that of the Letter of Credit to be replaced on or before the second (2nd) Business Day after written demand by the Secured Party (or the third (3rd) Business Day if only clause (i) under the definition of Letter of Credit Default applies).

(6)     Notwithstanding Paragraph 10, in all cases, the costs and expenses (including but not limited to the reasonable costs, expenses, and external attorney's fees of the Secured Party) of establishing, renewing, substituting, canceling, increasing, and reducing the amount of (as the case may be) one or more Letters of Credit shall be borne by the Pledgor.

(iv)   **Credit Rights and Remedies**

(1)     **Secured Party's Rights and Remedies** – For purposes of paragraph 8(a)(ii), the Secured Party may draw on any outstanding Letter of Credit in an amount equal to any amounts payable by the Pledgor with respect to any Obligations.

(2)     **Pledgor's Rights and Remedies** – For the purposes of Paragraph 8(b)(ii), (i) the Secured Party will be obligated immediately to Transfer any Letter

of Credit to the Pledgor and (ii) the Pledgor may do any one or more of the following (x) to the extent that the Letter of Credit is not Transferred to the Pledgor as required pursuant to (i) above, Set-off any amounts payable by the Pledgor with respect to any Obligations against any such Letter of Credit held by the Secured Party and to the extent its rights to Set-off are not exercised, withhold payment of any remaining amounts payable by the Pledgor with respect to any Obligations, up to the Value of any remaining Posted Collateral and the Value of any Letter of Credit held by the Secured Party, until any such Posted Collateral and such Letter of Credit is Transferred to the Pledgor; and (y) exercise rights and remedies available to the Pledgor under the terms of the Letter of Credit.

(k)     **Other Provisions:**

(i)     **Amendments to Paragraph 12.**  The following definitions in Paragraph 12 of this Annex are amended:

(1)     The definition of "Cash" in Paragraph 12 is deleted in its entirety and the following substituted therefore:

"**Cash**" shall mean United States Dollars, or such other currency which is acceptable to the Pledgee, in each case, in immediately available funds.

(ii)     **Additions to Paragraph 12.**  The following definitions are added to Paragraph 12 of this Annex in alphabetical order:

"**Credit Rating**" shall mean, with respect to a party or entity on any date of determination, the respective rating then assigned to its unsecured and senior long-term debt, or deposit obligations (not supported by third party credit enhancement), or its then current corporate credit rating by Standard & Poor's Rating Group (a division of the McGraw-Hill Companies.), or its successor (S&P), or Moody's Investors Service, Inc., or its successor (Moody's), or the specified rating agency. In the event of a split rating, the lowest of the available ratings shall prevail.

"**Letter of Credit**" shall mean an irrevocable, transferable, letter of credit, issued by a Qualified Institution and utilizing a form acceptable to the Secured Party, with such changes to the terms in that form as the Qualified Institution may require and as may be acceptable to the party in whose favor the Letter of Credit is issued.

"**Letter of Credit Default**" shall mean with respect to an outstanding Letter of Credit, the occurrence of any of the following events (i) the issuer of such Letter of Credit shall fail to maintain a Credit Rating of a least "A-" by S&P or "A3" by Moody's, (ii) the issuer of the Letter of Credit shall fail to comply with or perform its obligations under such Letter of Credit if such failure shall be continuing after the lapse of any applicable grace period; (iii) the issuer of such Letter of Credit

- 9 -

shall disaffirm, disclaim, repudiate or reject, in whole or in part, or challenge the validity of, such Letter of Credit; (iv) such Letter of Credit shall expire or terminate, or shall fail or cease to be in full force and effect at any time during the term of any outstanding Transaction; or (v) any event analogous to an event specified in Section 5(a)(viii) of this Agreement shall occur with respect to the issuer of such Letter of Credit; *provided however*, that no Letter of Credit Default shall occur in any event with respect to a Letter of Credit after the time such Letter of Credit is required to be canceled or returned to the Pledgor in accordance with the terms of this Annex.

(l)  **Demands and Notices** - All demands, specifications, and notices under this Annex will be made pursuant to the Notices Section of this Agreement.

(m)  **Addresses for Transferees** – All transfers under this Annex will be sent to the address provided by the transferee.

*[**signature page follows**]*

- 10 -

Agreed to by the undersigned this 1st day of February, 2010.

**EDF Trading North America, LLC**             **Bosque Power Company, LLC**


Signature: _____         Signature: _____
Name:                                     Name:
Title:                                    Title: Authorized Representative

**Exhibit B**

**Operating and Dispatch Procedures**

1.      Around-the-Clock Monitoring.   Energy Manager will monitor the Facility, related Energy schedules, and natural gas nominations on a 24-hour basis.  Energy Manager will implement any changes in schedules or gas nominations that are necessary and will keep Bosque informed of such changes and procedures.  Energy Manager will also coordinate dispatch and scheduling as directed by Bosque or as otherwise authorized in accordance with the provisions of this Agreement.

2.      Coordination of Natural Gas, Nominations, and Scheduling.

(a)      Energy Manager will coordinate the activities of natural gas suppliers, transporting pipelines, gas storage providers, and other natural gas service providers as necessary to enable timely nominations of natural gas volumes, and to facilitate operational changes in response to Bosque availability, market opportunities, and Third Party customer requirements.

(b)      Energy Manager will contract for transportation, storage, and balancing services as necessary to optimize the gas supply for the Facility.

3.      Complete Data.  Data provided by Bosque to Energy Manager for any submission to ERCOT shall be complete and correct in all material respects to enable a timely submission acceptable to ERCOT.

4.      Scheduled Transactions Beyond Term of Agreement.  This Agreement shall remain in full force and effect with regard to any Commodity Transaction that has a term beyond the general term of the Agreement.  Further, any obligations undertaken during the Term of this Agreement (including fees, charges, or reimbursement applicable under this Agreement) shall become due and payable when assessed, even if assessment occurs after termination of this Agreement.

5.      Recordings.  Each Party consents to the recording of any telephone conversations, email, or electronic messages transmitted between the Parties.   The contents of such telephone recording, or any email or electronic message transmitted between the Parties concerning this Agreement may be utilized to determine the intent of the Parties in any dispute arising under this Agreement, and such telephone or electronic record shall be deemed a written business record of any information, confirmation, consent, bid, authorization, instruction, notice or Commodity Transaction under this Agreement, which may be submitted in evidence in any proceeding or action related to this Agreement.  Each Party waives objection to the admission in arbitration or court of such recording or electronic message based on the "Best Evidence Rule" or other legal principles.   Such telephone recording or electronic message shall be the controlling evidence of the Parties' agreement with respect to any particular information, confirmation, consent, notice, or Commodity Transaction in the event a written confirmation of that information, confirmation, consent, notice, or Commodity Transaction is not fully executed or accepted by both Parties.  Each Party waives any further notice of such monitoring or recording and agrees to notify its officers and employees and obtain their consent to any such monitoring or recording.

6.      <u>Operating Procedures</u>.  For the purposes described herein, Bosque shall cause the operator of the Facility to perform its duties in accordance with the Operating Procedures described below.

7.      <u>Forced Outage, Derates and Scheduled Maintenance Reporting</u>.  The Bosque Representative shall provide Energy Manager via email to realtime@edftrading.com its scheduled maintenance activities for the next thirty (30) days.  Such reports shall be provided on or about the 1st and 3rd Monday of each month and will include:

i.      The date indicating when work is to begin;

ii.     A description of the scope of work to be performed;

iii.    The anticipated end date of the scheduled maintenance; and

iv.     The projected daily availability of Bosque.

In the event that Bosque incurs a forced outage, Bosque will report to Energy Manager immediately via telephone and inform Energy Manager of the event.  Such report shall include:

v.      A description of the outage;

vi.     The total curtailment in expected output of the Facility as a result of the outage/derate;

vii.    The expected duration of the outage/derate (when available); and

viii.   The impact, if any, on the remaining portion of the Facility that remains available.

8.      <u>Facility Information</u>.

i.      Bosque has separately provided heat rate and related performance data (the "<u>Technical Capabilities</u>") to Energy Manager which, at its option, Bosque may revise by written notice to Energy Manager.

ii.     For avoidance of doubt, the technical or operating capabilities of the Facility set forth in the Technical Capabilities shall not be construed as a representation, warranty, or guarantee by Energy Manager of any particular heat rate or other technical or operational capabilities, and the natural gas supply cost shall be calculated based on the actual heat rate or other operational or technical capabilities of the Facility under actual dispatch conditions.

9.      <u>Facility Operation</u>.  As between the Parties hereto, Bosque shall be solely responsible for operation of the Facility.  Bosque acknowledges that it is solely is responsible for the operations and maintenance of the Facility and the utilization of natural gas to produce electricity.  Energy Manager shall cooperate with Bosque to optimize the performance of the Facility during the Term and shall coordinate the performance of Energy Manager's obligations under this Agreement with Bosque, consistent with the operating procedures set forth herein.

**Exhibit C**

**Form of Report**

**[ATTACHED]**

Exhibit C-1

**Bosque Power Company, LLC**
**January-10**



Accrue through date 1/26/2010

| Date | Generation (MWh) | Term Energy Revenues ($) | Term Buyback | DA Energy Revenues | Ancillary Service Revenues ($) | Gas Sell Back | Out of Merit Resource Payment/Local Balancing | Total Revenues ($) | Natural Gas Commodity Expenses ($) | Natural Gas Transport Demand Charges | VOM Expenses ($) | Natural Gas Transport Credit Costs ($) | APX Setup & Scheduling Fees | Ercot Uninstructed Resource Charges | Ercot Fees ($) | Total Expenses ($) | Generation Margin ($) | Energy Manager Monthly Margin Fee ($) | Generator Owner Generation Margin | Total MTM Credit Exposure | Natural Gas Credit Exposure |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01/01/10 | 6,749 | 217,003 | - | 28,327 | 2,474 | 1,738 | - | 249,542 | 218,738 | 10,575 | 15,185 | - | 405 | 1,427 | 1,141 | 247,471 | 2,070 | 83 | 1,988 | 218,738 | 218,738 |
| 01/02/10 | 6,496 | 244,375 | - | (11,580) | 2,380 | 1,738 | - | 236,912 | 203,046 | 10,575 | 14,616 | - | 390 | 279 | 1,098 | 230,003 | 6,908 | 276 | 6,633 | 203,046 | 203,046 |
| 01/03/10 | 6,585 | 244,375 | - | (11,763) | 4,938 | 16,663 | - | 254,213 | 217,129 | 10,575 | 14,817 | - | 395 | 119 | 1,113 | 244,149 | 10,064 | 403 | 9,661 | 217,129 | 217,129 |
| 01/04/10 | 6,359 | 244,375 | - | (12,604) | 2,274 | 23,938 | - | 257,982 | 245,589 | 10,575 | 14,309 | - | 382 | 63 | 1,075 | 271,993 | (14,011) | (560) | (13,451) | 245,589 | 245,589 |
| 01/05/10 | 6,805 | 244,375 | - | (4,461) | 2,608 | 19,788 | - | 262,309 | 239,172 | 10,575 | 15,310 | - | 408 | - | 1,150 | 266,616 | (4,307) | (172) | (4,135) | 239,172 | 239,172 |
| 01/06/10 | 6,920 | 244,375 | - | 152,173 | 2,324 | 16,113 | - | 414,984 | 188,527 | 10,575 | 15,570 | - | 415 | - | 1,169 | 216,256 | 198,728 | 7,949 | 190,779 | 188,527 | 188,527 |
| 01/07/10 | 4,894 | 172,253 | - | 525 | 1,926 | 3,013 | - | 177,716 | 146,388 | 10,575 | 11,011 | - | 294 | 198 | 827 | 169,292 | 8,424 | 337 | 8,087 | 146,388 | 146,388 |
| 01/08/10 | 5,441 | 172,253 | - | 60,491 | 3,388 | 3,013 | 1,644 | 240,788 | 146,388 | 10,575 | 12,242 | - | 326 | - | 920 | 170,451 | 70,337 | 2,813 | 67,523 | 146,388 | 146,388 |
| 01/09/10 | 5,219 | 199,625 | - | 54,891 | 987 | 3,013 | - | 258,515 | 146,388 | 10,575 | 11,742 | - | 313 | - | 882 | 169,901 | 88,614 | 3,545 | 85,069 | 146,388 | 146,388 |
| 01/10/10 | 6,867 | 244,375 | - | 3,752 | 2,195 | (4,263) | - | 246,059 | 184,687 | 10,575 | 15,450 | - | 412 | 46 | 1,160 | 212,330 | 33,729 | 1,349 | 32,379 | 184,687 | 184,687 |
| 01/11/10 | 7,451 | 244,375 | - | 85,071 | 1,549 | (488) | - | 330,506 | 244,212 | 10,575 | 16,764 | - | 447 | 363 | 1,259 | 273,621 | 56,885 | 2,275 | 54,610 | 244,212 | 244,212 |
| 01/12/10 | 8,168 | 244,375 | - | 38,780 | 1,780 | 3,813 | - | 288,748 | 248,428 | 10,575 | 18,377 | - | 490 | - | 1,380 | 279,251 | 9,497 | 380 | 9,117 | 248,428 | 248,428 |
| 01/13/10 | 7,528 | 244,375 | - | 11,534 | 213 | 1,338 | - | 257,459 | 212,666 | 10,575 | 16,938 | - | 452 | - | 1,272 | 241,903 | 15,556 | 622 | 14,933 | 212,666 | 212,666 |
| 01/14/10 | 6,947 | 217,003 | - | (1,193) | 5,145 | 7,163 | - | 228,117 | 208,980 | 10,575 | 15,631 | - | 417 | - | 1,174 | 236,777 | (8,660) | (346) | (8,313) | 208,980 | 208,980 |
| 01/15/10 | 5,913 | 217,003 | - | (20,992) | 3,708 | 7,163 | - | 206,881 | 208,980 | 10,575 | 13,303 | - | 355 | 30 | 999 | 234,242 | (27,360) | (1,094) | (26,266) | 208,980 | 208,980 |
| 01/16/10 | 6,287 | 244,375 | - | (20,611) | 3,884 | 7,163 | 123 | 234,933 | 208,980 | 10,575 | 14,146 | - | 377 | 56 | 1,063 | 235,197 | (264) | (11) | (253) | 208,980 | 208,980 |
| 01/17/10 | 6,603 | 244,375 | - | (765) | 4,758 | (2,263) | - | 246,105 | 159,961 | 10,575 | 14,856 | - | 396 | 37 | 1,116 | 186,941 | 59,164 | 2,367 | 56,798 | 159,961 | 159,961 |
| 01/18/10 | 6,050 | 221,875 | - | 2,687 | 3,698 | (3,713) | - | 224,547 | 158,874 | 10,575 | 13,613 | - | 363 | 43 | 1,023 | 184,490 | 40,057 | 1,602 | 38,454 | 158,874 | 158,874 |
| 01/19/10 | 6,066 | 221,875 | - | 4,367 | 2,548 | (6,488) | - | 222,302 | 173,645 | 10,575 | 13,648 | - | 364 | - | 1,025 | 199,257 | 23,045 | 922 | 22,123 | 173,645 | 173,645 |
| 01/20/10 | 5,752 | 233,625 | - | (14,452) | 3,110 | (8,813) | - | 213,470 | 164,885 | 10,575 | 12,942 | - | 345 | 2 | 972 | 189,722 | 23,748 | 950 | 22,798 | 164,885 | 164,885 |
| 01/21/10 | 5,161 | 202,309 | - | (16,586) | 5,464 | 9,213 | - | 200,399 | 169,186 | 10,575 | 11,613 | - | 310 | - | 872 | 192,556 | 7,843 | 314 | 7,529 | 169,186 | 169,186 |
| 01/22/10 | 5,820 | 202,309 | - | 10,855 | 5,385 | 9,213 | - | 227,762 | 174,737 | 10,575 | 13,095 | - | 349 | - | 984 | 199,740 | 28,022 | 1,121 | 26,901 | 174,737 | 174,737 |
| 01/23/10 | 5,563 | 221,681 | - | (50,703) | 6,296 | 9,213 | - | 186,487 | 172,752 | 10,575 | 12,517 | - | 334 | 59 | 940 | 197,177 | (10,691) | (428) | (10,263) | 172,752 | 172,752 |
| 01/24/10 | 5,985 | 220,187 | - | 3,874 | 4,925 | 17,363 | - | 246,348 | 192,868 | 10,575 | 13,465 | - | 359 | 17 | 1,011 | 218,296 | 28,052 | 1,122 | 26,930 | 192,868 | 192,868 |
| 01/25/10 | 6,127 | 215,125 | - | 20,025 | 5,552 | 13,013 | - | 253,715 | 190,483 | 10,575 | 13,787 | - | 368 | 37 | 1,036 | 216,285 | 37,430 | 1,497 | 35,932 | 190,483 | 190,483 |
| 01/26/10 | 5,366 | 216,237 | - | (6,926) | 5,393 | 13,763 | - | 228,467 | 201,775 | 10,575 | 12,073 | - | 322 | - | 907 | 225,651 | 2,816 | 113 | 2,703 | 201,775 | 201,775 |
| 01/27/10 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 01/28/10 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 01/29/10 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 01/30/10 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 01/31/10 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **SUBTOTAL** | **163,121** | **5,838,482** | **-** | **304,716** | **88,900** | **161,400** | **1,768** | **6,395,265** | **5,027,466** | **274,950** | **367,022** | **-** | **9,787** | **2,777** | **27,567** | **5,709,569** | **685,696** | **27,428** | **658,269** | **5,027,466** | **5,027,466** |

**Exhibit D**

**Form of Letter of Credit**
**Irrevocable Standby Letter of Credit**

[Insert Issuing Bank Letterhead]

[_____], 2010
Our L/C No..: [_____]

To:                                              Applicant:
EDF Trading North America, LLC                   Bosque Power Company, LLC
4700 W. Sam Houston Parkway N., Suite 250        c/o PurEnergy Management Services, LLC
Houston, TX  77041                               1732 West Genesee Street
Attn: Vice President – ERCOT                      Syracuse, NY  13204
                                                 Attn: Don Scholl

Transaction reference number:  [_____]

Date of issue:                    [_____], 2010

Beneficiary:                      EDF Trading North America, LLC
                                  4700 W. Sam Houston Parkway N., Suite 250
                                  Houston, TX  77041
                                  Attn: Vice President - ERCOT

Applicant:                        Bosque Power Company, LLC
                                  C/o PurEnergy Management Services, LLC
                                  1732 West Genesee Street
                                  Syracuse, NY  13204
                                  Attn: Don Scholl

Date and place of expiry:         [_____], 20[__], except as otherwise provided below; at our
                                  counter

Documentary credit amount:        $[_____]

Available with:                   JPMorgan Chase Bank, N.A.; by payment

Additional details:

At the request, on the instructions and for the account of BOSQUE POWER COMPANY, LLC (the "**_Company_**"), we hereby establish this Irrevocable Standby Letter of Credit in your favor in connection with the Energy Management Agreement between you and the Company (the "**_EMA_**").

We hereby irrevocably authorize you to draw on us in accordance with the terms and conditions hereinafter set forth in the stated amount equal to _____ ($_____) (the "**_Stated_**

***Amount***"), effective immediately and expiring on [•] (the "***Expiration Date***"), except as otherwise provided below.

Subject to the foregoing and the further provisions of this Letter of Credit, payment under this Letter of Credit shall be made to you upon your presentation to us at the counters of JPMorgan Chase Bank, N.A., c/o JPMorgan Treasury Services, Attn: Standby Letter of Credit Dept., 10420 Highland Manor Drive, 4th Floor, Tampa, Florida 33610, of: (i) your sight draft in the form of Annex A attached hereto; and (ii) your drawing certificate in the form of Annex B attached hereto.  Such instruments, which form an integral part of this Letter of Credit, shall have all blanks appropriately filled in and shall be signed by one of your officers (each an "***Authorized Officer***"), and shall be on the form of a letter or telecopy on your letterhead.  Presentation of documents may also be made by fax transmission to fax no. 813-432-5162, with telephone notification to 813-432-6331 or to 1-800-634-1969, Option 1.  Any telecopy pursuant to which a drawing is made hereunder shall be promptly confirmed to us in writing; *provided*, that the giving of such written confirmation shall not be a condition to drawing under this Letter of Credit or honor thereof.  Demand for payment may be made by you under this Letter of Credit prior to the Expiration Date hereof at any time prior to 5:00 p.m., New York time, at our address set forth above on any Business Day.  As used herein the term "***Business Day***" means (a) a day on which we (at our above address) are open for the purpose of conducting a commercial banking business and (b) a day on which banking institutions in New York, New York, generally are open for the purpose of conducting a commercial banking business.  If demand for payment is made by you hereunder on a Business Day on or prior to 1:00 p.m., New York time, and your drawing certificate conforms to the terms and conditions hereof, payment shall be made to you by the second immediately succeeding Business Day.

Multiple drawings under this Letter of Credit are permitted.

Demands for payment hereunder honored by us shall not exceed the Stated Amount in effect at the time, and each such drawing shall reduce pro tanto the Stated Amount of this Letter of Credit.

Upon the earliest of (i) the honoring by us of the final drawing available to be made hereunder, (ii) the Expiration Date hereof, and (iii) our receipt of notice that the EMA and all Implementation Agreements (as defined in the EMA) have terminated, this Letter of Credit shall automatically terminate and shall be delivered by you to us or the Company for cancellation.

This Letter of Credit sets forth in full the terms of our undertaking, and this undertaking shall not in any way be modified, amended, amplified or limited by reference to any document, instrument or agreement referred to herein or in which this Letter of Credit is referred to or to which this Letter of Credit relates, and any such reference shall not be deemed to incorporate herein by reference any document, instrument or agreement.

This Letter of Credit is transferable in whole, but not in part, in connection with an assignment of your entire right, title and interest in and to, and all of your obligations under, the EMA upon delivery to us of this Letter of Credit accompanied by a properly completed Notice of Transfer in the form of Annex C attached hereto.  This Letter of Credit will not be transferred to any entity or person who is subject to sanctions issued by the U.S. Department of Commerce or to whom such transfer is prohibited by the Foreign Assets Control Regulations or any other United States regulations or laws.

Upon the payment to you or your account of the amount specified in the drawing certificate, we shall be fully discharged of our obligation under this Letter of Credit with respect to such drawing, and we shall

not thereafter be obligated to make any further payments under this Letter of Credit in respect of such drawing to you or to any other person.

All charges related to this Letter of Credit are for the Company's account.

This Letter of Credit shall be governed by, and construed in accordance with International Standby Practices, Publication 590 of the International Chamber of Commerce ("**_ISP98_**"), except as herein provided.  As to matters not covered by ISP98 and to the extent not inconsistent with ISP98 or made inapplicable by this Letter of Credit, this Letter of Credit shall be governed by and construed in accordance with the laws of the State of New York, including, without limitation, the Uniform Commercial Code as in effect in the State of New York.

Communications with respect to this Letter of Credit shall be in writing and be addressed to us at JPMorgan Chase Bank, N.A., c/o JPMorgan Treasury Services, Attn: Standby Letter of Credit Dept., 10420 Highland Manor Drive, 4th Floor, Tampa, Florida 33610, specifically referring to the number of this Letter of Credit.

Very truly yours,


JPMORGAN CHASE BANK, N.A.


By:_____

  Name:

  Title:

ANNEX A

SIGHT DRAFT

LETTER OF CREDIT NO.:  [_____]

[_____], 20[__]

JPMorgan Chase Bank, N.A.
1040 Highland Manor Dr., 4th Floor
Tampa, FL  33610
Attn: Standby Letter of Credit Department

For value received, pay on demand to EDF Trading North America, LLC [_____] DOLLARS ($_____) drawn under JPMorgan Chase Bank, N.A. Irrevocable Standby Letter Of Credit No. [_____].

EDF TRADING NORTH AMERICA, LLC


By:_____
    Name:
    Title:

ANNEX B

CERTIFICATE

LETTER OF CREDIT NO. [_____]

JPMorgan Chase Bank, N.A.
1040 Highland Manor Dr., 4th Floor
Tampa, FL  33610
Attn: Standby Letter of Credit Department

Re:  Irrevocable Standby Letter Of Credit No. [_____](the "***Letter of Credit***") issued by JPMorgan Chase Bank, N.A. ("***Issuing Bank***") in favor of EDF Trading North America, LLC ("***Beneficiary***") for the account of Bosque Power Company, LLC ("***Account Party***")

Ladies and Gentlemen:

The undersigned hereby certifies to Issuing Bank that:

1.  The undersigned is duly authorized to sign this certificate on behalf of Beneficiary.

2.  Beneficiary and Account Party are parties to an Energy Management Agreement (the "***EMA***").

3.  One of the following circumstances has occurred:

    (A)  An Event of Default has occurred under the EMA and $[_____] is due and owing to Beneficiary under the EMA; or

    (B)  Fewer than 10 days remain prior to expiration of the Letter of Credit and Account Party has failed to provide replacement security in accordance with the EMA.

4.  Beneficiary is entitled to submit its sight draft for payment under the Letter of Credit of the sum stated in such sight draft.

The undersigned is signing this certificate as of [_____], 20[__].

EDF TRADING NORTH AMERICA, LLC


By:_____
   Name:
   Title:

ANNEX C

NOTICE OF TRANSFER

LETTER OF CREDIT NO. [_____]

[_____], 20[__]

JPMorgan Chase Bank, N.A.
1040 Highland Manor Dr., 4th Floor
Tampa, FL  33610
Attn: Standby Letter of Credit Department

Re:  Irrevocable Standby Letter of Credit No. [_____](the "***Letter of Credit***") issued by JPMorgan Chase Bank, N.A. in favor of EDF Trading North America, LLC ("***Transferor***") for the account of Bosque Power Company, LLC

Ladies and Gentlemen:

Transferor has transferred the Letter of Credit to [*name and address*] ("***Transferee***").  Transferor confirms that it no longer has any rights under or interest in the Letter of Credit and that you shall have no further responsibility to make payment under the Letter of Credit to Transferor.

Transferor hereby surrenders the Letter of Credit to you and requests that you note the transfer of the Letter of Credit and deliver the Letter of Credit, amended or endorsed to reflect said transfer, to Transferee.

EDF TRADING NORTH AMERICA, LLC


By:_____
   Name:
   Title:

**Exhibit E**

**Variable O&M Costs**

**VARIABLE O&M COSTS**

| Variable O&M Costs | | |
|---|---|---|
| 2010 Dollars | | |
| Unit | $/MWhr | $ per CT Start |
| 1x1 | 1.97 | 12,608 |
| 2x1 | 2.42 | 12,608 |
| | | |
| Expected Inflation | | 2.50% |